**Docket No. 22-35271**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

———— • ————

PROJECT VERITAS and PROJECT VERITAS ACTION FUND,

*Plaintiffs-Appellants,*

v.

MICHAEL SCHMIDT, in his official capacity as Multnomah County District Attorney and
ELLEN ROSENBLUM, in her official capacity as Oregon Attorney General,

*Defendants-Appellees.*

_____

*Appeal from a Decision of the United States District Court for the District of Oregon,
No. 3:20-cv-01435-MO · Honorable Michael W. Mosman*

## APPELLANTS' OPENING BRIEF

BENJAMIN BARR
BARR & KLEIN PLLC
444 N. Michigan Avenue, Ste. 1200
Chicago, IL 60611
(202) 595-4671 Telephone
ben@barrklein.com

STEPHEN KLEIN
BARR & KLEIN PLLC
1629 K Street NW, Ste. 300
Washington, DC 20006
(202) 804-6676 Telephone
steve@barrklein.com

*Attorneys for Appellants Project Veritas and Project Veritas Action Fund*

 COUNSEL PRESS · (213) 680-2300          PRINTED ON RECYCLED PAPER 

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1, incorporated Plaintiffs-Appellants Project Veritas and Project Veritas Action Fund hereby certify that they have no parent corporations and that no publicly held corporation owns more than ten percent of any of the Plaintiff-Appellant organizations.

Dated: July 11, 2022

/s/ Stephen Klein
Stephen R. Klein
BARR & KLEIN PLLC
1629 K Street NW, Ste. 300
Washington, DC 20006
(202) 804-6676 Telephone
steve@barrklein.com

## Table of Contents

Table of Authorities ................................................................................. iv

Jurisdictional Statement ...........................................................................1

Issue Presented for Appeal.......................................................................1

Statutory Provisions .................................................................................1

Introduction ..............................................................................................2

Statement of the Case...............................................................................3

    I.    The History of Censoring Secret and Unannounced Recording
        in Oregon Revised Statutes § 165.540. ...............................................3

    II.   The Censorship of Project Veritas and Project Veritas Action
        Fund by Oregon Revised Statutes § 165.540. .....................................8

    III.  Proceedings Below. ...........................................................................10

Summary of the Argument.......................................................................11

Reviewability and Standard of Review ...................................................16

Argument.................................................................................................17

    I.    The Court Below Failed to Apply Strict Scrutiny to Oregon's
        Content-Based Recording Law .........................................................17

    II.   Secret or Unannounced Audio Recording by a Party to a
        Conversation ("One-Party Consent") is Protected by the First
        Amendment and Implicates Only Limited Privacy Interests.............22

        A.   Audio Recording is a Form of Speech Protected by the
             First Amendment, Including Secret and Unannounced
             Audio Recording.....................................................................23

        B.   Oregon's Ill-Defined Privacy Interests do not Support a
             Blanket Ban of One-Party Consent Recording........................28

III.  Oregon Revised Statutes § 165.540 is Unconstitutional on Its Face and As Applied to Project Veritas and Project Veritas Action Fund. ........................................................................36

  A.  Project Veritas and Project Veritas Action Fund's Recordings are High-Value, not Government-Issued, Speech. ........................................................................36

  B.  The Law Fails Every First Amendment Analysis....................38

    1.  The Law Fails Strict and Intermediate Scrutiny.............38

    2.  The Law Suffers From Underinclusiveness. .................45

    3.  The Law Suffers from Substantial Overbreadth............48

Conclusion ...........................................................................................54

Form 17. Statement of Related Cases ....................................................56

Form 8. Certificate of Compliance for Briefs.........................................57

Addendum

Certificate of Service

## Table of Authorities

**Cases**

*ACLU of Illinois v. Alvarez*,
    679 F.3d 583 (7th Cir. 2012) .................................................. 23, 27, 45

*Am. Soc'y of Journalists & Authors, Inc. v. Bonta*,
    15 F.4th 954 (9th Cir. 2021) ........................................................ 23, 24

*Anderson v. City of Hermosa Beach*,
    621 F.3d 1051 (9th Cir. 2010) ............................................................24

*Animal Legal Defense Fund v. Wasden*,
    878 F.3d 1184 (9th Cir. 2018) .................................................. *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................17

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001) .............................................................. 11, 22, 26

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................17

*Boquist v. Courtney*,
    32 F.4th 764 (9th Cir. 2022) ..............................................................17

*Buckley v. Valeo*,
    424 U.S. 1 (1976) .......................................................................... 31, 53

*Cincinnati v. Discovery Network, Inc.*,
    507 U.S. 410 (1993) ............................................................................22

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994) ...................................................................... 45, 46

*City of Lakewood v. Plain Dealer Publ'g Co.*,
    486 U.S. 750 (1988) ............................................................................50

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
    657 F.3d 936 (9th Cir. 2011) ...................................................... 48, 49

*Consolidated Edison Co. of New York, Inc. v. Public Service Comm'n of New York*,
447 U.S. 530 (1980) ............................................................................17

*Curry v. Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017)..............................................................17

*Delaurent v. State*,
--- P.3d ---, 320 Or. App. 191 (Or. Ct. App. 2022)................................. 2, 18, 25

*Desert Outdoor Advertising v. City of Moreno Valley*,
103 F.3d 814 (9th Cir.1996).................................................................21

*Elkins v. Washington Cty.*,
No. CIV 06-448-ST, 2007 WL 1342155 (D. Or. May 3, 2007) .............. 7, 50, 51

*Eu v. San Francisco County Democratic Central Cmte.*,
489 U.S. 214 (1989) ............................................................................48

*F.C.C. v. League of Women Voters of California*,
468 U.S. 364 (1984) ............................................................................36

*Fed. Election Comm'n v. Mass. Citizens For Life, Inc.*,
479 U.S. 238 (1986) ............................................................................44

*First Nat'l Bank v. Bellotti*,
435 U.S. 765 (1978) ...........................................................................3, 46

*Florida Star v. B.J.F.*,
491 U.S. 542 (1989) ............................................................................45

*Fordyce v. City of Seattle*,
55 F.3d 436 (9th Cir. 1995)..................................................................24

*Forsyth Cnty. v. Nationalist Movement*,
505 U.S. 123 (1992) ............................................................................49

*Foti v. City of Menlo Park*,
146 F.3d 629 (9th Cir. 1998)................................................................ 20, 27

*Garrison v. Louisiana*,
379 U.S. 64 (1964) ................................................................. 37

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ............................................................... 49

*Hoffa v. U.S.*,
385 U.S. 293 (1966) ............................................................... 33

*Johanns v. Livestock Marketing Assn.*,
544 U.S. 550 (2005) ............................................................... 37

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) ............................................................... 24

*Katz v. U.S.*,
389 U.S. 347 (1967) ................................................... 28, 32, 52

*McCullen v. Coakley*,
573 U.S. 464 (2014) ....................................................... 39, 42

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ............................................................... 18

*Meyer v. Grant*,
486 U.S. 414 (1988) ....................................................... 27, 43

*Mills v. Alabama*,
384 U.S. 214 (1966) ............................................................... 37

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
460 U.S. 575 (1983) ............................................................... 21

*NAACP v. Button*,
371 U.S. 415 (1963) ....................................................... 51, 53

*Nat'l Advertising Co. v. City of Orange*,
861 F.2d 246 (9th Cir. 1988 .......................................... 20, 21

*Nat'l Treasury Emps. Union v. U.S. Dep't of Treasury*,
25 F.3d 237 (5th Cir. 1994) ................................................... 47

*Neuman v. Liles*,
    369 P.3d 1117 (Or. 2016) ....................................................................43

*New Mexico State Inv. Council v. Ernst & Young, LLP*,
    641 F.3d 1089 (9th Cir. 2011 ....................................................... 16, 17

*New York Times Co. v. U.S.*,
    403 U.S. 713 (1971) ...........................................................................31

*Pelican Bay Forest Products, Inc. v. Western Timber Products, Inc.*,
    443 P.3d 651 (Or. App. 2019) ...........................................................43

*People v. Clark*,
    6 N.E.3d 154 (Ill. 2011)......................................................................52

*Project Veritas Action Fund v. Rollins*,
    982 F.3d 813 (1st Cir. 2020) ....................................................... 27, 45

*R.A.V. v. City of St. Paul, Minn.*,
    505 U.S. 377 (1992) ................................................................. 2, 18, 45

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ................................................................ 18, 22, 38

*Reno v. ACLU*,
    521 U.S. 844 (1997) ...........................................................................49

*Sanders v. Am. Broadcasting Companies, Inc.*,
    978 P.2d 67 (Cal. 1999)............................................................... 42, 43

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
    467 U.S. 947 (1984) ...........................................................................48

*Sheppard v. Maxwell*,
    384 U.S. 333 (1966) ...........................................................................37

*Smith v. Daily Mail Pub. Co.*,
    443 U.S. 97 (1979) .........................................................................3, 28

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ...........................................................................31

*State v. Bichsel*,
    790 P.2d 1142 (Or. Ct. App. 1990) ............................................................ 6, 39, 50

*State v. Evensen*,
    447 P.3d 23 (Or. Ct. App. 2019) ...........................................................7

*State v. Evensen*,
    455 P.3d 41 (Or. 2019) ...........................................................7

*State v. Fowler*,
    111 P.3d 1264 (Wash. Ct. App. 2005) ...........................................................5

*State v. Goetz*,
    191 P.3d 489 (Mont. 2008) ...........................................................35

*State v. Knobel*,
    777 P.2d 985 (Or. Ct. App. 1989) ...........................................................6, 39

*State v. Lissy*,
    747 P.2d 345 (Or. 1987) ...........................................................5

*State v. Neff*,
    265 P.3d 62 (Or. Ct. App. 2011) ...........................................................35

*Stromberg v. California*,
    283 U.S. 359 (1931) ...........................................................37

*Sullivan v. Gray*,
    324 N.W.2d 58 (Mich. Ct. App. 1982) ...........................................................28

*Turner Broadcasting System, Inc. v. F.C.C.*,
    512 U.S. 622 (1994) ...........................................................38

*U.S. v. Alvarez*,
    567 U.S. 709 (2012) ........................................................... 39, 40

*U.S. v. Dorfman*,
    690 F.2d 1230 (7th Cir. 1982) ...........................................................31

*U.S. v. LKAV*,
    712 F.3d 436 (9th Cir. 2013) ...........................................................51

*U.S. v. Luis,*
   537 F. App'x 752 (9th Cir. 2013)........................................................34

*U.S. v. Orm Hieng,*
   679 F.3d 1131 (9th Cir. 2012)...........................................................47

*U.S. v. Playboy Entm't Grp., Inc.,*
   529 U.S. 803 (2000) .................................................................. 43, 44

*U.S. v. Stevens,*
   559 U.S. 460 (2010) ........................................................................48

*U.S. v. White,*
   401 U.S. 745 (1971) .............................................................. 32, 33, 34

*Virginia v. Hicks,*
   539 U.S. 113 (2003) ........................................................................54

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ........................................................................39

