# Docket No. 22-35271

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

---

PROJECT VERITAS and PROJECT VERITAS ACTION FUND,

*Plaintiffs-Appellants,*

v.

MICHAEL SCHMIDT, in his official capacity as Multnomah County District Attorney and ELLEN ROSENBLUM, in her official capacity as Oregon Attorney General,

*Defendants-Appellees.*

---

*Appeal from a Decision of the United States District Court for the District of Oregon, No. 3:20-cv-01435-MO · Honorable Michael W. Mosman*

## APPELLANTS' REPLY BRIEF

BENJAMIN BARR
BARR & KLEIN PLLC
444 N. Michigan Avenue, Ste. 1200
Chicago, IL 60611
(202) 595-4671 Telephone
ben@barrklein.com

STEPHEN KLEIN
BARR & KLEIN PLLC
1629 K Street NW, Ste. 300
Washington, DC 20006
(202) 804-6676 Telephone
steve@barrklein.com

*Attorneys for Appellants Project Veritas and Project Veritas Action Fund*

---



COUNSEL PRESS · (213) 680-2300          PRINTED ON RECYCLED PAPER



## Table of Contents

Table of Authorities .................................................................................... ii

Introduction ................................................................................................1

Argument.....................................................................................................2

    I.    Oregon's Lopsided Approach to Recording Law is a National
          Outlier.......................................................................................2

          A.    Oregon's Recording Law Distorts Newsgathering
                and Is a Content-Based Restriction on Speech ..........................4

          B.    Oregon Lacks any Finely Tuned, Real Governmental Interest
                to Support its Manipulation of Newsgathering........................10

          C.    A Word About One-Party Secret Recording ............................14

    II.    Veritas Met Relaxed Article III Standards..........................................16

    III.    Of Remedies and Invalidation............................................................22

Conclusion ................................................................................................26

Form 8.  Certificate of Compliance for Briefs........................................27

Certificate of Service ................................................................................28

# Table of Authorities

## Cases

*ACLU of Illinois v. Alvarez*,
  679 F.3d 583 (7th Cir. 2012) ...................................................................9

*Anderson v. City of Hermosa Beach*,
  621 F.3d 1051 (9th Cir. 2010) ...............................................................4

*Ariz. Broadcasters Ass'n v. Brnovich*,
  2022 WL 4121198 (D. Ariz. Sept. 9, 2022) ..........................................3

*Ariz. Right to Life PAC v. Bayless*,
  320 F.3d 1002 (9th Cir. 2003) ..................................................... 17, 18

*Babbitt v. United Farm Workers Nat. Union*,
  442 U.S. 289 (1979) ...............................................................................17

*Barr v. Am. Ass'n of Political Consultants*,
  140 S.Ct. 2335 (2020) ............................................................................23

*Bates v. State Bar of Ariz.*,
  433 U.S. 350 (1977) ...............................................................................22

*Boos v. Barry*,
  485 U.S. 312 (1988) .................................................................................6

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) ...............................................................................25

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ...................................................................................18

*Cal. Pro-Life Council, Inc. v. Getman*,
  328 F.3d 1088 (9th Cir. 2003) ..............................................................17

*Cefalu v. Globe Newspaper Co.*,
  391 N.E.2d 939 (Mass. App. 1979) .......................................................11

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010) .................................................................... 4, 8, 23

*City of Cincinnati v. Discovery Network, Inc.*,
    507 U.S. 410 (1993) .........................................................................7

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994) ...........................................................................6

*City of Lakewood v. Plain Dealer Publishing Co.*,
    486 U.S. 750 (1988) ........................................................................22

*Conroy v. Mewshaw*,
    2022 WL 1750536 (D. Or. Apr. 12, 2022) ........................................13

*Conroy v. Mewshaw*,
    2022 WL 2981453 (D. Or. Jul. 28, 2022) .........................................13

*Cox v. Miller*,
    296 F.3d 89 (2d Cir. 2002) ..............................................................13

*Delaurent v. State*,
    514 P.3d 113 (Or. Ct. App. 2022) ...................................................4, 8

*Doe v. Berkeley Publishers*,
    496 S.E.2d 636 (S.C. 1998)..............................................................12

*Fed. Election Comm'n v. Beaumont*,
    539 U.S. 146 (2003) ........................................................................18

*Foti v. City of Menlo Park*,
    146 F.3d 629 (9th Cir. 1998)..............................................................7

*Glendale Associates, Ltd. v. N.L.R.B.*,
    347 F.3d 1145 (9th Cir. 2003)............................................................6

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ........................................................................23

*Hagler v. Democrat-News, Inc.*,
    699 S.W.2d 96 (Mo. App. 1985).......................................................12

*Honeyfund.com, Inc. v. Ron DeSantis*,
   2022 WL 3486962 (N.D. Fla. Aug. 18, 2022) ....................................................1, 6

*Italian Colors Restaurant v. Becerra*,
   878 F.3d 1165 (9th Cir. 2018) ...................................................... 19, 21

*J.C. v. WALA-TV, Inc.*,
   675 So.2d 360 (Ala. 1996) .......................................................... 11, 12

*Melvin v. Reed*,
   297 P. 91 (Cal. App. 1931)........................................................11