**Statutes**

18 PA. CONST. STAT. ANN. § 5703 .........................................................53

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

720 ILL. COMP. STAT. 5/14-2................................................................53

CAL. PENAL CODE § 632 ......................................................................53

FLA. STAT. § 934.03 ............................................................................53

MD. CODE ANN., CTS. & JUD. PROC. § 10-402......................................53

MONT. CODE ANN. § 45-8-213 .............................................................53

N.H. REV. STAT. § 570-A:2..................................................................53

O.R.S. § 133.721 ............................................................................6, 39

O.R.S. § 163.700 ...................................................................................42

O.R.S. § 163.701 ...................................................................................42

O.R.S. § 163.732 ...................................................................................43

O.R.S. § 165.535 (1961) ..........................................................................4

O.R.S. § 165.535 (2022) ....................................................................4, 41

O.R.S. § 165.540 (1955) ....................................................................4, 22

O.R.S. § 165.540 (1961) ................................................................. 4, 5, 29

O.R.S. § 165.540 (1983) ...........................................................................5

O.R.S. § 165.540 (1989) ...........................................................................6

O.R.S. § 165.540 (2022) ................................................................. passim

O.R.S. § 165.543 (1983) ...........................................................................6

O.R.S. § 165.543 (2022) ........................................................... 10, 26, 39

WASH. REV. CODE § 9.73.030 ...............................................................53

## Other Authorities

ALAN F. WESTIN, PRIVACY AND FREEDOM (1967) .....................................29

Alan F. Westin, *The Wire-Tapping Problem: An Analysis and A Legislative Proposal*, 52 COLUM. L. REV. 165 (1952) ...........................................29

BLACK'S LAW DICTIONARY (11th ed. 2019) ...........................................29

*Booknotes - Pillar of Fire: America in the King Years 1963-65*, C-SPAN, Apr. 12, 1998 ...............................................................................25

Comm. of Mass. Interim Report of the Special Commission to Investigate Electronic Eavesdropping and Wiretapping, No. 1132 (June 1968)...................30

JACK GOLDSMITH, IN HOFFA'S SHADOW (2019) .....................................26

MERRIAM-WEBSTER, https://www.merriam-webster.com/ .................... 6, 28, 38, 50

Oregon House Cmte. on Judiciary, SB 654, May 24, 2001 ................................ 2, 25

Oregon Senate Cmte. on Judiciary, HB 2704, June 2, 2015 .................................. 19

Oregon Senate Cmte. on Judiciary, SB 165, Feb. 17, 1955 .................................. 29

*Oregon's public records advocate resigns 2 months after appointed*, KMTR,
   Sept. 30, 2020 .......................................................................................... 9

Rauvin Johl, *Reassessing Wiretap and Eavesdropping Statutes: Making
   One-Party Consent the Default*, 12 HARV. L & POL'Y REV. 177 (2018) ............. 33

**Rules**

Fed. R. App. P. 4 ........................................................................................... 1

Fed. R. Civ. P. 12(b)(6) ................................................................................ 16

Fed. R. Evid. 803 ......................................................................................... 47

**Constitutional Provisions**

U.S. CONST. amend. I ....................................................................... *passim*

U.S. CONST. amend. IV ..................................................................... *passim*

U.S. CONST. amend. XIV ................................................................... 23

## Jurisdictional Statement

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Project Veritas and Project Veritas Action Fund ("PV" and "PVA" or, collectively, "Veritas") challenged Oregon Revised Statutes ("O.R.S.") section 165.540 under the First and Fourteenth Amendments, raising a federal question. ER-99–103. The district court entered an opinion and order granting District Attorney Schmidt and Attorney General Rosenblum's (collectively, "the State") motion to dismiss counts I and II of the complaint on August 10, 2021 and entered judgment on March 7, 2022. ER-3, 4–25. Veritas filed a timely notice of appeal on April 1, 2022. ER-112; Fed. R. App. P. 4(a)(1)(A). The appeal arises from a judgment that disposed of all the parties' claims. ER-3. Thus, this Court has jurisdiction under 28 U.S.C. § 1291.

## Issue Presented for Appeal

Whether the district court erred in ruling that Project Veritas and Project Veritas Action Fund failed to state a claim that Oregon Revised Statutes section 165.540 is unconstitutional on its face and as applied.

## Statutory Provisions

Pursuant to Circuit Rule 28-2.7, copies of pertinent statutes appear in the addendum to this brief.

**Introduction**

In a word, Oregon Revised Statutes section 165.540 is lopsided. Through a series of amendments spanning decades, Oregon created a confusing hodgepodge of restrictions and government-granted exceptions as to how one may obtain—that is, make audio recordings of—conversations. Through this skewed lens, the law permits (indeed, prefers) the recording of certain conversations while making others much more difficult or impossible to obtain. But Oregon "has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 392 (1992). Because section 165.540 favors the unannounced recording of legislatively sanctioned content while hindering other recording, it presents constitutional problems.

The result of Oregon's piecemeal law is to cut off surreptitious or unannounced recording of certain subjects and events, censoring an extremely effective form of newsgathering. This case focuses on the constitutional protection afforded to this unique mode of communication. As recognized in other contexts of Oregon law, secret or unannounced recording "ensure[s] that the most accurate evidence is preserved . . . ." *Delaurent v. State*, --- P.3d ---, 320 Or. App. 191, 198 (Or. Ct. App. 2022) (quoting Exhibit I, Oregon House Cmte. on Judiciary, SB 654, May 24, 2001 (testimony of Peter D. Shepherd, Deputy Attorney General)). To

prohibit one of the most effective ways to gather and publish the news is to limit the "stock of information from which members of the public may draw" and is wholly foreign to the First Amendment. *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 783 (1978); *see also Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 102 (1979) ("state action to punish the publication of truthful information seldom can satisfy constitutional standards"). These first principles are absent in the opinion below. *Cf. Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184 (9th Cir. 2018).

The court below erred in its consideration of the foundational First Amendment principles governing this case. It treated the secret and unannounced audio recording performed by journalists as incidental, replaceable speech instead of core, high-value speech. It ignored the law's content-based permissions and restrictions. It went so far as to conclude that the act of *obtaining* governmental speech is government speech itself, subject to little First Amendment oversight. As a result, the court erred in its analysis of the law. Veritas urges this Court to correct these errors and reverse the court below.

## Statement of the Case

### I.   The History of Censoring Secret and Unannounced Recording in Oregon Revised Statutes § 165.540.

Oregon Revised Statutes section 165.540 was initially enacted as an anti-wiretapping law in 1955, regulating only how one may obtain telecommunications or radio communications. The law has always permitted participants in phone calls

to record (or "obtain") them without notice to another party. *Cf.* O.R.S. § 165.540(1)(a) (1955) *with* O.R.S. § 165.540(1)(a) (2022) (current law included in Addendum). The law was amended in 1959 and 1961, adding the provision that expanded the reach of the law to regulate obtaining a "conversation," the provision that is central to this appeal. *See* O.R.S. §§ 165.535(1) (1961), 165.540(1)(c) (1961). Specifically:

> [N]o person shall . . . (c) [o]btain or attempt to obtain the whole or any part of a conversation by means of any device, contrivance, machine or apparatus, whether electrical, mechanical, manual or otherwise, if all participants in the conversation are not specifically informed that their conversation is being obtained.

O.R.S. § 165.540(1)(c) (1961). This provision, too, has not changed since its enactment. *Cf.* O.R.S. § 165.540(1)(c) (1961) *with* O.R.S. § 165.540(1)(c) (2022). A "conversation" is "the transmission between two or more persons of an oral communication which is not a telecommunication or a radio communication." O.R.S. § 165.535(1) (1961).[1] Thus, for more than half a century, Oregon law has permitted what is commonly called "one-party consent" to record one's own phone

---

[1] In 2021, the Oregon Legislature amended the definition of "conversation" to "include[] a communication occurring through a video conferencing program." *See* O.R.S. § 165.535(1) (2022) (included in Addendum). The lower court declared that this amendment "[did] not alter the language of the 2020 version of the statute in a way that changes its meaning or my analysis." ER-5. But this amendment, like the one-party consent provisions for telecommunications and radio communications, is pertinent to the law's lack of tailoring. *See infra* Argument part III(B).

calls but required "all-party consent" to record one's own oral, in-person conversations. *See State v. Fowler*, 111 P.3d 1264, 1267 (Wash. Ct. App. 2005) ("under Oregon's one-party consent law [for obtaining telephone calls], the Oregon recordings were legal."); *State v. Lissy*, 747 P.2d 345, 352 (Or. 1987) ("The Oregon statutes require a court order [to obtain conversations] unless all parties consent, the federal statutes do not when one of the parties consents.").

Other amendments in 1959 included the first of many iterations of exceptions for law enforcement to obtain conversations without specifically informing all participants. *See* O.R.S. § 165.540(5)(a) (1961). For just over two decades, the only exception to § 165.540(1)(c) for citizens permitted "subscribers or members of their family [to] perform acts prohibited . . . in their homes." O.R.S. § 165.540(3) (1961); *see* O.R.S. § 165.540(3) (2022). In 1983, the legislature added further exceptions, or situations in which one need not "specifically inform[]" participants to obtain a conversation but must instead provide constructive notice by the use of "an unconcealed recording device." O.R.S. § 165.540(6) (1983). Exactly how broadly these exceptions apply has become part of this litigation. *Cf.* ER-22–23 (discussing the State's "somewhat surprising" disclaimer that many *open* recordings in public are public meetings under section 165.540(6)(a)(A)); *see infra* part III(B)(3).

Section 165.543 was also enacted in 1983, regulating the interception of wire or oral communications when one "is not a party to the communication[,]" or what

is generally understood as eavesdropping. O.R.S. § 165.543 (1983);[2] *eavesdrop*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/eavesdrop ("to listen secretly to what is said in private"). In 1989, another exception to section 165.540(1)(c) was added, allowing one to "record[] a conversation during a felony that endangers human life." *See* O.R.S. § 165.540(6) (1989); O.R.S. § 165.540(5)(a) (2022). In 2015, another open recording exception was added, permitting one to "record[] a conversation in which a law enforcement officer is a participant" if, among other factors, "[t]he recording is made openly and in plain view of the participants in the conversation[.]" O.R.S. § 165.540(5)(b) (2022).

Since the provisions at issue, particularly section 165.540(1)(c), have remained unchanged since enactment, the interpretations and applications of the law by state courts endure. For example, outside of specific exceptions in the law, "persons recording the conversations of others [must] give an *unequivocal warning* to that effect." *State v. Bichsel*, 790 P.2d 1142, 1145 (Or. Ct. App. 1990) (emphasis added). Aside from the law's exceptions, the circumstances of a conversation do not matter—all participants must be specifically informed for the recording to be legal. *See, e.g., State v. Knobel*, 777 P.2d 985, 988 n.1 (Or. Ct. App. 1989) ("ORS 165.540(1)(c) includes no language indicating that a reasonable expectation of

---

[2] Section 165.543 incorporates different definitions for its operative terms. *See* O.R.S. § 133.721 (included in Addendum).

privacy is required."). This includes many situations in which one is openly displaying a recording device. *See Elkins v. Washington Cty.*, No. CIV 06-448-ST, 2007 WL 1342155, at *6 (D. Or. May 3, 2007).[3]

Yet even these few exceptions can have curious effects. The most private of conversations may be secretly obtained by "subscribers to telecommunications and radio services (and their family members) who, in their homes, engage in conduct otherwise prohibited by section 165.540(1)(c), regardless of whether the subscribed-to service is utilized to obtain the conversation." *State v. Evensen*, 447 P.3d 23, 32 (Or. Ct. App. 2019), *review denied,* 455 P.3d 41 (Or. 2019) (applying the exception in section 165.540(3)). The law is an eclectic mix of permissions and prohibitions, and these arbitrary twists and turns raise serious First Amendment concerns including underinclusiveness, overbreadth, and the suppression of speech based on its content.