*Meyer v. Grant*,
   486 U.S. 414 (1988) ........................................................15

*Miami Herald Pub. Co. v. Tornillo*,
   418 U.S. 241 (1974) ........................................................5

*NAACP v. Button*,
   371 U.S. 415 (1963) ........................................................25

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ........................................................1

*People v. Clark*,
   6 N.E.3d 154 (Ill. 2011)........................................................ 23, 24

*R.A.V. v. City of St. Paul, Minn.*,
   505 U.S. 377 (1992) ........................................................6

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ........................................................3

*Sorrell v. IMS Health, Inc.*,
   564 U.S. 552 (2011) ........................................................6

*State v. Ashworth*,
   228 P.3d 381 (Idaho Ct. App. 2010) ................................................13

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ........................................................17

iv

*U.S. v. Katz,*
   389 U.S. 347 (1967) ...................................................................................10

*U.S. v. White,*
   401 U.S. 745 (1971) .....................................................................................9

*Valentine v. C.B.S., Inc.,*
   698 F.2d 430 (11th Cir. 1983)..................................................................12

*Wolfson v. Brammer,*
   616 F.3d 1045 (9th Cir. 2010).......................................................... 18, 21

*Zillow, Inc. v. Bork,*
   2022 WL 883849 (E.D. Ky. Mar. 24, 2022) .........................................6

**Statutes**

18 PA. CONST. STAT. § 5703..........................................................................2

720 ILL. COMP. STAT. 5/14-2.......................................................................2

CAL. PENAL CODE § 632 ...............................................................................2

FLA. STAT. § 934.03 .....................................................................................2

MD. CODE ANN., CTS. & JUD. PROC. § 10-402 ...........................................2

MONT. CODE § 45-8-213 ..............................................................................2

N.H. REV. STAT. § 570-A:2 ..........................................................................2

O.R.S. § 165.540 ................................................................................ *passim*

WASH. REV. CODE § 9.73.030 ......................................................................2

**Other Authorities**

2 Z. CHAFEE, GOVERNMENT AND MASS COMMUNICATIONS 633 (1947)....................5

Amy Rokuson, *"To Catch a Predator" Gets Caught: Are NBC's Television Journalists Sacrificing Media Ethics and Legal Procedures for a Chance in the Spotlight?*, 19 SETON HALL J. 511 (2009) ............................................................14

Anna Brown, *Republicans more likely than Democrats to have confidence in police*, PEW RESEARCH CENTER, Jan. 13, 2017 ...................................................3, 4

Ben Kamisar, *Sanders campaign pays $14.5k fine to settle FEC complaint*, THE HILL, Mar. 1, 2018 ...............................................................................................15

Bernard W. Bell, *Secrets and Lies: News Media and Law Enforcement Use of Deception as an Investigative Tool*, 60 UNIV. PITTSBURGH L. REV. 745 (1999) .14

*Lake Wobegon Effect*, PSYCHOLOGY WIKI .............................................................16

Louis W. Hodges, *Undercover, masquerading, surreptitious taping*, J. OF MASS MEDIA ETHICS 3:2 (Fall 1988) ..............................................................................9

Mark Pazniokas, *AG Tong opens civil rights investigation of Project Veritas allegations*, THE CONNECTICUT MIRROR, Sept. 1, 2022 .......................................15

Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193 (1890)..............................................................................................................11

## Rules

FED. R. CIV. P. 54 ...............................................................................................17

## Constitutional Provisions

U.S. CONST. amend. I .................................................................................. *passim*

U.S. CONST. amend. IV ................................................................................ 9, 10

**Introduction**

The State of Oregon continues its foray in being a "First Amendment upside down." *Honeyfund.com, Inc. v. Ron DeSantis*, 2022 WL 3486962 *1 (N.D. Fla. Aug. 18, 2022). Far removed from First Amendment principles, Oregon Revised Statutes section 165.540 picks winners and losers in the marketplace of newsgathering. So higgledy-piggledy, the law welcomes the unannounced recording of conversations that include one class of government actors—law enforcement—while forbidding similar unannounced recording of conversations including any other government official. Unlike most states, Oregon goes a step further to hobble effective newsgathering by banning nearly all surreptitious recording, even in public places.

The Oregon Attorney General and Multnomah County District Attorney attempt to defend these newsgathering restrictions by offering a capacious definition of privacy and invoking watered-down levels of scrutiny. They disregard the special role of one-party recording and undercover journalism and treat speech at the core of the First Amendment—collecting information about public issues—as pedestrian, low-value, discardable speech. *Cf. New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). They ultimately ask that the law's extraconstitutional maze of recording allowances and prohibitions be upheld. But existing free speech doctrine stands against this and should afford relief to Project Veritas and Project Veritas Action Fund (collectively, "Veritas").

**Argument**

## I. Oregon's Lopsided Approach to Recording Law is a National Outlier

Oregon's recording law is not a close cousin to any other state analogue. *Cf.* Appellees' Br. 13-14. While forty states permit what is commonly deemed "one-party consent" to record oral communications or conversations, only ten states employ some form of "all-party consent" in their recording laws.[1] Thus, 80 percent of states permit one party to a conversation to make a secret or unannounced recording of others in that same conversation. Even the minority of states that require all-party consent usually allow for one-party consent in situations with no reasonable expectation of privacy. Unlike Oregon, they do not discriminate between permissive recording of conversations with certain subjects while denying similar rights to record other subjects.