---

[3] Following the 2015 amendment to section 165.540(5)(b) it is likely that the recording at issue in *Elkins* would be legal since it was a conversation with law enforcement officers. But if Elkins were interacting with any other government official such as an employee of the Public Records Advocate in the exact same circumstances, the recording would remain a misdemeanor. *See* ER-95 (Compl. ¶28).

**II.     The Censorship of Project Veritas and Project Veritas Action Fund by Oregon Revised Statutes § 165.540.**

PV and PVA are nonprofit national media organizations that engage almost exclusively in undercover investigative journalism. ER-89, 91 (Compl. ¶¶1, 11-12). Undercover journalists working for both organizations have documented newsworthy matters by obtaining conversations through secret and unannounced recording, often in areas held open to the public such as sidewalks, restaurants, and hotel lobbies. ER-89–90 (Compl. ¶5). PV has used open and secret recording to investigate a variety of matters of public concern. *See, e.g.*, ER-93–94, 98 (Compl. ¶¶21, 34). So has PVA, using open and secret recording to document protests in various states, including Virginia and Georgia. ER-96, 106–111 (Compl. ¶32, Compl. Exhs. 1-2). Both parties seldom inform others they are being recorded since such an announcement damages the truthfulness of what is to be recorded. *See, e.g.*, ER-95–96, 99 (Compl. ¶¶29, 38). The restrictions in section 165.540 censor unannounced open recording and secret recording in Oregon, and, but for the law, Veritas would use both methods throughout the state. ER-95–96 (Compl. ¶¶28-31).

Were these prohibitions not in place, PVA would investigate allegations of corruption at the offices of the Oregon Public Records Advocate and the Public Records Advisory Council. Specifically, the investigation would examine whether the Advocate and Council operate impartially or under pressure from the Governor. In 2019, Oregon's Public Records Advocate resigned due to alleged pressure from

8

or mismanagement by Governor Kate Brown.[4] But for section 165.540, PVA would investigate this issue and secretly record interactions with the Advocate, his or her staff, and members of the PRA Council in: (1) open-air cafes in Portland, (2) public parks, (3) on sidewalks, and (4) in other public areas. If secret recording is not achievable, PVA would use open, unannounced recording in these same circumstances. These methods of newsgathering are all illegal under section 165.540. *See* ER-95 (Compl. ¶28).

PV would focus its investigations in Oregon on the dramatic rise in violent protests in Portland between the police and members of Antifa and other fringe groups. This investigation involves four distinct sets of reporting activities. First, PV would obtain conversations between the police and protestors via secret recording to report whether usual policing functions are occurring in Portland. Second, PV would secretly obtain conversations between PV journalists and the police to gather candid police perspectives on the causes of the protests. Third, PV would secretly obtain conversations between PV journalists and protestors to gather protestors' perspectives about the causes of the protests, to learn about instances of police abuse, and to investigate any anti-police animus. Finally, in less dangerous situations or

---

[4] Notably, after Veritas filed its complaint in this matter, another Public Records Advocate reportedly resigned. *Oregon's public records advocate resigns 2 months after appointed*, KMTR, Sept. 30, 2020, https://nbc16.com/news/local/oregons-public-records-advocate-resigns-2-months-after-appointed.

when the situation does not permit for secret recording, PV would openly record conversations with protestors but without specifically informing everyone in the conversation of the recording. *See* ER-95–96 (Compl. ¶29).

Importantly, none of Veritas's activities would constitute eavesdropping, or secretly recording the conversations of others. They would only involve journalists obtaining their own conversations or acting on the principle of one-party consent. ER-94 (Compl. ¶23). Nevertheless, section 165.540 threatens to punish Veritas with a misdemeanor for any of these secret or open recordings that occur without specifically informing all participants. O.R.S. § 165.540(8). This is, in fact, a broader prohibition than Oregon law places upon bona fide eavesdropping with electronic devices. *See* O.R.S. § 165.543; *cf.* ER-20–22 *with* ER-52–54. The censorship of PV and PVA by section 165.540 is broad, preventing the organizations from engaging in undercover journalism in Oregon.

## III.   Proceedings Below.

PV and PVA challenged the unannounced open recording and secret recording provisions of section 165.540 as unconstitutional under the First Amendment in the court below, claiming the law violates free speech and the free press. ER-99–102 (Compl. ¶¶39-48 (Counts I and II)). Veritas also challenged the law's prohibitions on obtaining or using recordings made in violation of the law. ER-102–103 (Compl. Count III). After the court below denied Veritas's motion for

preliminary injunction, the State filed a motion to dismiss, which the court granted as to counts I and II but denied as to count III. ER-4–5, 25. The parties entered discovery, and in mid-January 2022 both the Multnomah County District Attorney's office and the Solicitor General of the Oregon Department of Justice issued statements disclaiming enforcement of the prohibitions on obtaining or using illegally recorded conversations under sections 165.540(1)(d) and (e) in situations that reflect the Supreme Court's ruling in *Bartnicki v. Vopper*, 532 U.S. 514 (2001). The parties filed a joint stipulation of dismissal for the remaining count III on March 3, 2022, which the court below entered in final judgment on March 7, 2022. ER-3. PV and PVA filed a timely notice of appeal as to counts I and II on April 1, 2022. ER-112–113.

## Summary of the Argument

Audiovisual recording is the bread and butter of modern journalism. Yet, Oregon Revised Statutes section 165.540, among the most onerous of its kind nationwide, generally prohibits the recording of in-person conversations unless all participants therein are explicitly notified. Accompanying this provision is a detailed assortment of exceptions for obtaining in-person conversations favored by the Oregon Legislature; these include interactions with law enforcement, public meetings, and conversations during the commission of felonies endangering human life. In effect, the law makes certain information readily obtainable, while censoring

11

disfavored speech, like that of Project Veritas and Project Veritas Action Fund. By way of section 165.540, Oregon has put its thumb on the scale of public discourse, favoring some content at the expense of what it deems subservient to nebulous "privacy" interests. The law violates the First Amendment, irrespective of whether strict or intermediate scrutiny applies.

Although section 165.540 fails under intermediate scrutiny, the district court still erred in applying that standard of review to the case at bar. This is because one must examine the content of a recording to determine its treatment under the act. Thus, section 165.540 facially discriminates on the basis of content, empowering the government to determine the subjects of debate and control the public discourse. For this reason, section 165.540 triggers strict scrutiny, which it manifestly fails for want of tailoring. Fatal to the statute's constitutionality is that its restrictions and exceptions are wholly illogical. They do not correspond to a reasonable expectation of conversational privacy, resulting in stark overinclusiveness and underinclusiveness.

Compounding its error, the district court held that Veritas carried the burden of establishing discriminatory legislative purpose to support a finding that the law was content based. Thus, the court below confused purpose with effect, notwithstanding that strict scrutiny applies to content-based regulations regardless of the motives behind them.

The lower court also exaggerated the State's putative privacy interests while undervaluing the First Amendment guarantees imperiled by Oregon's restrictive regime. There is a limit to conversational privacy, particularly when participants have no reasonable expectation of it. Moreover, a one-party consent standard applies only to obtaining conversations in which the recorder participates. It follows that section 165.540 does little to safeguard legitimate privacy interests. Meanwhile, recording communications is not only an expressive activity, but a highly valued expressive activity. Unannounced, surreptitious recording constitutes a distinctly reliable means of preserving and disseminating truthful information. Contrary to the assessment of the district court, such means are not remotely fungible with other forms of newsgathering. As such, section 165.540 eliminates an irreplaceable, tried and true method of journalism. Failure to meaningfully weigh the uniquely valuable speech at stake against Oregon's putative governmental interest constitutes reversible error.

More broadly, the lower court departed from established protections against censorship of audiovisual recordings and content-based speech. Instead, it uncritically accepted Oregon's sweeping authority to control high-value expressive conduct protected by the First Amendment. Exacerbating its error, the district court interpreted the exceptions contained in section 165.540(5)(b) to regulate government, rather than private, speech. In reality, it is the conduct of private actors,

namely their choice of subject and content, that this provision regulates. Having conflated the acquisition of government speech with government speech itself, the lower court ignored the clear authority of case law, which holds that speech dedicated to holding public officials accountable deserves the highest level of First Amendment protection.

Instead of protecting concrete privacy interests, section 165.540 imposes an obligation of secrecy over one's own conversations without regard to any expectation of privacy. Such a sweeping imposition is by its very nature untailored. This, in addition to the law's arbitrary favoring of certain contents over others, fails both strict and intermediate scrutiny.

Either standard of review requires that the law be narrowly tailored to serve a significant or compelling government interest. As section 165.540 applies irrespective of privacy expectations, it impacts far more speech than is necessary to safeguard privacy. Oregon has myriad alternatives to protect conversational privacy that are narrowly tailored, logically weigh privacy interests, and do not manipulate the content of public discourse according to the Legislature's fancy. It is telling, for instance, that Oregon deems one-party consent recordings an anathema to conversational privacy when most states permit such recordings. Yet Oregon does not find that one-party consent violates the privacy of conversations over the phone or radio. Thus, to strike down section 165.540 is not to denigrate the state's interest

in safeguarding legitimate expectations of privacy. Rather, it is to make plain that incorporeal invocations of privacy cannot be a pretext for the government to burden disfavored speech.

The court below erroneously asserted that alternative means of newsgathering to unannounced recordings render section 165.540 constitutional. Yet, the notion that the court's proffered alternatives are somehow adequate substitutes to one of the most effective forms of newsgathering is farcical. To permit video recording, but not audio, for example, obliterates the distinctive, evidentiary reliability of audiovisual recordings. Regardless, it is simply not for the government to ignore the speech choices of private citizens and force upon them a preferred method of reporting.

Laws punishing the publication of truthful information in the name of privacy must do so evenhandedly. If it fails to do so, the law is underinclusive, a telltale sign that the government interest is uncompelling. The exceptions baked into the law, such as that for recording law enforcement officers, necessarily encourage certain content at the expense of other content. This is a state-sponsored distortion of public discourse, amplifying certain subjects while muting others deemed of lesser importance by the Legislature.

The interpretation of section 165.540 adopted by the court below is also erroneous. Federal courts may only make limiting constructions of state laws when the plain terms thereof are capable of bearing such meaning. Federal courts cannot

insert missing terms, nor can they uncritically accept narrow interpretations of statutes that save them from judicial invalidation when such interpretations are baseless. The lower court did just that, accepting the State's dubious interpretation of the law's public meetings exception to include all but the most brief of public interactions. While this interpretation is convenient to sustain the law, the plain language of section 165.540 cannot bear such meaning. Caselaw interpreting the statute, in addition to the provision's legislative history, render the inescapable conclusion that the lower court's interpretation is unreasonable.

When the statute is properly interpreted, starting with its plain meaning, it is unconstitutionally overbroad because journalists are denied their right to record communications occurring in public without any regard to the expectation of privacy around a given conversation. Neither logic nor precision can be said to characterize section 165.540. Its overbreadth and underinclusiveness render the law unconstitutional on its face and as applied to Veritas. Irrespective of whether the Court adopts strict scrutiny, intermediate scrutiny, or the overbreadth doctrine, such a lopsided law cannot stand.