It is easy to understand why states would be reluctant to be recording licensing czars. The law enforcement exception in the law triggers difficult-to-uphold content, even viewpoint, based standards. Indeed, just recently, Arizona enacted a recording law that forbade video recording the police within eight feet, which the United States

---

[1] Excluding Massachusetts, which retains a partially-invalidated ban against surreptitious recording, nine states employ different forms of all-party consent standards for recording conversations. CAL. PENAL CODE § 632; FLA. STAT. § 934.03; 720 ILL. COMP. STAT. 5/14-2; MD. CODE ANN., CTS. & JUD. PROC. § 10-402; MONT. CODE § 45-8-213; N.H. REV. STAT. § 570-A:2; O.R.S. § 165.540; 18 PA. CONST. STAT. § 5703; WASH. REV. CODE § 9.73.030.

District Court for the District of Arizona quickly enjoined. *Ariz. Broadcasters Ass'n v. Brnovich*, 2022 WL 4121198 (D. Ariz. Sept. 9, 2022). The court determined that a law negatively impacting the ability to record one class of government actors was content based because it "singles out specific subject matter for differential treatment." *Id.* at *2 (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 166 (2015)). Conversely, Oregon's law favors the recording of one specific subject matter—the police doing their duties in public—while denying a similar right to record all other government actors. O.R.S. § 165.540(5)(b).

Oregon's lopsided recording law is not like any other state's approach. Rather, it represents a renegade attempt to control the act of newsgathering, generously opening the floodgates of recording for police officers while banning a similar right to record any other government employee. Curiously, the reputation of law enforcement is sharply polarized, often divided between the belief that the police are generally abusive or that they are defenders of the fabric of civil society. And this tracks substantially with ideological beliefs. As reported by the Pew Research Center, about seventy-five percent of Republicans agree that police are doing their job well when it comes to treating ethnic groups equally and using the right amount of force. Anna Brown, *Republicans more likely than Democrats to have confidence in police*, PEW RESEARCH CENTER, Jan. 13, 2017, https://www.pewresearch.org/fact-tank/2017/01/13/republicans-more-likely-than-democrats-to-have-confidence-in-

[police/](police/). Conversely, around twenty-five percent of Democrats share a similar view. *Id.* This revelation bears noting since it reveals ideological masking. Oregon law openly welcomes undercover reporting that heightens accountability of the police while disfavoring undercover reporting about other government actors (or anyone else, for that matter). *See Delaurent v. State*, 514 P.3d 113, 119 (Or. Ct. App. 2022) (exempting district attorneys from the definition of "law enforcement officer" in section 165.540(5)(b)). Oregon has the First Amendment upside down, and this Court should set it aright.

## A. Oregon's Recording Law Distorts Newsgathering and Is a Content-Based Restriction on Speech

Restrictions on protected First Amendment conduct may occur at any point in the speech process. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010). This Circuit has expressly noted that, as to the exercise of free speech and the free press, "we have not attempted to disconnect the end product from the act of creation." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061–62 (9th Cir. 2010). And the hard decisions that go into deciding which news subjects to cover, which to leave out, and how to portray a story are all protected by the First Amendment. *See, e.g.*, *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 255–58

(1974).[2] This includes deciding whether to record a police officer or public records agent doing their work in public.

Section 165.540 acts as a content funnel at the front end of journalism. The state appellees maintain that the law is not content based, that it applies "regardless of the subject-matter of the conversation recorded." Appellees' Br. 16. They insist that the variety of exceptions do not "have anything to do with the content of the conversation that is being recorded." *Id.* at 19. But this misses a crucial first step in analyzing just when Oregon's recording law applies. That is, their argument turns a blind eye to the actual content trigger.

Under the first step of the exception in section 165.540(5)(b), the law's prohibitions *do not apply* to a person who records a conversation in which a law enforcement officer is a participant. Selecting which subject to record in the newsgathering process—a police officer, an environmental planner, or a mayor—invokes First Amendment protection. *Tornillo*, 418 U.S. at 255–58. To ignore this is to endorse government marching orders on which subjects to report about and which to avoid. And the law reflects governmental favoritism of one subject; it is content-

---

[2] *See also* 2 Z. CHAFEE, GOVERNMENT AND MASS COMMUNICATIONS 633 (1947) ("A journal does not merely print observed facts the way a cow is photographed . . . . As soon as the facts are set in their context, you have interpretation and you have selection, and editorial selection opens the way to editorial suppression. Then how can the state force abstention from discrimination in the news without dictating selection?").

based and subject to strict scrutiny. *Boos v. Barry*, 485 U.S. 312, 321–22 (1988). To conclude otherwise would be antithetical to the First Amendment. *Honeyfund.com*, 2022 WL 3486962 at *10.