### Reviewability and Standard of Review

The Court reviews *de novo* challenges to a dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *New Mexico State Inv. Council v. Ernst & Young, LLP*, 641 F.3d 1089, 1094 (9th Cir. 2011); *see* ER-7–8. "To survive

a motion to dismiss, the [plaintiffs'] complaint 'must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). On review, the Court considers the materials incorporated by reference in the complaint, and judicially noticed matters. *Ernst & Young*, 641 F.3d at 1094; *Curry v. Yelp Inc.*, 875 F.3d 1219, 1224 (9th Cir. 2017). The counts appealed to this Court state plausible claims to relief under the First Amendment.

## Argument

## I. The Court Below Failed to Apply Strict Scrutiny to Oregon's Content-Based Recording Law

Ignoring several content triggers in section 165.540, the lower court errantly applied intermediate scrutiny to uphold Oregon's recording law. ER-18. A law is facially content based when it discriminates between the message a speaker may convey or, in this case, obtain. *Wasden*, 878 F.3d at 1204. Content-based laws are disfavored for a simple reason: allowing the government the "choice of permissible subjects for public debate would be to allow that government control over the search for political truth." *Consolidated Edison Co. of New York, Inc. v. Public Service Comm'n of New York*, 447 U.S. 530, 538 (1980). For audiovisual recordings, this means government limits on the range of information journalists may obtain and share with the American public. Because of this, content-based laws are

17

presumptively unconstitutional. *R.A.V.*, 505 U.S. at 395. To overcome such a presumption, government must demonstrate that the law serves a compelling governmental interest and is narrowly tailored to achieve it. *Id.* Many content-based laws are not overtly discriminatory, but rather operate more subtly, "defining regulated speech by its function or purpose." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (banning anonymous speech "is a regulation of pure speech . . . even though [a] provision applies evenhandedly to advocates of differing viewpoints[.]"). As is discussed later, the law's alleged protection of conversational privacy is likely an attempt to protect candor and enact content control. *See infra* part II(B).

Section 165.540 is content based because one must examine the content of recorded communications to determine whether they are disfavored by the law. For example, the law allows the open recording of law enforcement officers—that is, strictly, police officers—without needing to specifically inform them of the recording. However, notice is generally required to record almost anyone else. O.R.S. § 165.540(5)(b); *see Delaurent*, 320 Or. App. at 201 (ruling that district attorneys are not "law enforcement officer[s]" under the law). The law also permits secretly recording a conversation during a felony endangering human life, but not, moments later, a conversation in which the perpetrator or a witness discusses the

crime. O.R.S. § 165.540(5)(a). Thus, to understand whether one complied with the law requires examining the recorded communications and assessing, at a minimum:

- Did the conversation include a police officer?

- Did the conversation occur during a felony endangering human life?[5]

For recorded communications featuring a police officer, Oregon permits open, unannounced recording.[6] But if the unannounced recording captured the non-lethal illegal acts of a town council member, the recording is a misdemeanor. The only way the government knows if the recording is legal is by examining its content accordingly. If a Veritas journalist captures a fateful homicide with a hidden camera at a political event in Oregon, the law would permit the secret recording of

---

[5] Other exemptions apply, further illustrating concerns about content or subject discrimination. For example, when the law tolerates open recording without notifying everyone they are being recorded, it applies haphazardly, allowing open recording at, for example, a staged press conference, but not afterward on busy sidewalks in the most traditional of public fora. *See* O.R.S. § 165.540(6)(a).

[6] In 2015, the state legislature amended section 165.540 to allow for the unannounced recording of police officers. During testimony given by the sponsor of House Bill 2704, Representative Lew Frederick commented that recording without notifying police officers of the recording produced "truth—and credibility and trust are important assets when it comes to protecting the public through police work." Oregon Senate Cmte. on Judiciary, HB 2704, June 2, 2015, *available at* https://olis.oregonlegislature.gov/liz/mediaplayer/?clientID=4879615486&eventID =2015061027 (Rep. Frederick's testimony begins at 00:16:20). Audio records, from Representative Frederick's perspective, helped "illuminate the truth," and "truth is better than conjecture, especially in an environment where assumptions are polarized." *Id.*

19

conversations during the homicide. But if that same journalist secretly recorded seconds or minutes later and captured present sense impressions of witnesses, the recording would be illegal. A PVA journalist did just this in Charlottesville, Virginia in 2017. *See* ER-107 (CLIP_10_CHV_ANTIFA.mov at 13:29-14:03). A few seconds of this secret recording would be legal in Oregon; the rest of it would be a misdemeanor. *See id.* (CLIP_9_CHV_ANTIFA.mov at 08:00-08:20).[7] And the only way the state can tell whether the recording is lawful is to examine its content.

This Court has long recognized that exemptions within far-reaching laws that regulate or restrict speech often trigger content-based concerns. In *Foti v. City of Menlo Park*, 146 F.3d 629, 636 (9th Cir. 1998), this Court found that a municipality's ban of all signs on public property was content based because of exceptions. That is, when exceptions to a ban are based on content, "the restriction itself is based on content." *Id.* (quoting *Nat'l Advertising Co. v. City of Orange*, 861 F.2d 246, 249 (9th Cir. 1988)). There, allowing "open house" real estate signs along with safety, traffic, and public informational signs constituted content-based provisions because

---

[7] Notably, the court below stated this "video exemplar" did not "end[] up affecting" its analysis. ER-7–8. But this video is, at the very least, a clear example of PVA's secret recording for which the law would be unconstitutional as applied and for which the State *has not* disclaimed enforcement. *Cf.* ER-22–23 (discussing the State's "somewhat surprising" disclaimer that many *open* recordings in public are public meetings under section 165.540(6)(a)(A)); *see infra* part III(B)(3) (challenging this problematic interpretation).

one would have to examine the content of the signs to know if one complied with the law. This precedent has applied widely throughout the Ninth Circuit. *See, e.g.*, *Desert Outdoor Advertising v. City of Moreno Valley*, 103 F.3d 814, 820 (9th Cir.1996) (applying content-based test to exemptions for official notices, directional, warning, or information structures, public utility signs, and structures erected near a city or county boundary which contain the name of the city, county, or civic, fraternal, or religious organizations located therein); *Nat'l Advertising Co.*, 861 F.2d at 248 (applying content-based test to exemptions for memorial tablets or plaques, real estate and construction signs, open house signs, and traffic and safety signs).

The lessons of *Menlo Park*, *City of Orange*, and *City of Moreno Valley* hold true here: where exceptions to bans are based on content, the law itself is content-based. The court below erred in deciding that Veritas bore the burden to show a discriminatory legislative purpose to support any finding that the law was content based. ER-12 ("I find it completely implausible that in 1961 the recording statute was amended to include the general prohibition before me as some subtle attempt to influence people's speech while being recorded"). In doing so, the court confused purpose with effect. First Amendment caselaw has consistently held that "[i]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment." *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 592 (1983). A law that is content based on its face is "subject

to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).

PV and PVA never alleged, and never were required to allege, that Oregon acted with sinister intent. Veritas did allege that the *effect* of Oregon's hodgepodge of legislative amendments was to make the law content-based due to its discriminatory treatment of audiovisual recordings based only on their content. ER-100 (Compl. ¶42). Failing to apply controlling precedent about how courts should analyze content-based triggers, the court erred in placing the burden on plaintiffs to prove discriminatory intent. This error in failing to apply strict scrutiny necessarily carries downstream effects on the court's subsequent reasoning.

**II.    Secret or Unannounced Audio Recording by a Party to a Conversation ("One-Party Consent") is Protected by the First Amendment and Implicates Only Limited Privacy Interests.**

Oregon law originated as strictly a wiretapping prohibition, addressing the earliest form of electronic eavesdropping. *See* O.R.S. § 165.540(1)(a) (1955). Whether someone secretly listens to the conversations of others over a phone line or in a secluded setting, the governmental interest in privacy is manifest, and such behavior may be banned under threat of criminal penalties. *See Bartnicki*, 532 U.S. at 532–33. Like any governmental interest, there is a limit to conversational privacy,

particularly for someone whose conversation is recorded by a known party. In instances of one-party consent recording, it is the First Amendment rights of free speech and the free press of the person making the recording that are paramount and which overcome restrictions as broad as Oregon's. *See* U.S. CONST. amend. I; *see also ACLU of Illinois v. Alvarez* ("*ACLU*"), 679 F.3d 583, 595 (7th Cir. 2012) (The act of making an audiovisual recording is included within the "First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording"). Yet some courts have been reluctant to meaningfully analyze the value of secret and unannounced recording and the limits of conversational privacy, respectively. *See* ER-23–24. This section re-affirms the First Amendment interests inherent in secret and unannounced audio recording and argues for a bright line between restricting eavesdropping and restricting the recording of one's own conversations. Once these principles are established, Veritas's challenges to the Oregon law are plainly meritorious, and the law is unconstitutional.

### A. Audio Recording is a Form of Speech Protected by the First Amendment, Including Secret and Unannounced Audio Recording.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press[.]" U.S. CONST. amend. I. These rights apply to the states through the Fourteenth Amendment. U.S. CONST. amend. XIV; *Am. Soc'y of Journalists & Authors, Inc. v. Bonta*, 15 F.4th 954, 960 (9th Cir.

2021). "[T]here is a 'First Amendment right to film matters of public interest.'" *Wasden*, 878 F.3d at 1203 (quoting *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995)). More pointedly, "[a]udiovisual recordings are protected by the First Amendment as recognized 'organ[s] of public opinion' and as a 'significant medium for the communication of ideas.'" *Id.* (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952)). This Court has not shied away from affirming that the speech process is largely indistinguishable from the speech product:

> The process of expression through a medium has never been thought so distinct from the expression itself that we could disaggregate Picasso from his brushes and canvas, or that we could value Beethoven without the benefit of strings and woodwinds. In other words, we have never seriously questioned that the processes of writing words down on paper, painting a picture, and playing an instrument are purely expressive activities entitled to full First Amendment protection.

*Id.* (quoting *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061–62 (9th Cir. 2010)). The process of audio recording communications, including secret or unannounced audio recording of the same, is a purely expressive activity.

The importance of secret and unannounced audio recording in capturing honesty or truth—one might say *veritas*—expressed by others cannot be underemphasized. These methods do so in a way that cannot be accomplished otherwise. In one sense, this is little more than a truism: an individual or government agent does not eavesdrop, wiretap, or secretly record as a party to acquire content he can otherwise obtain on the record. "'[B]ody wires are an important means of

ensuring officer safety[,]' and '*ensure that the most accurate evidence is preserved*.'" *Delaurent*, 320 Or. App. at 198 (quoting Oregon House Cmte. on Judiciary, SB 654, May 24, 2001 (testimony of Peter D. Shepherd, Deputy Attorney General)) (emphasis added). Yet, to courts, including the court below, bans that encompass all these activities—eavesdropping, wiretapping, and secret or unannounced recording of one's own conversations—suggest a diminished speech value in the process and product. *See* ER 19-20 ("[I]t makes sense to treat the real-time quality of audio recording differently in terms of the government's interest in protecting individual privacy."). This is simply not so.

Even one of the most controversial (and, Veritas emphasizes, wrongful) domestic surveillance efforts of the United States government, undertaken against Dr. Martin Luther King, Jr., has served as an invaluable asset for historians, who are able to present history as it was.

> [T]here's nothing better than a verbatim wiretap transcript of somebody's entire telephone life, you know. That's very, very revealing and primary, often quite--showing quite the opposite character effect of what the wiretaps are premised on. The wiretaps will be premised on the fact that--the suspicion that this person would be talking to Boris, his Soviet agent, as a spy all the time and, in fact, what you'll get is somebody talking about going to jail and the freedom movement and quite--quite noble characters.