When reviewing exceptions in speech-related laws, courts often find them content based and subject to strict scrutiny because they amount to state discrimination against particular messages. When Vermont precluded the release of prescribing information by pharmacies, its exemptions allowing release of that information for research or educational compliance amounted to a content-based restriction. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 563–64 (2011). Where Kentucky exempted newspapers, and only newspapers, from cost surcharges for accessing real property tax information, it constituted a content-based discrimination. *Zillow, Inc. v. Bork*, 2022 WL 883849 (E.D. Ky. Mar. 24, 2022). Where St. Paul, Minnesota sought to prohibit certain hate-based communications, but allowed some others, the law was content-based. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992). This Circuit has drawn similar conclusions.

The Court considers a law content based "when it establishes a general ban on speech, but maintains exceptions for speech on certain subjects." *Glendale Associates, Ltd. v. N.L.R.B.*, 347 F.3d 1145, 1155–56 (9th Cir. 2003) (citing *City of Ladue v. Gilleo*, 512 U.S. 43, 60 (1994) (a city's ordinance regulating signs on private property was content-based because it had ten exceptions); *City of Cincinnati*

*v. Discovery Network, Inc.*, 507 U.S. 410 (1993) (ordinance banning commercial handbills on news racks but allowing newspapers was content based); *Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998) (regulation banning posting of signs on public property except for real estate, governmental, and safety and traffic signs was content-based)). So, Oregon's exception that allows the unannounced recording of the police against a general prohibition of unannounced recording reveals a policy favoring the recording of the police while generally making it difficult or impossible to record other subjects. There is just no way around it: section 165.540(5)(b) is a content-based restriction of newsgathering.

The following hypotheticals display the content discrimination in the law. A Veritas journalist elects to sit with a police officer who is soliciting the journalist for a bribe in an open-air café in Portland. The journalist places her cell phone on the table in open view and records the conversation to share with the public. Under the law, she is allowed to do so without any announcement. But another journalist, following another lead, decides to record a different subject. That journalist strikes up a conversation with an employee of the Public Records Advocate at another open-air café, who starts sharing stories about corruption within that office. However, that journalist cannot record his own conversation unless he has notified the employee he is doing so. The former example allows for newsworthy information to be recorded and shared with the public. The latter hampers effective newsgathering and

ignores important First Amendment protections. *See, e.g.*, *Citizens United*, 558 U.S. at 339 (First Amendment protections are designed to hold officials accountable to the public).

It bears repeating that Oregon's requirement that a newsgathering citizen *specifically inform* all participants in a conversation of recording is itself a content-based trigger. O.R.S. § 165.540(1)(c). This is because that announcement itself necessarily alters the content of what will be recorded. The undercover journalist testing a Public Records Advocate employee with a bribe will elicit very little honest information if he must first announce his recording.

Appellees continue to insist that under section 165.540, no government agent reviews the content of communications to decide if unannounced recording is illegal or not. Appellees' Br. 16-17. But that cannot be true. A government actor must necessarily first ask and examine whether the recording meets certain statutory requirements including whether a law enforcement officer participated in the conversation. If so, then no announcement to record is required. If not, any other subject of recording requires the subject to be specifically informed, lest that recording be found to be a criminal violation of the law. *See Delaurent*, 514 P.3d at 114.

For purposes of undercover journalism, announced recording is hobbled, ineffective, and unhelpful. Few burglars will admit they burgled when presented

with the announcement they are being recorded. *See U.S. v. White*, 401 U.S. 745, 749 (1971). But many would-be criminals or abusers of the public trust will otherwise brag about their crimes during a casual stroll on a sidewalk or in a crowded bar. The noted professor of journalism ethics, Louis W. Hodges, expressed this observation when contemplating the use of deceptive newsgathering: "[T]here must be no reasonable likelihood that comparably accurate and reliable information could be obtained as efficiently through conventional investigative techniques." Louis W. Hodges, *Undercover, masquerading, surreptitious taping*, J. OF MASS MEDIA ETHICS 3:2, 26-36 (Fall 1988). In no way can announced recording offer the public accurate and reliable information about corruption, wrongdoing, or public officials abusing the public trust.

Announced recording removes a stock of First Amendment critical information from the public and deprives citizens of helpful information. Conversely, the unique medium of unannounced recording is first-class recording. It allows journalists the best opportunity to "preserv[e] and disseminat[e] news and information about events that occur in public." *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012). This is easy enough to examine. As the Supreme Court has already stated in the Fourth Amendment context, an electronic recording will "many times produce a more reliable rendition of what a defendant has said than will the unaided memory of a police agent." *White*, 401 U.S. at 753. Requiring someone to

specifically announce the recording to disfavored subjects just damages the utility of the recording and gives one side of a contested public accountability debate the upper hand.

**B.      Oregon Lacks any Finely Tuned, Real Governmental Interest to Support its Manipulation of Newsgathering**

To support its ban against unannounced recordings, Oregon claims the law advances an interest in citizens being able to participate in conversations knowing they will not be recorded and broadcast to the world. Appellees' Br. 24. This is an expansive and untethered formulation of privacy, since what one conveys to another on a public sidewalk or in a crowded bar—indeed, in majority of conversations—is always at risk of repetition and rebroadcast. And this is what Oregon attempts to broadly prohibit—citizens from capturing newsworthy information in the public square and sharing it with an interested public.