*Booknotes - Pillar of Fire: America in the King Years 1963-65*, C-SPAN, Apr. 12, 1998, *available at* http://www.booknotes.org/Watch/100454-1/Taylor-Branch

(timestamps 03:05-04:31).[8] Moreover, the Supreme Court has recognized that illegally obtained conversations, or wiretaps, may contain matters of public concern. *Bartnicki*, 532 U.S. at 252. It is thus the courts' obligation to scrutinize regulation of how one obtains conversations as closely as regulations of any other speech activity. *See Wasden*, 878 F.3d at 1204–05. This is not to say that eavesdropping and wiretapping laws are unconstitutional, and this case does not challenge those parts of Oregon law. *See* ER-94 (Compl. ¶23) ("PV and PVA do not engage and have no intent to engage in eavesdropping[.]"); *see* O.R.S. §§ 165.540(1)(a), (b); 165.543. Privacy is an important governmental interest that eavesdropping and wiretapping prohibitions are narrowly tailored to protect. But when someone—be it a Veritas journalist or anyone in Oregon—records *his or her own conversation* in secret or without specifically informing all parties, the privacy interests are minimal against the most compelling speech interest of capturing history as it is, or unfiltered dialogue.

The court below diminished the unique nature—and value—of surreptitious recording. After giving short shrift to undercover journalism, it simply decided that

---

[8] More recently, to "corroborate or correct" information provided by his stepfather Charles O'Brien for a book discussing the disappearance of Jimmy Hoffa, Professor Jack Goldsmith utilized "thousands of pages of unpublished or unexplored government records, including thousands of pages of transcripts from illegal bugs that recorded Chuckie, his mother, and Detroit crime family members in the early 1960s." JACK GOLDSMITH, IN HOFFA'S SHADOW 8 (2019).

other forms of newsgathering—the newsman calling the corrupt CEO for a statement whether he bribed a city councilmember—constituted an ample alternative method for PV and PVA to do reporting. ER-23–24. But it is settled that the First Amendment "affords the greatest protection to purposeful speech while allowing more regulation of incidental speech." *Foti*, 146 F.3d at 639. Included in that right is the principle that speakers not only enjoy a right to free speech, but "also to select *what they believe* to be the most effective means for so doing." *Meyer v. Grant*, 486 U.S. 414, 424 (1988) (emphasis added). And so here, being able to record the corrupt CEO offering a bribe in a crowded, public bar is effective speech. Phoning the CEO to ask him if he committed bribery is a laughable substitute. Nor does an undercover journalist documenting the actual event in writing live up to "the real-time quality of audio recording." ER-20–21. Both the First and Seventh Circuit agree that audio and audiovisual "recording are *uniquely* reliable and powerful methods of preserving and disseminating news and information about events that occur in public." *ACLU*, 679 F.3d at 607 (emphasis added); *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 840 (1st Cir. 2020). The Court below simply assumed all forms of recording are equal, or close enough to it. Not so; secret and unannounced recording are unique, valuable tools that are not fungible with other forms of newsgathering.

27

**B.      Oregon's Ill-Defined Privacy Interests do not Support a Blanket Ban of One-Party Consent Recording.**

There is a stark difference between the privacy interests underlying prohibitions against eavesdropping or wiretapping and a prohibition of one-party consent recording. A conversation is the "oral exchange of sentiments, observations, opinions, or ideas[.]" *conversation*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/conversation. The person with whom one voluntarily converses does not intrude into the privacy of the conversation; that is limited to eavesdroppers (who invade privacy because *no one* is voluntarily conversing with them). One may not, by default, rely on a known party to keep a conversation confidential. *See, e.g.*, *Katz v. U.S.*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection"). Relatedly, the *law* may not, by default, prohibit a party to a conversation from sharing its contents: this would be anathema to free speech. *Smith*, 443 U.S. at 102 ("state action to punish the publication of truthful information seldom can satisfy constitutional standards."). An audio recording by a party is little more than a more accurate record of what one party is already, in the overwhelming majority of circumstances, entitled to share in a free society. *See Sullivan v. Gray*, 324 N.W.2d 58, 60 (Mich. Ct. App. 1982). To restrict secret or unannounced audio recording by default requires an esoteric expansion of

28

conversational privacy that is largely unrecognized in other areas of law and that has not withstood First Amendment challenges in any other context. *See infra* part III(B).

The limited philosophical discussion of one-party consent during the passage of modern wiretapping laws spoke more of *candor* than privacy. *See* O.R.S. § 165.540(1)(c) (1961) (reflecting the addition of the provision at issue). Some suggested that permitting one-party consent would harm "[t]he quality of being open, honest, and sincere; frankness; outspokenness." *candor*, BLACK'S LAW DICTIONARY (11th ed. 2019). For example, Professor Alan Westin, a prominent academic, argued that there was no meaningful distinction between eavesdropping and one-party recording: "[P]ermitting *eavesdropping with the consent of one party* would be to sanction a means of reproducing conversation that could choke off much vital social exchange." ALAN F. WESTIN, PRIVACY AND FREEDOM 437 (1967) (emphasis added).[9] When asked to comment specifically on Massachusetts law, which bans secret recording by citizens under any circumstances, Westin further elaborated:

> "From a public policy standpoint, we must consider what would be the impact in the coming decade, when electronic monitoring

---

[9] Westin's earlier work was cited by the Oregon Senate Judiciary Committee when they drafted the original wiretapping law in 1955. Oregon Senate Cmte. on Judiciary, SB 165, Feb. 17, 1955, at 1 *available at* http://records.sos.state.or.us/ORSOSWebDrawer/RecordView/3199905 (citing Alan F. Westin, *The Wire-Tapping Problem: An Analysis and A Legislative Proposal*, 52 COLUM. L. REV. 165 (1952)).

devices spread even more widely in the population, of each citizen having to know that the person to whom he is talking in the office, at home, in his car, on the street, in a store, etc., may be recording the conversation with full legal authority and without having to have such clandestine recording authorized in advance by any judicial agency. I think this creates a serious inhibition on freedom of communication, especially because the person who chooses to speak *frankly and freely* in personal conversation runs the risk, under such a situation, that what he says in jest, with a wink, for its shock value on his conversational partner, or to test some belief held by the other party, can now be produced in evidence against him[.]"

Comm. of Mass. Interim Report of the Special Commission to Investigate Electronic Eavesdropping and Wiretapping, No. 1132, at 12 (June 1968) (Concurrence of Elliot B. Cole and William P. Homans, Jr., quoting letter from Prof. Westin) (emphasis added). In short, the concern with one-party consent lay not with having a conversation overheard or recorded by an unknown party, but in diminishing the subject's candor to known parties in a conversation, or even that his recorded communications would be presented elsewhere without vital context. The latter concerns are not wholly divorced from privacy, but they are far from synonymous with it.[10]

It is important to critically examine these alleged important governmental interests. It is against the backdrop of cardinal First Amendment principles that an

---

[10] Concerns about content such as distorted speech, false publications, or related problems are all addressed by Oregon through better-fitted remedies in tort and statutory law. *See infra* part III(B).

interest in securing the candor of conversation cannot be sustained. After all, this interest is peculiar—for it is a claim to government authority to referee who may acquire and disseminate truthful information in civil society. Keeping truthful information from the public, even if it is thought to protect them from harm or supposed distortion, is not a governmental interest *per se*. *Sorrell v. IMS Health Inc*., 564 U.S. 552, 576–77 (2011) ; *see also New York Times Co. v. U.S.*, 403 U.S. 713 (1971). And any broader claim to protecting conversational privacy cannot be absolute—such a claim must yield to the First Amendment rights of those recording newsworthy, public events. *See U.S. v. Dorfman*, 690 F.2d 1230, 1234 (7th Cir. 1982) (based on First and Fourth Amendment precedent, an interest in protecting conversational privacy cannot be absolute).

Oregon's interest in promoting candor of conversation fails for another important reason. The justification alludes to the real reason for Oregon's recording law: censoring one party in the name of bolstering the free speech of another. This has been firmly rejected as a governmental interest. *See Buckley v. Valeo*, 424 U.S. 1, 48–49 (1976) ("the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment[.]"). At best, privacy interests of parties recorded by another known party are tenuous, while the censorship of the law against parties who would obtain vital speech is clear. That no meaningful analysis of the governmental

31

interest at hand occurred by the court below is reason enough to reverse and remand this case.

In the Fourth Amendment context, the Supreme Court drew a bright line between one-party consent and eavesdropping in *United States v. White*. 401 U.S. 745 (1971). In that case, a government informant used a concealed radio transmitter to share with the police his conversations with a suspect. *Id.* at 746–47. The Court distinguished *Katz v. United States*, in which it found that the Fourth Amendment prohibited the government from certain electronic eavesdropping without a warrant—specifically, secretly "attaching a listening device to the outside of a public telephone booth and record[ing] the [suspect's] end of his telephone conversations." *Id.* at 748; *see generally Katz*, 389 U.S. 347. Eavesdropping, however, is distinct from revealing or recording one's own conversation:

> [H]owever strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the authorities. In these circumstances, 'no interest legitimately protected by the Fourth Amendment is involved,' for that amendment affords no protection to 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.' . . . No warrant to 'search and seize' is required in such circumstances, nor is it when the Government sends to defendant's home a secret agent who conceals his identity and makes a purchase of narcotics from the accused . . . *or when the same agent, unbeknown to the defendant, carries electronic equipment to record the defendant's words and the evidence so gathered is later offered in evidence.*

*White*, 401 U.S. at 749 (citations omitted) (emphasis added).[11] The plurality emphasized that, for Fourth Amendment and privacy purposes, a one-party recording by a police officer is no different than "writ[ing] down for official use his conversations with a defendant and testify[ing] concerning them[.]" *Id.* at 750–51 (citing *Hoffa v. U.S.*, 385 U.S. 293 , 300–03 (1966)). Yet, the *reliability* of an audio recording was undeniable in comparison:

> Nor should we be too ready to erect constitutional barriers to relevant and probative evidence which is also accurate and reliable. An electronic recording *will many times produce a more reliable rendition of what a defendant has said than will the unaided memory of a police agent*. It may also be that with the recording in existence it is less likely that the informant will change his mind, less chance that threat or injury will suppress unfavorable evidence and less chance that cross-examination will confound the testimony. . . . [W]e are not prepared to hold that a defendant who has no constitutional right to exclude the informer's unaided testimony nevertheless has a Fourth Amendment privilege against *a more accurate version of the events in question*.

*Id.* at 753 (emphasis added). The First Amendment analysis here is not beholden to Fourth Amendment analysis, but the State cannot expand conversational privacy to

---

[11] Most rules of evidence permit parties to a conversation to testify about that conversation, so it is counterintuitive to make a party's recording of that same conversation illegal, since the recording is likely more accurate than either party's recollection. *See* Rauvin Johl, *Reassessing Wiretap and Eavesdropping Statutes: Making One-Party Consent the Default*, 12 HARV. L & POL'Y REV. 177, 182 (2018); *see infra* note 13. That such recordings carry heightened evidentiary importance also signal that this sort of speech is high value for purposes of First Amendment protection.

33

an extent that entirely subsumes the truths contained throughout the *White* opinion about the limited privacy implicated in one-party consent recording and the value of secret and unannounced audio recording of one's own conversations.