Recording and privacy law draw from expectations of privacy formed in the context of the Fourth Amendment. These expectations include important boundaries to recognize corresponding First Amendment interests to acquire and publish information. In the Fourth Amendment context, it is well-established that what a "person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *U.S. v. Katz*, 389 U.S. 347, 351 (1967) (Harlan, J., concurring). This is a key lesson for the Appellees: what one does in public is not private. Whenever a person transacts activities or shares information in

the public square, he voluntarily exposes his presence, actions, and ideas to others to be viewed and, in 2022, recorded. Legal norms must catch up to citizens' Ring doorbells, Snap Spectacles (sunglasses with built-in cameras), mobile phones, and other devices that have proliferated everyday life, *not* just law enforcement body cameras. *See* O.R.S. § 165.540(5)(d)(B).

Even the harbingers of privacy law in the United States recognized limits to its application. Samuel Warren and Louis Brandeis's seminal *The Right to Privacy* admitted that privacy claims could not be had for issues of "public and general interest" in which the public has a "legitimate concern." Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193, 214 (1890). And one of the first cases to ever contemplate the outer reaches of privacy understood that a right to privacy "does not exist in the dissemination of news and news events." *Melvin v. Reed*, 297 P. 91 (Cal. App. 1931).

Courts nationwide have recognized this important distinction within privacy law because the enumerated constitutional right to engage in newsgathering is often superior to statutorily or common law driven privacy interests. *See, e.g.*, *Cefalu v. Globe Newspaper Co.*, 391 N.E.2d 935, 939 (Mass. App. 1979) (photographs of individuals lined up in public for unemployment benefits did not constitute invasion of privacy because appearing in a public place "necessarily involves doffing the cloak of privacy which the law protects"); *J.C. v. WALA-TV, Inc.*, 675 So.2d 360

(Ala. 1996) (coverage of runaway child and supposedly private details could not constitute invasion of privacy due to the public nature of the event and First Amendment public interest in this information); *Hagler v. Democrat-News, Inc.*, 699 S.W.2d 96, 99–100 (Mo. App. 1985) (coverage and publication of police raid and seizure of marijuana is not an invasion of privacy because it constitutes a matter of public importance); *Valentine v. C.B.S., Inc.*, 698 F.2d 430, 432–33 (11th Cir. 1983) (previously disclosed public events could not form basis for invasion of privacy, especially given they were matters of public importance); *Doe v. Berkeley Publishers*, 496 S.E.2d 636, 637 (S.C. 1998) (publishing name of sexual assault victim did not form basis of invasion of privacy claim because the information was a matter of public importance).

The Project Veritas Parties do not suggest that Oregon is without any interest in protecting privacy. But this interest must be more tailored than a near blanket ban of unannounced recording. The state appellees suggest a parade of horribles will follow the vindication of the First Amendment in this matter—including that recording will be allowed in twelve-step groups, religious services, or in political campaigns. Appellees' Br. 25. But these are defined, objectively identified areas where privacy concerns already are, or may be, protected. As noted in the Project Veritas Parties' opening brief, Oregon already protects against the invasion of privacy in several ways. Appellants' Br. 42-43. Oregon tort law recognizes the

invasion of privacy, and the U.S. District Court of Oregon recently recognized that "publishing private information in a socially intolerable way" offers a cause of action. *Conroy v. Mewshaw*, 2022 WL 1750536 at *6 (D. Or. Apr. 12, 2022); *see also Conroy v. Mewshaw*, 2022 WL 2981453, at *3 (D. Or. Jul. 28, 2022) (agreeing "that Plaintiff adequately alleged wrongful disclosure.") Courts frequently examine the fact-intensive issues underlying privacy torts. *See, e.g.*, *Cox v. Miller*, 296 F.3d 89 (2d Cir. 2002) (no expectation of privacy in communications to other Alcoholics Anonymous members given lack of confidentiality in the communication); *State v. Ashworth*, 228 P.3d 381, 385–86 (Idaho Ct. App. 2010) (finding communications in a twelve-step program private because the "nature of Alcoholics Anonymous conveys an objective understanding of a group that protects the anonymity of its members"). In doing so, courts tailor privacy concerns to respect free speech interests. Instead of allowing these factually difficult calls to be made in court, Oregon used a bludgeon to eliminate an invaluable method of acquiring information. In tailoring the protection of privacy to free speech and the free press, these rights are patently missing in Oregon law.

By failing to tailor the law to adhere to First Amendment concerns, section 165.540 fails any tailoring analysis before this Court. *See* Appellants' Br. 38-48.