Justice Douglas's dissent in *White*—while citing, among others, Professor Westin—did not substantively engage the distinction between eavesdropping and one-party recording and all but called for a warrant requirement for any form of government recording. *Id.* at 756–66 (Douglas, J., dissenting). Ironically, at points, his reasoning can be read to bolster the plurality opinion:

> The individual must keep some facts concerning his thoughts within a small zone of people. At the same time he must be free to pour out his woes or inspirations or dreams to others. *He remains the sole judge as to what must be said and what must remain unspoken*. This is the essence of the idea of privacy implicit in the First and Fifth Amendments as well as in the Fourth.

*Id.* at 763 (emphasis added). If Justice Douglas meant a party to a conversation is responsible for his own words, he was plainly correct. If he meant to suggest a party has absolute control of what "must remain unspoken" by those he confides in, he was plainly incorrect, both ethically and constitutionally. The one-party consent standard of *White* endures. *See, e.g.*, *U.S. v. Luis*, 537 F. App'x 752, 753 (9th Cir. 2013).

Of course, the Fourth Amendment is a baseline for protecting the persons, houses, papers, and effects of Americans from unreasonable searches and seizures by the government. U.S. CONST. amend. IV. Upon this, the federal and state

governments may enact greater protection. Some state supreme courts have ruled that their state constitutions provide a greater right to privacy from government recording than the Fourth Amendment and require a warrant for one-party recordings. *See, e.g.*, *State v. Goetz*, 191 P.3d 489, 504 (Mont. 2008). Indeed, Oregon could ban all wiretapping *by the government* or even one-party recording of conversations *by the government*. *But see* O.R.S. § 165.540(2)(a)(B), (5)(d), (5)(e) (providing *exceptions* to the law's restrictions *for* the government). In this sense, the law cannot be too protective of privacy. But the First Amendment is different: it is a limit past which the government may not regulate speech activities. When it regulates free speech and the free press, *a law can be too protective of privacy*. This principle went unobserved by the court below.

This is the case of section 165.540, protecting a nebulous citizens' "'*right* not to be recorded without their knowledge'" with exceptions defined wholly by legislative fiat. ER-12 (citing State's Mot. to Dismiss) (emphasis added); *see also State v. Neff*, 265 P.3d 62, 66 (Or. Ct. App. 2011) ("the primary concern underlying ORS 165.540(1)(c) was the protection of participants in conversations from being recorded without their knowledge."). The wholesale lack of bona fide privacy protection in myriad applications of the law—protections actually geared toward changing the content of what's obtained—calls for the statute to be subject to strict

scrutiny. But even under intermediate scrutiny, the law's prohibition on secret recording and restrictions on unannounced open recording are unconstitutional.

## III. Oregon Revised Statutes § 165.540 is Unconstitutional on Its Face and As Applied to Project Veritas and Project Veritas Action Fund.

The district court's opinion sharply departs from the First Amendment's protection against censorship of audiovisual recordings and content-based speech. *See Wasden*, 878 F.3d at 1203. Rather than review the challenged prohibitions as issues involving high-value First Amendment conduct, the lower court embraced Oregon's lopsided, unfettered control over newsgathering, rubberstamping its authority. This Court should reverse.

### A. Project Veritas and Project Veritas Action Fund's Recordings are High-Value, not Government-Issued, Speech.

The court below erred by concluding that the law enforcement exception contained in the statute impacts government, not private, speech. ER-16–18 ("government speech is analyzed differently in the First Amendment context"). But it is the conduct of the one obtaining a conversation—not the government's—that is implicated by this provision. O.R.S. § 165.540(1)(c), (5)(b). Reporters, specifically, make important choices about which subject they wish to follow, record, and report about. A speaker's choice of subject carries weighty First Amendment implications. *See, e.g.*, *F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 375–76 (1984). Section 165.540 impacts the ability of a free press to record and publish the

36

actions of those in public office. Considering the importance of this right, the district court erred by analyzing the free speech interests of PV and PVA through the lens of the government speech doctrine and entirely diluted First Amendment protection. This constitutes plain error.

Caselaw confirms that speech focused on holding government officials accountable—like recording their candid statements in public—occupies the highest, not lowest, rung of First Amendment protection. *See, e.g.*, *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966) ("The press . . . guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism"); *Mills v. Alabama*, 384 U.S. 214, 218 (1966) ("there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs"); *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."); *Stromberg v. California*, 283 U.S. 359, 369 (1931).

The court below ignored this weight of authority by deciding that the act of *acquiring* government speech *is* government speech. *Johanns v. Livestock Marketing Assn.*, 544 U.S. 550, 553 (2005) ("Government's own speech . . . is exempt from First Amendment scrutiny"). The jurisprudential difference could not

be starker. To place this case within the government speech doctrine is to turn First Amendment doctrine upside down.

**B.    The Law Fails Every First Amendment Analysis.**

Section 1650.540 abridges unique and valuable speech tools of journalists: secret and unannounced recording. *See supra* part II(A). This censorship reaches nearly all conversations in Oregon, except for content approved by the government, such as conversations with law enforcement. There is no interest in personal privacy that imposes *omertà* over citizens' own conversations. *omertà*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/omertà; *see supra* part II(B). Tailoring analysis is almost unnecessary, because the law is not tailored at all to a cognizable definition of conversational privacy. *Cf.* ER-19. Nevertheless, tailoring analysis only shows more arbitrary assessments of privacy throughout the law. Section 165.540 fails strict scrutiny and intermediate scrutiny and is facially overbroad.

**1.    The Law Fails Strict and Intermediate Scrutiny.**

To uphold the constitutionality of section 165.540, Oregon must demonstrate that the law serves a compelling governmental interest and is narrowly drawn in doing so. *Reed*, 576 U.S. at 163. When examining a suspect law under strict scrutiny, the law must restrict as little speech as possible to further its goal. *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 680 (1994). Under intermediate

scrutiny, a law "still must be 'narrowly tailored to serve a significant governmental interest.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989)). Section 165.540 ostensibly acts to protect conversational privacy. *Knobel*, 777 P.2d at 988; *Bichsel*, 790 P.2d at 1144 (excepting a recording under section 165.540(4) because "[t]he police had no property or privacy interest in" a radio or television transmission.). But its tailoring is wholly arbitrary, which is to say, it is not tailored at all.

Under strict scrutiny, a court must examine if the government's chosen restriction on speech is "actually necessary" to achieve its stated interest. *U.S. v. Alvarez*, 567 U.S. 709, 725 (2012). This places the burden on government to show a "direct causal link between the restriction imposed and the injury to be prevented." *Id.* Oregon has many tools at its disposal to protect conversational privacy without the need to rely on disfavored content triggers. Instead of employing a list of numerous exemptions to its notice requirement, such as the recordings of police and felonies that endanger human life, it could regulate recording without reference to content by employing a one-party consent standard or by regulating recording only in truly private circumstances—that is, using a "reasonable expectation of privacy" standard. O.R.S. § 165.540(6); *see* O.R.S. §§ 165.543, 133.721(7)(a) (implementing an expectation of privacy standard in the definition of "oral communication" for purposes of eavesdropping under section 165.543).

Because of the lopsided effect of the law, the public is sure to hear plentiful recordings of police officers in Oregon, but very little of other public servants given the skewed notice requirement. This scenario triggers Justice Breyer's concern in his concurrence in *United States v. Alvarez* that laws employing such content-based restrictions leads to their use against politically unpopular groups and individuals. 567 U.S. at 734 (Breyer, J., concurring). Oregon welcomes journalists to record the misdeeds of the police liberally, but criminalizes journalists engaged in unannounced recordings of other public servants. This sort of manipulation of newsgathering is impermissible under the First Amendment and fails to survive strict scrutiny.

Setting aside the law's content restrictions, the law also fails strict or intermediate scrutiny for other reasons. Section 165.540(1)(a) permits a participant to record his own phone call without notice to the other party. Whether the other participant is calling from a mobile phone in the middle of a crowd in which third parties can hear all her words, or from a landline within her own home in which only the recording party can hear her words, she is unentitled to be specifically informed of a recording. Yet, the law requires specifically informing her before recording an in-person conversation that occurs within the same crowd as the phone call. O.R.S. § 165.540(1)(c). She must also be informed before recording an in-person conversation within her own home, but *she* may record the conversation without

notice in that setting: there, the conversation is private for only one party. O.R.S. § 165.540(3). This means that, according to the law, Oregonians have a greater expectation of privacy in a crowd than in another's home. Following the law's amendment last year, if the homeowner uses her mobile phone to join a Zoom meeting, that is a "conversation" for purposes of the law and, unlike a phone call with another person, she is generally entitled to be specifically informed before any recording occurs. O.R.S. §§ 165.535(1); 165.540(1)(c), (6). Oregon law goes so far as to include a much more limited restriction on bona fide eavesdropping with electronic devices as compared to the stark restrictions it places on the unannounced or secret recording of one's own conversations. *See* O.R.S. § 165.543; *cf.* ER-20–22 *with* ER-52–54 This is not tailoring; it is a legislature playing tiddlywinks with free speech.

Section 165.540(1)(c) prohibits nearly all recordings of conversations to which one is a party unless others are "specifically informed" a recording is occurring, even if one is openly recording. But the law reaches too far and protects speech far removed from any definition of privacy. It is notable that its provisions ordinarily apply in the most public of fora—sidewalks, streets, and public plazas. Its bounds, while not limitless, are expansive, capturing areas of American life usually held out to public inspection. The law provides narrow exceptions in certain preferred circumstances that require "recording . . . openly and in plain view" or

"us[ing] an unconcealed recording device." O.R.S. § 165.540(5)(b), (6). The law does not generally recognize constructive notice for most open recording. These provisions fail both strict and intermediate scrutiny, and only further highlight that the law is not geared toward protecting conversational privacy, but to effectively shield accountability.

Under either scrutiny analysis, this Court should note the many alternatives the government could employ to protect conversational privacy that would be less damaging to First Amendment interests. *See, e.g.*, *McCullen*, 573 U.S. at 479 (considering "less-restrictive alternatives" for a content-neutral law); *Wasden*, 878 F.3d at 1204–05 (Idaho failed to satisfy narrow tailoring because the law was both under and over-inclusive). Oregon is left with a wide array of tools to do so. This inquiry was performed by this Court in *Wasden* regarding Idaho law, where it was clear that there were various ways government could achieve its stated interests while burdening little or no speech. In *Wasden*, this meant examining state statutory provisions and available torts protecting property and privacy interests. 878 F.3d at 1205. Oregon offers a wide host of privacy-protective measures to use against unruly journalists that do not censor speech in the first place. It maintains two statutory classifications for invasion of privacy. *See* O.R.S. §§ 163.700; 163.701. And reporters in other states who invaded truly private circumstances have had successful invasion of privacy claims raised against them. *See, e.g.*, *Sanders v. Am.*

*Broadcasting Companies, Inc.*, 978 P.2d 67 (Cal. 1999). Overly zealous reporters can find themselves on the wrong side of stalking violations. *See* O.R.S. § 163.732. Like many other states, Oregon protects against false statements of fact that injure one's reputation through the tort of defamation. *See generally Neuman v. Liles*, 369 P.3d 1117 (Or. 2016). Similarly, and as alluded to in *Wasden*, Oregon law includes comprehensive protection against trade secret violations. *Pelican Bay Forest Products, Inc. v. Western Timber Products, Inc.*, 443 P.3d 651 (Or. App. 2019). It is not as if, in the absence of section 165.540, that privacy would be unguarded in Oregon. Rather, privacy safeguards would remain along with the ability to engage in newsgathering. These are the more narrowly tailored ways Oregon acts to protect privacy interests without damaging the First Amendment rights of citizens to record conversations of public import. Just as in *Wasden*, Oregon's heavy-handed approach to protecting privacy while ignoring First Amendment rights should be invalidated.