## C.    A Word About One-Party Secret Recording

Beyond Oregon's manipulation of newsgathering by restricting open recording, its ban of surreptitious recording—even as a party—is equally problematic. One-party secret recording is a most valuable—indeed, irreplaceable—tool. Consider *To Catch a Predator*, a former *Dateline NBC* series. *See* Amy Rokuson, *"To Catch a Predator" Gets Caught: Are NBC's Television Journalists Sacrificing Media Ethics and Legal Procedures for a Chance in the Spotlight?*, 19 SETON HALL J. 511 (2009). There, reporter Chris Hansen worked with an organization called Perverted Justice to set up sting operations against alleged pedophiles. This led to public transparency and discussions about the considerable problem of sexual abuse across the country. Or consider the *Chicago Sun-Times* Mirage Bar investigation, where it purchased a bar and reported upon happenings of corruption to the public. *See* Bernard W. Bell, *Secrets and Lies: News Media and Law Enforcement Use of Deception as an Investigative Tool*, 60 UNIV. PITTSBURGH L. REV. 745, 780 (1999). This led to changes in Chicago city governance and important anti-corruption reforms. Beneath all of this, the obvious: wrongdoers rarely admit to wrongdoing on the record.

Veritas's success in reporting has depended almost exclusively on one-party secret recording. They would not have documented illegal campaign contributions from foreign nationals in the 2016 presidential campaign without it. *See* Ben

Kamisar, *Sanders campaign pays $14.5k fine to settle FEC complaint*, THE HILL, Mar. 1, 2018, *available at* https://thehill.com/homenews/campaign/376373-sanders-campaign-pays-145k-fine-to-settle-fec-complaint/. Their recent revelations of illegal ideological bias in public school systems also depended entirely on one-party secret recording. *See* Mark Pazniokas, *AG Tong opens civil rights investigation of Project Veritas allegations*, THE CONNECTICUT MIRROR, Sept. 1, 2022, *available at* https://ctmirror.org/2022/09/01/project-veritas-jeremy-boland-greenwich-ct-investigation-william-tong/. Only one newsgathering medium, surreptitious one-party recording, made this information available to the American public.

That Veritas acquires such eclectic newsworthy information via one-party secret recording is constitutionally significant. Selective permission to allow citizens to use hobbled, half-effective means of recording—such as, if the journalist can convince the subject to enter his or her own home—do not alleviate the constitutional injury before this Court. *See* O.R.S. § 165.540(3). That is, citizens enjoy the right to select "what *they* believe to be the most effective means for so doing." *Meyer v. Grant*, 486 U.S. 414, 424 (1988) (emphasis added). Without one-party secret recording, there is no Chris Hansen, there is no Mirage Bar, and there is no Project Veritas. Accordingly, in the face of an unequivocal secret recording ban, less newsworthy stories break and the public gets to hear in no small part what the state wants it to hear. And like Lake Wobegon, most of Oregon's government agents,

except the police, are above average.[3] The First Amendment demands better than this.

Recording and privacy laws must give breathing space to countervailing First Amendment concerns. One of the major purposes of the First Amendment is to keep government officials accountable, and eliminating one of the reliable ways of doing so is not supportable. As detailed in Veritas's opening brief, there is no interest in personal privacy that imposes omertà over citizens' own conversations. Appellants' Br. 38. And a prophylactic ban of nearly all secret recording, including by a party to a conversation, simply cuts off too much high-value newsgathering to pass any tailoring analysis. The State of Oregon must go back to the drawing board and draft a recording law that appropriately tailors the protection of privacy concerns to respect free speech. Because section 165.540 does not do so, it should be declared constitutionally invalid.

## II.    Veritas Met Relaxed Article III Standards

Veritas challenged Oregon recording law on its face and as applied. ER-103 (Compl. Prayer for Relief ¶1). The state complains that the "precise contours" of the as-applied challenge are not clear, and that the case is not ripe for review. Appellees'

---

[3]    *See, e.g.*, *Lake Wobegon Effect*, PSYCHOLOGY WIKI, https://psychology.fandom.com/wiki/Lake_Wobegon_effect (last visited Sept. 30, 2022).

Br. 43. They allege that Veritas's request for relief was not "limited to any particular circumstances or purposes." *Id.* But a request to remedy a constitutional violation need not be limited to only afford relief to record, for example, an employee of the Public Records Advocate on Thursdays while they shop at Kramer Books. *See, e.g.*, ER-95 (Compl. ¶28). That would require Veritas to return to court with a new challenge each time a new opportunity arose instead of enjoying relief congruent with their newsgathering.

This pleading practice is consistent with Federal Rule of Civil Procedure 54(c): "Every . . . final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." *Id.* It is also consistent with Article III jurisprudence on standing and ripeness. That is, Project Veritas and Project Veritas Action Fund pled that they intend to engage in a course of conduct "arguably affected with a constitutional interest." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)). In the context of First Amendment protected conduct, more relaxed standing and ripeness inquiries are the norm. *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003). Indeed, one need not await threatened injury due to the chilling effect such laws have on free speech interests. *Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). To avoid the chilling effect of restrictions on speech, this Circuit has followed a

"hold your tongue and challenge now" approach rather than requiring litigants to speak first and take their chances with the consequences. *Id.* at 1006.

*Wolfson v. Brammer* is illustrative of properly relaxed ripeness and standing considerations in pre-enforcement First Amendment challenges. 616 F.3d 1045 (9th Cir. 2010). There, a judicial candidate satisfied Article III concerns to challenge a law restricting candidate conduct because he expressed a general desire to solicit campaign contributions and to endorse other candidates. *Id.* at 1059. This Circuit did not require the candidate to identify particular contributions he might raise or other candidates he might endorse.[4] Addressing prudential ripeness concerns, the Court noted that it addresses two factors—the fitness of the issues for review and the hardship imposed by withholding review. *Id.* at 1060. Because the law involved primarily questions of law, review was appropriate. *Id.* And because the candidate would have to engage in self-censorship until some future resolution of the issue, the hardship tipped in his favor. *Id.* at 1060–61.