In examining tailoring, the court below erred in finding alternative means of engaging in newsgathering. That is to say that whatever less effective channels of communication the government doles out to the citizenry ends the constitutional question. ER-23–24. Under strict scrutiny, this is plainly wrong, because speakers, not government agents, are empowered to "select *what they believe* to be the most effective means for so doing." *Meyer*, 486 U.S. at 424 (emphasis added); *U.S. v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812–13 (2000) (law burdening rather than

banning speech may still be subject to strict scrutiny). The fact that a law leaves open more burdensome, less effective ways to engage in desired First Amendment conduct is to acknowledge it will "discourage protected speech." *Fed. Election Comm'n v. Mass. Citizens For Life, Inc.*, 479 U.S. 238, 255 (1986). At the same time, the court below consistently shifted the burden in favor of the censor, not the speaker. But Oregon must present "more than anecdote and supposition" to support a law subject to strict scrutiny. *Playboy Entm't Grp.*, 529 U.S. at 812. This it failed to do, other than to suggest legislative interests in privacy would somehow uphold the law. Indeed, where the "record is silent as to the comparative effectiveness of . . . two alternatives"—one of which burdens more speech than the other—the more burdensome restriction cannot survive strict scrutiny. *Id.* at 826.

Even under intermediate scrutiny, the lower court's observation that a reporter's option to simply record video clips without audio or tell people they are recording is farcical. ER-24. Reporters could also hire court reporters to walk around and transcribe every moment of their interactions, or they could chisel notes in stone. But ignoring the burden placed on undercover journalists, while being overly deferential to government censorship, is not a proper analysis of alternative channels of communication.

The lower court failed to examine the unique character of audiovisual recording. Had it done so, it would have found, like the First and Seventh Circuits

did, that unlike other forms of newsgathering, audiovisual recordings are "uniquely reliable and powerful methods of preserving and disseminating news and information about events that occur in public." *ACLU*, 679 F.3d at 607; *Rollins*, 982 F.3d at 840. Permitting a journalist to obtain video, but not audio, of "the same content . . . is a mystery." *Wasden*, 878 F.3d at 1205. Oregon's law cripples effective newsgathering. The alternatives it leaves open, such as directly asking a suspicious subject if he broke the law, are poor substitutes. Like the First and Seventh Circuits, this Court should afford heightened protection to audiovisual recordings as irreplaceable methods for gathering high-value, newsworthy information. In doing so, it should reverse the lower court's opinion upholding section 165.540.

### 2. The Law Suffers From Underinclusiveness.

Problematically, the standards to record in Oregon are woefully underinclusive. The notion that a law may not be underinclusive is a bedrock First Amendment principle. *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994). Laws that are underinclusive may be challenged facially because underinclusiveness demonstrates the lack of a genuine governmental interest. *See, e.g.*, *Florida Star v. B.J.F.*, 491 U.S. 542, 540 (1989); *R.A.V.*, 505 U.S. at 387–88. That is, whenever a state attempts the "extraordinary measure of punishing truthful publication in the name of privacy," it must demonstrate that the law advancing this interest does so evenhandedly. *Florida Star*, 491 U.S. at 540–41. Exemptions from otherwise

45

allowable regulations of speech can "represent a governmental 'attempt to give one side of a debatable public question an advantage in expressing its views to the people.'" *Ladue*, 512 U.S. at 51 (quoting *Bellotti*, 435 U.S. at 785–86).

The underinclusiveness of section 165.540 operates in several ways. Oregon's recording mandate skews news reporting in favor of critical or interesting stories about police and against obtaining similar information about anyone else—be it a staff member of the Public Records Advocate or a congressional candidate. *See* ER-95 (Compl. ¶28). Pursuant to the underinclusvieness doctrine, additional exemptions in the law undermine Oregon's interest in protecting conversational privacy. For example, not requiring notice to obtain conversations at a press conference, but requiring it on a busy sidewalk, does not advance conversational privacy interests in an evenhanded manner. Oregon's allowance for recordings at government-preferred events eviscerate the state's interest in protecting conversational privacy. One may record a congressional candidate at his official press conference unannounced, but not on a crowded MAX light rail ride. This makes a mockery of the important decisions journalists make when deciding who, what, when, where, and how to record, and the curious exemptions only undercut Oregon's claim of protecting conversational privacy.

Like the Ag-Gag law at issue in *Wasden*, Oregon has some heavy lifting to do to justify this law. 878 F.3d at 1196. Whatever interest Oregon may have, it must be

able to explain why limiting the recording of nearly all governmental officials, except the police, without notice, effectuates its interest in protecting conversational privacy better than eliminating all recording, or limiting recording to truly private areas.[12] It must further demonstrate why allowing the secret recording of felonies endangering human life are permissible, but not similar recordings capturing the present sense impressions of alleged criminals or witnesses moments later.[13] Oregon bears the burden, undetected by the court below, to show a "direct causal link between the restriction imposed and the injury to be prevented." *Id.* Without a detailed explanation, it is likely that Oregon, intentionally or unintentionally, favors the robust unannounced recording of police while suppressing audio recording of other public servants. And it curiously favors the secret filming of some felonies, but not important details revealed moments after such a crime. In a society premised on the notion that more speech about those holding public office, and about public

---

[12] More broadly, it is hard to imagine how Oregon's recording law effectuates the protection of conversational privacy for government employees. It is generally recognized that government employees enjoy diminished privacy rights due to the "right of the public to repose trust and confidence in them." *Nat'l Treasury Emps. Union v. U.S. Dep't of Treasury*, 25 F.3d 237, 244 (5th Cir. 1994).

[13] Paradoxically, the law stands in contradiction to Rule 803 of the Federal Rules of Evidence, which allows for the admission of present sense impressions as an exception to hearsay. And the reason that introduction of present sense impressions is permissible is that they are "inherently reliable" as they are "unlikely to reflect memory loss or provide an opportunity to lie." *U.S. v. Orm Hieng*, 679 F.3d 1131, 1147 (9th Cir. 2012) (Berzon, J., concurring).

events, is fundamentally good, Oregon's lopsided recording law must be declared unconstitutional. *See Eu v. San Francisco County Democratic Central Cmte.*, 489 U.S. 214, 222–23 (1989).

### 3. The Law Suffers from Substantial Overbreadth.

Section 165.540 fails review for the separate reason that it suppresses substantially more speech than necessary to protect legitimate privacy concerns. Facial challenges to a law's validity under the First Amendment are successful where "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011) (quoting *U.S. v. Stevens*, 559 U.S. 460, 473 (2010)). Courts must examine the breadth of how the law applies, and if it is shown that the law applies to substantially more speech than is reasonably necessary for the government to achieve its stated interest, the law must be stricken. *Id*. at 948–49. Where a law such as section 165.540 imposes a restriction on protected First Amendment activity, and where the problem with the law is that the "means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 967–68 (1984).

To begin a proper overbreadth analysis is to first construe the statute before a court. *City of Redondo Beach*, 657 F.3d at 945. In this case, the State proffered, and the court below accepted, a most generous interpretation of the law—that most chance encounters in public are "public meetings" that allow open recording not subject to notification requirements. ER-22–23. This reading of the law is unsupportable.

In making determinations about the proposed reach of the law, a court must consider the government's "authoritative constructions of the [law], including its own implementation and interpretation of it." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992). But there are limits to a federal court's power of construction—namely, that when federal courts interpret statutes, they may fashion limiting constructions only when they are "readily susceptible" to those interpretations. *Reno v. ACLU*, 521 U.S. 844, 884 (1997). And a further jurisprudential wrinkle limits this power too. It is "not within [the federal judiciary's] power to construe and narrow state laws." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).

To construe a statute implicating protected First Amendment conduct, courts should first consult the plain language of the law. Federal courts are without the power to insert "missing terms" in flawed statutes, or to embrace illogical constructions. *City of Redondo Beach*, 657 F.3d at 946–47. Nor should federal courts

presume government will act in "good faith" and adhere to interpretations not present on the face of the statute. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988).

The plain text of section 165.540 provides that one must specifically notify others of recording unless certain exemptions are present. One such exemption allows unannounced recording at "[p]ublic or semipublic meetings such as hearings before governmental or quasi-governmental bodies, trials, press conferences, public speeches, rallies and sporting or other events." A "meeting" is not defined in Oregon's recording law, but its common understanding is to be "an act or process of coming together: such as an assembly for a common purpose. . . ." *meeting*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/meeting. A "meeting" is different from an "encounter," which is defined as, "to come upon or experience unexpectedly" or "a chance meeting." *encounter*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/encounter.

Oregon caselaw also confirms the plain reading of section 165.540. Notably, cases occurring prior to the 2015 amendments did not allow for the unannounced recording of police. In *Bichsel*, the Court of Appeals of Oregon determined that encounters between police and citizens with recorders in plain sight did not constitute public or semipublic meetings under the law. 790 P.2d at 1143 n.3. The federal district court recognized this interpretation in *Elkins*. No. CIV 06-448-ST,

2007 WL 1342155, at *6. Were it plausible that every interaction between two people could constitute a "public meeting," the Oregon Legislature would not have needed to amend the law in 2015 for unannounced open recordings of police. But it amended the law precisely because a chance encounter between two people in public is not ordinarily understood to be a "meeting."

In this matter, the State proffered, and the court below accepted, an illogical interpretation contrary to *Bichsel* and *Elkins*—that most chance encounters can be "public meetings" that permit open recording not subject to notification requirements. ER-22–23. This interpretation contradicts the settled construction of the law by state courts as well as the plain meaning of the statute. In the Ninth Circuit, such statutory "interpretations which would produce absurd results are to be avoided." *U.S. v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013). The court below accepted this interpretation and failed to abide by rules of statutory construction.

This Court is then left with a law of alarming breadth. Designed to purportedly protect conversational privacy, section 165.540 prohibits unannounced and secret recording in areas that are not truly private. The law is oversized, imprecise, and prophylactic.[14] It claims to protect conversational privacy, but it prohibits recording

---

[14] Laws that do not respond precisely to the substantive problem which legitimately concerns the government are deemed prophylactic in First Amendment jurisprudence and thus suspect. *NAACP v. Button*, 371 U.S. 415, 438 (1963).

in circumstances where one voluntarily exposes communications to others—that is, where one lacks a reasonable expectation of privacy. *See, e.g.*, *Katz*, 389 U.S. at 351 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection"). Thus, the law prohibits recording a loud argument on the street, a political provocateur on a crowded subway, a drunk, hate-filled conversation in a parking lot, or any discussion anywhere where third parties could easily overhear it—unless the recorder specifically informs every single person in the conversation that they are being recorded. Because of this, the law remains substantially overbroad by prohibiting the recording of conversations that are in fact not private. *See People v. Clark*, 6 N.E.3d 154, 160–62 (Ill. 2011).