---

[4] *Contra* the state appellees' arguments here, whether and how a candidate may make particular contributions is highly dependent on the facts. This is because election law forbids certain corporate contributions, limits coordination of information and contribution efforts, and places other fact-specific limits on electoral activity. *See, e.g.*, *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146 (2003); *Buckley v. Valeo*, 424 U.S. 1 (1976). Even in light of this, this Circuit did not require so detailed of fact pleading but rather found Article III concerns satisfied given the intent to generally engage in activity that would violate the law.

More recently, this Circuit followed relaxed standards when addressing Article III concerns in a First Amendment challenge. *Italian Colors Restaurant v. Becerra*, 878 F.3d 1165, 1171–72 (9th Cir. 2018). Even vague statements to engage in behavior that would violate the law satisfied standing. *Id.* at 1173. The case involved credit card surcharges, and general statements that the plaintiff's shops would impose surcharges "at their stores, on their customers, when credit card surcharges are legal" was sufficient for Article III purposes. *Id.* at 1174. Notably, this Court did not require the restaurants to show which customers or at what times they would apply these surcharges. Instead, a general intent to do so in specific violation of the law was sufficient.

In the challenge before this Court, Veritas satisfies standing and ripeness concerns. Undercover journalists working for both organizations have documented newsworthy matters by obtaining conversations through secret and unannounced recording as a party, often in areas held open to the public such as sidewalks, restaurants, and hotel lobbies. ER-89–90 (Compl. ¶5). Project Veritas has used one-party open and secret recording to investigate a variety of matters of public concern. *See, e.g.*, ER-93–94, 98 (Compl. ¶¶21, 34). So has Project Veritas Action Fund, using these methods to document protests in various states, including Virginia and Georgia. ER-96, 106–111 (Compl. ¶32, Compl. Exhs. 1-2). Both parties seldom inform others they are being recorded since such an announcement damages the

truthfulness and integrity of what is to be recorded. *See, e.g.*, ER-95–96, 99 (Compl. ¶¶29, 38). The restrictions in section 165.540 censor unannounced open recording and one-party secret recording in Oregon, and, but for the law, the Project Veritas Parties would use both methods throughout the state. ER-95–96 (Compl. ¶¶28-31).

Were these prohibitions not in place, Project Veritas Action Fund would investigate allegations of corruption at the offices of the Oregon Public Records Advocate and the Public Records Advisory Council. Specifically, the investigation would examine whether the Advocate and Council operate impartially or under pressure from the Governor. ER-95 (Compl. ¶28). But for section 165.540, The organizations' journalists would investigate this issue and, as a party, secretly record conversations with the Advocate, his or her staff, and members of the Public Records Advocate Council in: (1) open-air cafés in Portland, (2) public parks, (3) on sidewalks, and (4) in other public areas. *Id.* If secret recording is not achievable, Project Veritas Action journalists would use open, unannounced recording in these same circumstances. *Id.* These pleadings are sufficiently detailed to satisfy Article III concerns.

Project Veritas would focus its investigations in Oregon on the rise in violent protests in Portland between the police and members of Antifa and other activist groups. This investigation involves four distinct sets of reporting activities. ER-95–96 (Compl. ¶29). First, Veritas would obtain conversations between the police and

protestors through secret recording to report whether usual policing functions are occurring in Portland. Second, Veritas journalists would secretly obtain conversations with the police to gather candid police perspectives on the causes of the protests. Third, Veritas journalists would secretly obtain conversations with protestors to gather their perspectives about the causes of the protests, to learn about instances of police abuse, and to investigate any anti-police animus. In less dangerous situations or where secret record simply is not viable, Veritas would openly record protestors in an unannounced manner. *Id.* These pleadings are sufficiently detailed to satisfy Article III concerns. As to this investigation, the Project Veritas Parties filed in the court below—and at this Court—a copy of a video that reflects *the exact type of one-party secret recording* Veritas would undertake under much the same circumstances but for the law. *See* ER-107 (DVD folder "Virginia Recordings").

Like *Wolfson* and *Italian Colors Restaurant*, Veritas has alleged specific plans that the organizations would execute but for section 165.540. Although they cannot predict which specific park, café, or sidewalk where their undercover journalists might find a Public Records Advocate, they need not do so. All they must do is generally allege their intention to engage in this prohibited conduct with sufficient particularity to allow this Court to resolve the challenge. *See, e.g.*, ER-107. They have described with particularity four concerns they wish to investigate and record

relating to violent protests in Oregon. Naturally, neither Veritas party is clairvoyant and cannot predict the exact occurrences they would record. But they can and have alleged general plans to engage in constitutionally protected conduct prohibited by the law at issue.