Undoubtedly, section 165.540 may apply legitimately in a few instances, such as protecting a hushed conversation in a secluded hallway, the musings of a friend whispering his life's woes to another friend, in confidence, in a secluded office, or colleagues discussing confidential medical options in a hospital visitation room. But the law's legitimate applications are dwarfed by its enormous reach that prohibits unannounced recording in a dizzying number of traditional public fora where privacy expectations are eliminated or substantially diminished. Under Oregon law, the public park, busy sidewalks, streets and pedestrian zones, crowded buses, and a great number of other places lose their status as cherished public fora where ideas are freely exchanged—but become curiously "private." This is the backdrop against

which an overbreadth determination must be made. The Oregon Legislature's various amendments over the years have left the law clumsy, far-reaching, and imprecise, with little connection to legitimate privacy interests. Instead, it just blankets traditional public fora as if they were private and shields these areas from effective newsgathering. The government may not take such extraordinary measures to punish the collection and publication of truthful information. Indeed, "precision of regulation must be the touchstone." *Buckley*, 424 U.S. at 14 (quoting *Button*, 371 U.S. at 438)). Where precision is demanded, Oregon delivers a ham-fisted law bearing little connection to protecting conversational privacy.

As discussed earlier, Oregon enjoys a multitude of options to protect privacy interests, without trampling First Amendment rights. *See supra* part III(B)(1). Comparatively, unlike eight states that restrict recording only in truly private situations, or 40 states that permit recording of one's own conversations, Oregon's law completely forecloses the ability to record unannounced or secretly in many public places.[15] *Forty-eight other jurisdictions* represent sensible approaches to

---

[15] Outside of Massachusetts, Oregon features some of the most burdensome recording provisions given its breadth and impact on newsgathering. Other states employing all-party consent standards at least attempt to balance privacy and speech concerns in crafting recording laws. *See, e.g.*, CAL. PENAL CODE § 632; FLA. STAT. § 934.03; 720 ILL. COMP. STAT. 5/14-2; MD. CODE ANN., CTS. & JUD. PROC. § 10-402; MONT. CODE ANN. § 45-8-213; N.H. REV. STAT. § 570-A:2; 18 PA. CONST. STAT. ANN. § 5703; WASH. REV. CODE § 9.73.030.

protecting conversational privacy. Oregon also already has a diverse array of applicable privacy-protecting torts and statutes to protect against false or distorted publications. The judicial focus must then be on whether Oregon needed to employ so prophylactic a tool to pursue its interest in protecting conversational privacy when a host of finely tuned alternatives could achieve the same end.

Because section 165.540 oddly transforms most traditional public fora into areas deemed "private" by law, its application to protected speech relative to its "plainly legitimate applications" is seriously imbalanced. *Virginia v. Hicks*, 539 U.S. 113, 119–20 (2003). Reporters on the beat are deprived of the ability to engage in unannounced and secret recording where stories are most likely to show themselves. This operates as a near complete blackout for acquiring candid and truthful information about the state of public life in Oregon. As a result, such an imbalanced, blundersome approach is best invalidated facially through the overbreadth doctrine.

## Conclusion

The Court should reverse the opinion and order of the district court dismissing Veritas's claims.

Respectfully submitted on the 11th Day of July, 2022.

/s/ Benjamin Barr
Benjamin Barr
BARR & KLEIN PLLC
444 N. Michigan Avenue, Ste. 1200
Chicago, IL 60611
(202) 595-4671 Telephone
ben@barrklein.com

/s/ Stephen Klein
Stephen R. Klein
BARR & KLEIN PLLC
1629 K Street NW, Ste. 300
Washington, DC 20006
(202) 804-6676 Telephone
steve@barrklein.com

*Attorneys for Plaintiffs-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number(s)** 22-35271

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

Signature ___ s/ Stephen Klein _____          Date ____ July 11, 2022 _____

56

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 22-35271 _____

I am the attorney or self-represented party.

**This brief contains** ___12,990___ **words**, excluding the items exempted by

Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App.

P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


Signature ___s/ Stephen Klein___      Date ___July 11, 2022___

57

# ADDENDUM

**TABLE OF CONTENTS**
**[ADDENDUM]**

O.R.S. § 165.540. Obtaining whole or part of communication ......................ADD-1

O.R.S. § 165.535. Definitions ..........................................................................ADD-5

O.R.S. § 165.543. Interception of communications .......................................ADD-5

O.R.S. § 133.721. Definitions ..........................................................................ADD-5

**O.R.S. § 165.540. Obtaining whole or part of communication**

(1) Except as otherwise provided in ORS 133.724 or 133.726 or subsections (2) to (7) of this section, a person may not:

(a) Obtain or attempt to obtain the whole or any part of a telecommunication or a radio communication to which the person is not a participant, by means of any device, contrivance, machine or apparatus, whether electrical, mechanical, manual or otherwise, unless consent is given by at least one participant.

(b) Tamper with the wires, connections, boxes, fuses, circuits, lines or any other equipment or facilities of a telecommunication or radio communication company over which messages are transmitted, with the intent to obtain unlawfully the contents of a telecommunication or radio communication to which the person is not a participant.

(c) Obtain or attempt to obtain the whole or any part of a conversation by means of any device, contrivance, machine or apparatus, whether electrical, mechanical, manual or otherwise, if not all participants in the conversation are specifically informed that their conversation is being obtained.

(d) Obtain the whole or any part of a conversation, telecommunication or radio communication from any person, while knowing or having good reason to believe that the conversation, telecommunication or radio communication was initially obtained in a manner prohibited by this section.

(e) Use or attempt to use, or divulge to others, any conversation, telecommunication or radio communication obtained by any means prohibited by this section.

(2)    (a) The prohibitions in subsection (1)(a), (b) and (c) of this section do not apply to:

(A) Officers, employees or agents of a telecommunication or radio communication company who perform the acts prohibited by subsection (1)(a), (b) and (c) of this section for the purpose of construction, maintenance or conducting of their telecommunication or radio communication service, facilities or equipment.

(B) Public officials in charge of and at jails, police premises, sheriffs' offices, Department of Corrections institutions and other penal or correctional institutions, except as to communications or conversations between an attorney and the client of the attorney.

(b) Officers, employees or agents of a telecommunication or radio communication company who obtain information under paragraph (a) of this subsection may not use or attempt to use, or divulge to others, the information except for the purpose of construction, maintenance, or conducting of their telecommunication or radio communication service, facilities or equipment.

(3) The prohibitions in subsection (1)(a), (b) or (c) of this section do not apply to subscribers or members of their family who perform the acts prohibited in subsection (1) of this section in their homes.

(4) The prohibitions in subsection (1)(a) of this section do not apply to the receiving or obtaining of the contents of any radio or television broadcast transmitted for the use of the general public.

(5) The prohibitions in subsection (1)(c) of this section do not apply to:

(a) A person who records a conversation during a felony that endangers human life;

(b) A person who records a conversation in which a law enforcement officer is a participant, if:

(A) The recording is made while the officer is performing official duties;

(B) The recording is made openly and in plain view of the participants in the conversation;

(C) The conversation being recorded is audible to the person by normal unaided hearing; and

(D) The person is in a place where the person lawfully may be;

(c)(A) A person who, pursuant to ORS 133.400, records an interview conducted by a peace officer in a law enforcement facility; or

(B) A person who, pursuant to ORS 133.402, records a custodial interview, as defined ORS 133.402;

(d) A law enforcement officer who is in uniform and displaying a badge and who is operating:

(A) A vehicle-mounted video camera that records the scene in front of, within or surrounding a police vehicle, unless the officer has reasonable opportunity to inform participants in the conversation that the conversation is being obtained; or

(B) A video camera worn upon the officer's person that records the officer's interactions with members of the public while the officer is on duty, unless:

(i) The officer has an opportunity to announce at the beginning of the interaction that the conversation is being obtained; and

(ii) The announcement can be accomplished without causing jeopardy to the officer or any other person and without unreasonably impairing a criminal investigation; or

(e) A law enforcement officer who, acting in the officer's official capacity, deploys an Electro-Muscular Disruption Technology device that contains a built-in monitoring system capable of recording audio or video, for the duration of that deployment.

(6)     (a) The prohibitions in subsection (1)(c) of this section do not apply to persons who intercept or attempt to intercept oral communications that are part of any of the following proceedings, if the person uses an unconcealed recording device or if the communications occur through a video conferencing program:

(A) Public or semipublic meetings such as hearings before governmental or quasi-governmental bodies, trials, press conferences, public speeches, rallies and sporting or other events;

(B) Regularly scheduled classes or similar educational activities in public or private institutions; or

(C) Private meetings or conferences if all others involved knew or reasonably should have known that the recording was being made.

ADD-3

(b) The prohibitions in subsection (1)(c) of this section do not apply to a person who, with the intent to capture alleged unlawful activity, obtains or attempts to obtain a conversation occurring through a video conferencing program if the person is a participant in the conversation, or at least one participant in the conversation consents to the recording, and:

    (A) The person is a law enforcement officer or is acting in coordination with a law enforcement officer;

    (B) The person is acting in coordination with an attorney or an enforcement or regulatory entity; or

    (C) The person reasonably believes that the recording may be used as evidence in a judicial or administrative proceeding.

(7) The prohibitions in subsection (1)(a), (c), (d) and (e) of this section do not apply to any:

    (a) Radio communication that is transmitted by a station operating on an authorized frequency within the amateur or citizens bands; or

    (b) Person who intercepts a radio communication that is transmitted by any governmental, law enforcement, civil defense or public safety communications system, including police and fire, readily accessible to the general public provided that the interception is not for purposes of illegal activity.

(8) Violation of subsection (1) or (2)(b) of this section is a Class A misdemeanor.

(9) The exception described in subsection (5)(b) of this section does not authorize the person recording the law enforcement officer to engage in criminal trespass as described in ORS 164.243, 164.245, 164.255, 164.265 or 164.278 or to interfere with a peace officer as described in ORS 162.247.

(10) As used in this section:

    (a) "Electro-Muscular Disruption Technology device" means a device that uses a high-voltage, low power charge of electricity to induce involuntary muscle contractions intended to cause temporary incapacitation. "Electro-Muscular Disruption Technology device" includes devices commonly known as tasers.

(b) "Law enforcement officer" has the meaning given that term in ORS 133.726.

## O.R.S. § 165.535. Definitions

(1) "Conversation" means the transmission between two or more persons of an oral communication which is not a telecommunication or a radio communication, and includes a communication occurring through a video conferencing program.

## O.R.S. § 165.543. Interception of communications

(1) Except as provided in ORS 133.724 or as provided in ORS 165.540 (2)(a), any person who willfully intercepts, attempts to intercept or procures any other person to intercept or attempt to intercept any wire or oral communication where such person is not a party to the communication and where none of the parties to the communication has given prior consent to the interception, is guilty of a Class A misdemeanor.

(2) As used in this section, the terms "intercept" and "wire or oral communication" have the meanings provided under ORS 133.721.

## O.R.S. § 133.721. Definitions

(5) "Intercept" means the acquisition, by listening or recording, of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device.

* * *

(7) "Oral communication" means:

(a) Any oral communication, other than a wire or electronic communication, uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation; or

(b) An utterance by a person who is participating in a wire or electronic communication, if the utterance is audible to another person who, at the time the wire or electronic communication occurs, is in the immediate presence of the person participating in the communication.

ADD-5

* * *

(10) "Wire communication" means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable or other like connection between the point of origin and the point of reception, whether furnished or operated by a public utility or privately owned or leased.

**Certificate of Service**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system on July 11, 2022.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

Dated: July 11, 2022

/s/ Stephen Klein
Stephen R. Klein
BARR & KLEIN PLLC
1629 K Street NW, Ste. 300
Washington, DC 20006
(202) 804-6676 Telephone
steve@barrklein.com