If pre-enforcement First Amendment challenges were not subject to relaxed Article III standards, free speech rights would go unvindicated. Few speakers have the resources to risk criminal penalties or endure lengthy litigation. "First Amendment interests are fragile interests, and a person who contemplates protected activity might be discouraged by the *in terrorem* effect of the statute." *Bates v. State Bar of Ariz.*, 433 U.S. 350, 380 (1977). Thus, the chill emanating from Oregon's speech-suppressive recording law is sufficient to satisfy standing and ripeness concerns for would-be speakers such as Veritas. *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755–57 (1988).

## III. Of Remedies and Invalidation

Caught between a constitutional rock and a hard place, there are few options for partial invalidation of section 165.540. This further supports broad, facial relief. Facial invalidity rests on three grounds: (1) federalism concerns, (2) the adequacy of relief, and (3) the need to protect newsgathering for third parties not before the court. As to federalism concerns, there are limits to a federal court's ability to construe state statutes. That is, it is "not within [the federal judiciary's] power to construe and

narrow state laws." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). Unlike a situation such as *Barr v. American Association of Political Consultants*, this Court is interpreting a state, not federal, statute. 140 S.Ct. 2335 (2020). Federal courts enjoy some latitude to construe or narrow a federal statute, but where a state law is before a federal court, the court lacks this authority. This is especially true for a law such as section 165.540 that enjoys decades of consistent state court interpretation. *See* Appellants' Br. 6-7.

As to overbreadth and standing, the attorney general and district attorney suggest Veritas simply asked for too much relief. But where a law reaches far beyond its intended goal—here, to protect conversational privacy—and damages other protected First Amendment conduct, invalidation is appropriate. After all, the distinction made between "facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United*, 558 U.S. at 332. Where narrower arguments and proffered constructions are not sustainable under a fair reading of the law, facial invalidation is appropriate. *Id.* at 332-33.

The analysis of *People v. Clark* is apt. 6 N.E.3d 154, 160–62 (Ill. 2011). There, the Illinois Supreme Court invalidated the state's recording law because, while it was designed to protect conversational privacy, it reached much further and

prohibited even secret or unannounced recording of loud arguments on the street or a political debate in a park. *Id.* Just the same, section 165.540 reaches too far. Though it contains government-blessed exceptions, such as accommodating the open recording of certain meetings or law enforcement, it still prohibits one-party secret recordings on streets or in other places with no expectation of privacy or to capture wrongdoing of government officials *anywhere*. All these areas have little traditional connection with privacy concerns since what one exposes in public is usually public.

A recording law that considers nearly all public communications to be private is foundationally overbroad. As the Illinois Supreme Court reasoned:

> If another person overhears what we say, we cannot control to whom that person may repeat what we said. That person may write down what we say and publish it, and this is not a violation of the eavesdropping statute. Yet if that same person records our words with an audio recording device, even if it is not published in any way, a criminal act has been committed. The person taking notes may misquote us or misrepresent what we said, but an audio recording is the best evidence of our words. Yet, the eavesdropping statute bars it.

*Clark*, 6 N.E.3d at 161. Oregon elected, through a series of legislative amendments, to extensively expand the reach of its recording law. It works to bar secret or unannounced recording of a host of common, everyday interactions that are ordinarily viewed as lacking any connotation of privacy. The law is not reflective, legislative wisdom. It is not narrowly tailored to protect privacy interests. It rather flounders and forbids citizen journalists from using the most reliable form of

recording to capture newsworthy events happening in public. This sort of languid approach to tailoring is not permitted by the First Amendment. Rather, Oregon's law is prophylactic and unconstitutional under controlling First Amendment precedent. *NAACP v. Button*, 371 U.S. 415, 438 (1963).

Finally, there is a further social good to facial invalidation through overbreadth, and that is to respect the rights of citizens and journalists not before this Court. An overbroad statute's mere existence "may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). Such laws, like section 165.540, may exist for decades and criminalize the innocent conduct of many until a singular plaintiff musters the courage and resources to challenge it.

Oregon's recording law reaches too far, captures too much First Amendment protected newsgathering, and extends to every citizen journalist operating in the state. It bans the most effective means of capturing information occurring in public under the rubric that it is "private" and thus cuts off substantial amounts of important public dialogue. Section 165.540 is not subject to a workable narrowing construction and should rather be sent back to the Oregon Legislature to draft a new recording law that respects free speech in light of privacy interests.

**Conclusion**

This Court should reverse the opinion and order of the district court dismissing Veritas's claims.

Respectfully submitted on the 3rd day of October, 2022.

/s/ Benjamin Barr
Benjamin Barr
BARR & KLEIN PLLC
444 N. Michigan Avenue, Ste. 1200
Chicago, IL 60611
(202) 595-4671 Telephone
ben@barrklein.com

/s/ Stephen Klein
Stephen R. Klein
BARR & KLEIN PLLC
1629 K Street NW, Ste. 300
Washington, DC 20006
(202) 804-6676 Telephone
steve@barrklein.com

*Attorneys for Plaintiffs-Appellants*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-35271

I am the attorney or self-represented party.

**This brief contains** | 5,918 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [        ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Stephen Klein | **Date** | October 3, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

Form 8      27      *Rev. 12/01/2018*

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Stephen Klein
Stephen R. Klein
BARR & KLEIN PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(202) 804-6676 Telephone
steve@barrklein.com