*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

PROJECT VERITAS and PROJECT VERITAS ACTION FUND,

*Plaintiffs-Appellants,*

v.

MICHAEL SCHMIDT, in his official capacity as Multnomah County District Attorney and ELLEN ROSENBLUM, in her official capacity as Oregon Attorney General,

*Defendants-Appellees.*

---

*Appeal from a Decision of the United States District Court for the District of Oregon,*
*No. 3:20-cv-01435-MO · Honorable Michael W. Mosman*

## APPELLANTS' SUPPLEMENTAL BRIEF

BENJAMIN BARR
BARR & KLEIN PLLC
444 N. Michigan Avenue, Ste. 1200
Chicago, IL 60611
(202) 595-4671 Telephone
ben@barrklein.com

STEPHEN KLEIN
BARR & KLEIN PLLC
1629 K Street NW, Ste. 300
Washington, DC 20006
(202) 804-6676 Telephone
steve@barrklein.com

*Attorneys for Appellants Project Veritas and Project Veritas Action Fund*

 

# Table of Contents

Table of Authorities............................................................................ ii

Introduction .........................................................................................1

Argument.............................................................................................2

    I.    Oregon's Recording Law Triggers First Amendment Scrutiny ............2

        A.    Picasso and his Brushes: Laws Targeting the Creation of Speech Trigger First Amendment Scrutiny ...............................................2

        B.    Limits on Speaker Preferences About How to Exercise First Amendment Freedoms Trigger First Amendment Scrutiny .......4

        C.    Similar Pre-Publication Decisions Trigger First Amendment Scrutiny .......................................................................................6

    II.    The Oregon Recording Law's Exceptions Distort Decisions About What Subjects to Film and Constitute Content-Based Restrictions on Speech.....................................................................................9

    III.    A Word About Severability and King Pyrrhus ...................................13

Conclusion .........................................................................................15

# Table of Authorities

## Cases

*ACLU of Illinois v. Alvarez*,
  679 F.3d 583 (7th Cir. 2012) ..........................................................................2, 14

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*,
  916 F.3d 749 (9th Cir. 2019) ................................................................................10

*Anderson v. City of Hermosa Beach*,
  621 F.3d 1051 (9th Cir. 2010) ..................................................................... *passim*

*Animal Legal Defense Fund v. Wasden*,
  878 F.3d 1184 (9th Cir. 2018)................................................................... 1, 3, 14

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
  140 S.Ct. 2335 (2020) ...........................................................................................11

*Buehrle v. City of Key West*,
  813 F.3d 973 (11th Cir. 2015)..................................................................................2

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010) .................................................................................................3

*City of Cincinnati v. Discovery Network, Inc.*,
  507 U.S. 410 (1993) ...............................................................................................11

*City of Ladue v. Gilleo*,
  512 U.S. 43 (1994) .................................................................................................11

*Columbia Broadcasting System, Inc. v. Democratic Nat'l Cmte.*,
  412 U.S. 94 (1973) ...................................................................................................7

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
  657 F.3d 936 (9th Cir. 2011)..................................................................................13

*Connick v. Myers*,
461 U.S. 138 (1983) ...........................................................2

*Fields v. City of Philadelphia*,
862 F.3d 353 (3d Cir. 2017).............................................14

*First Nat'l Bank v. Bellotti*,
435 U.S. 765 (1978) .........................................................15

*Fordyce v. City of Seattle*,
55 F.3d 436 (9th Cir. 1995) ...............................................3

*Foti v. City of Menlo Park*,
146 F.3d 629 (9th Cir. 1998) ...........................................11

*Glendale Associates, Ltd. v. N.L.R.B.*,
347 F.3d 1145 (9th Cir. 2003).........................................11

*Green v. Miss United States of America, LLC*,
52 F.4th 773 (9th Cir. 2022) ..............................................8

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
515 U.S. 557 (1995) ...........................................................8

*Legal Services Corp. v. Velazquez*,
531 U.S. 533 (2001) .........................................................13

*Lindmark Associates, Inc. v. Willingboro Tp.*,
431 U.S. 85 (1977) .........................................................7, 8

*Meyer v. Grant*,
486 U.S. 414 (1988) .......................................................5, 14

*Miami Herald v. Tornillo*,
418 U.S. 241 (1974) .......................................................7, 10

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018). ......................................................6, 10

*Project Veritas Action Fund v. Rollins*,
   982 F.3d 813 (1st Cir. 2020) .................................................................14

*Project Veritas v. Schmidt*,
   72 F.4th 1043 (9th Cir. 2023), reh'g en banc granted, opinion vacated, 95 F.4th
   1152 (9th Cir. 2024) ............................................................ 4, 5, 13, 14

*Reed v. Town of Gilbert Ariz.*,
   576 U.S. 155 (2015) .........................................................................12

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
   487 U.S. 781 (1988) ...........................................................................7

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*,
   502 U.S. 105 (1991) .........................................................................12

*U.S. v. Grace*,
   461 U.S. 171 (1983) .........................................................................14

**Statutes**

O.R.S. § 165.540 ............................................................................. *passim*

**Constitutional Provisions**

U.S. Const. amend. I. ....................................................................... *passim*

## Introduction

We begin with first principles. The act of recording is "inextricably intertwined" with the end-product of reporting the news and is "itself entitled to full First Amendment protection." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1062 (9th Cir. 2010); *see also Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184, 1204 (9th Cir. 2018). Every journalist's decision about which subject to record and how to acquire a story involves individual expressive deliberation. Oregon Revised Statutes section 165.540 is little more than government intrusion into journalistic decisions about how to capture reliable and candid events happening in public. Project Veritas and Project Veritas Action Fund (collectively "Veritas") request that the Court rule that this law is unconstitutional under the First Amendment. U.S. CONST. amend. I.

Oregon's peculiar recording law supposedly protects citizens by enabling them to "know[] whether their conversations are being recorded." DktEntry 19 at 31 (Appellees' Br.) This far-reaching, portable privacy bubble applies even in the most public of fora, extinguishing First Amendment rights in its wake. Like tattoo artists and animal rights activists who came before it, Veritas's distinctive techniques deserve similar First Amendment protection. This supplemental brief addresses why Oregon's recording law triggers scrutiny for recording, includes content-based triggers, and is constitutionally infirm.

# Argument

## I. Oregon's Recording Law Triggers First Amendment Scrutiny

Section 165.540 triggers three strands of doctrinal First Amendment concern, each giving rise to First Amendment scrutiny.

### A. Picasso and his Brushes: Laws Targeting the Creation of Speech Trigger First Amendment Scrutiny

> The process of expression through a medium has never been thought so distinct from the expression itself that we could disaggregate Picasso from his brushes and canvas, or that we could value Beethoven without the benefit of strings and woodwinds. In other words, we have never seriously questioned that the processes of writing words down on paper, painting a picture, and playing an instrument are purely expressive activities entitled to full First Amendment protection.

*Anderson*, 621 F.3d at 1062.

Capturing items of public concern to disseminate for public consumption occupies the "highest rung of the hierarchy of First Amendment values." *Connick v. Myers*, 461 U.S. 138, 145 (1983). If the First Amendment did not protect the antecedent acts giving rise to the free flow of ideas, government would be free to "proceed upstream and dam the source" of speech. *Buehrle v. City of Key West*, 813 F.3d 973, 977 (11th Cir. 2015); *see also ACLU of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (failure to protect antecedent speech acts would make resulting publication utterly ineffective).

The Supreme Court has consistently protected all elements of creation of the "speech process." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010). Within the Ninth Circuit, *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995), and *Wasden*, 878 F.3d at 1203–05, stand for the proposition that laws impacting the newsgathering process trigger First Amendment scrutiny. As explained in *Wasden*, the "act of recording is . . . expressive activity; decisions about content, composition, lighting, volume, and angles, among others, are expressive in the same way as the written word or a musical score." 878 F.3d at 1203. And it was *Anderson*, 621 F.3d at 1061–62, that recognized that courts cannot meaningfully separate the process of expression from its end product or publication.

Section 165.540 empowers government to intrude into journalistic choices about how to capture reliable and candid events happening in public. The law demands that nearly any subject of audio recording be "specifically informed" of the recording—an announcement that eliminates the candidness of that moment entirely. And so, violent protestors who believe they are speaking to another member of their "revolution" will gladly share details of their group's next dangerous plan—until the camera lights come out and recording is announced. And a crooked city council member might brag about his corrupt dealings at a crowded bar, but not when a reporter announces the recording and shoves a microphone in his face.

This need to capture candid, in-the-moment recordings was borne out by the pleadings below and the Ninth Circuit's earlier ruling. *See, e.g.*, ER-99 (Ver. Compl. ¶38) ("They never specifically inform subjects about recording because subjects will not share truthful, or, at least, candid information when notice is provided. Similarly, [they] rarely record openly because subjects change their behavior and recollections when they detect a recording device"); *Project Veritas v. Schmidt*, 72 F.4th 1043, 1065 (9th Cir. 2023), reh'g en banc granted, opinion vacated, 95 F.4th 1152 (9th Cir. 2024) ("such notification would effectively destroy the intended content of the recording"). Unannounced recording delivers the truth of the situation captured. It offers the public high-value information. Announced recording ensures that nothing too informative is shared—talking points are regurgitated and soundbites get delivered just as practiced. Given that the act of recording is "inextricably intertwined" with any end news publication, Oregon's choice to inject itself into journalistic choices about what or how to record triggers First Amendment scrutiny. *Anderson*, 621 F.3d at 1062.

### B.    Limits on Speaker Preferences About How to Exercise First Amendment Freedoms Trigger First Amendment Scrutiny

Since the act of recording is protected by the First Amendment, this Court should next consider whether limits on unannounced recording triggers First Amendment scrutiny. Concomitant with First Amendment protection for recording is a parallel line of First Amendment reasoning borne out in *Meyer v. Grant*, 486

U.S. 414 (1988). This principle recognizes that a speaker's manner of expression remains constitutionally protected. That is, the First Amendment protects a speaker's "right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Id.* at 424. This important rule is grounded in subjective, speaker-held expectations.

*Meyer* concerned Colorado's ban of initiative proponents using paid petition circulators and its consequential impact on free speech. *Id.* Importantly, Colorado left open other means for initiative proponents to get their message out—through unpaid, volunteer petition circulation. Much like the dissent reasoned in the original *Schmidt* opinion, *Meyer*'s initiative proponents still had other ways to speak. *See Schmidt*, 72 F.4th at 1077–78 (Christen, J., dissenting). But the fact that one could "employ other means to disseminate their ideas [did] not take their speech . . . outside the bounds of First Amendment protection." *Meyer*, 486 U.S. at 424.

Oregon's recording law presents a quandary similar to the law invalidated in *Meyer*. Colorado eliminated one entire channel of communication—paid initiative circulators—while leaving other options available to exercise free speech rights. Oregon eliminated one entire channel of communication—unannounced recording—while leaving announced recording available. Colorado's law targeted speech about important societal concern (the deregulation of the trucking industry) and Oregon's law smothers reporting that captures newsworthy information. Like

5

Colorado, that Oregon leaves open ineffectual, announced recording does nothing to resolve the First Amendment inquiry.

Oregon's law triggers *Wasden*'s earlier realization that government rules about how or what one records necessarily triggers First Amendment scrutiny. Because journalistic selection of which subjects and topics to record is necessarily "intertwined with the process of producing" the end publication, that recording is "entitled to full constitutional protection." *Anderson*, 621 F.3d at 1063. Whether it is the tattoo artist selecting a design, an animal rights activist deciding which farm to film, or a Veritas journalist on the streets of Portland determining which Antifa members or police officers to record, each selection carries with it individual expressive deliberation (the *who* and *how* of recording), thus invoking First Amendment scrutiny. Reading *Meyer* and *Wasden* in tandem demonstrate that laws burdening the speech creation process still trigger First Amendment scrutiny, even if other avenues of expression remain available.[1]

### C. Similar Pre-Publication Decisions Trigger First Amendment Scrutiny

The Supreme Court has long protected the freedom of journalists to decide the content of their newsgathering and resulting publication. *Miami Herald v.*

---

[1] Forcing speakers to carry government-mandated messages causes the additional injury of diluting or altering the message of the speaker. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018).

*Tornillo*, 418 U.S. 241, 258 (1974). The "choice of material to go into a newspaper" is a protected form of "editorial control and judgment." *Id.* Citing Zechariah Chafee, the *Miami Herald* Court noted that "abstention from discrimination in the news" necessarily would constitute "dictat[ed] selection" of that very information by the government. *Id.* at 258 n.24. What the journalist elects to capture with his lens or record with his iPhone must be protected against government interference.

In cases like *Miami Herald* and *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94 (1973), the Supreme Court faced edicts that attempted to force the publication of specific material by the press. But the reasoning denying government the authority to compel publication was squarely centered on the protection of journalistic control and autonomy—individual expressive deliberation. Cases like *Riley v. National Federation of the Blind*, which invalidated reasonable fee rule imposed on charities, also stand for the proposition that "speakers, not the government, know best both what they want to say and how they want to say it." 487 U.S. 781, 791 (1988).

Just the same, cases like *Lindmark Associates v. Willingboro Township* have guarded against government attempts to prevent the citizenry "from obtaining certain information." 431 U.S. 85, 96 (1977). There, a township council attempted to ban real estate "for sale" signs in an effort to prevent the "flight of white homeowners. . . ." *Id.* at 86. The government reasoned this was really no abridgement

of speech, since the law "restrict[ed] only one method of communication." *Id*. at 93. Still, the Court took notice of the uniquely effective nature of "for sale" signs and understood that other ways of communicating would be less effective.

The Supreme Court's speaker autonomy cases came to its fore in *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995). *Hurley* plainly provides that all "speech inherently involves choices of what to say and what to leave unsaid." *Id.* at 573 (quotation omitted). This rule extends broadly, as government may not interfere with speaker preferences about "expressions of value, opinion, or endorsement" and reaches equally so to "statements of fact." *Id.* The rule is deceptively simple: it shields "choices of content that in someone's eyes are misguided, or even hurtful." *Id.* at 574.

This Court has likewise recognized that decisions about what sort of content to include even in beauty pageants triggered First Amendment scrutiny per *Hurley*. *Green v. Miss United States of America, LLC*, 52 F.4th 773 (9th Cir. 2022). Because pageants combined music and dancing to express a message, First Amendment concerns are implicated. More importantly, beauty pageants are used to express the "ideal vision of American womanhood" and First Amendment concerns implicate both *who* and *how* the pageant speaks. *Id.* at 780. Thus, the pageant's "message [could not] be divorced from the Pageant's selection and evaluation of contestants." *Id.*

Whether it is beauty pageants, animal rights activists, or petition circulators, the First Amendment protects the *who* and *how* of speech creation. Oregon cannot divorce Veritas's method of recording from its publications. Oregon's election to inject itself into the *who* and *how* of reporting by attaching announcement rules for recording triggers First Amendment concerns.

Individual choices of Veritas journalists to decide who and how to record trigger First Amendment scrutiny. Cases like *Hermosa Beach* and *Wasden* instruct that individual expressive elements giving rise to an end creation are each protected. Cases like *Meyer* demonstrate that an important part of First Amendment protection is in allowing speakers to decide the manner they think best to communicate their message. And cases like *Miami Herald*, *Hurley*, and *Green* hold that journalistic decisions about what goes in and what stays out of expressive work rests at the core of the First Amendment. Taken together, these doctrinal strands demonstrate that Oregon's requirement that most recording include a warning that ensures some subjects are "specifically informed" triggers serious First Amendment concerns.

## II.    The Oregon Recording Law's Exceptions Distort Decisions About What Subjects to Film and Constitute Content-Based Restrictions on Speech

Section 165.540 acts as a content funnel at the front end of journalism. Section 165.540(5)(b) removes the law's prohibitions for a person who records a conversation in which a law enforcement officer is a participant. A broader

exemption allows one to "record[] a conversation during a felony that endangers human life," assuming one can predict which felonies will endanger a human life. Or. Rev. Stat. § 165.540(5)(a). As demonstrated earlier, selecting which subject to record in the newsgathering process—a police officer or member of the Public Records Advocate—invokes First Amendment scrutiny. *Miami Herald*, 418 U.S. at 255–58. Just the same, deciding which act of public unrest to record—journalist Andy Ngo being beaten over the head and suffering brain injuries in Portland rallies or capturing simple acts of graffiti—invokes First Amendment scrutiny. In other words, it is for a journalist, not a government official, to select which events in public to record. When government puts its thumb on the preferred content-recording of a journalist, it creates a content-based speech restriction. The exemptions in Oregon's law bring life to government content preferences and render Section 165.540 unconstitutional.[2]

---

[2] It bears repeating that Oregon's requirement that a newsgathering citizen specifically inform all participants in a conversation of recording is itself a content-based trigger. Or. Rev. Stat. § 165.540(1)(c). This is because that announcement itself alters the content of what will be recorded. The undercover journalist testing a Public Records Advocate employee for illegal activities will elicit very little honest information if he must first announce his recording. Specifically informing others one is recording only mutes and damages the efficacy of the recording by eliminating truthful or candid interactions. *See Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. at 776–77 (government-compelled speech constitutes a content-based restriction of speech); *see also Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 759 (9th Cir. 2019) (Ikuta, J., dissenting and concurring).

Courts consider a law content based "when it establishes a general ban on speech, but maintains exceptions for speech on certain subjects." *Glendale Associates, Ltd. v. N.L.R.B.*, 347 F.3d 1145, 1155–56 (9th Cir. 2003) (citing *City of Ladue v. Gilleo*, 512 U.S. 43, 60 (1994)) (city's ordinance regulating signs on private property was content-based because it had ten exceptions); *City of Cincinnati v. Discovery Network, Inc*., 507 U.S. 410 (1993) (ordinance banning commercial handbills on news racks but allowing newspapers was content based); *Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998) (regulation banning posting of signs on public property except for real estate, governmental, and safety and traffic signs was content-based); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S.Ct. 2335, 2347 (2020) (plurality opinion).

Since recording is deemed expressive conduct and Oregon limits how one records based on the matter recorded, First Amendment content-based concerns are triggered. At its core, Oregon's exception that allows the unannounced recording of the police against a general prohibition of unannounced recording reveals a policy favoring the recording of the police. Reporters might elect to record an employee of the Public Records Advocate or a city council member, but Oregon law makes candid, truthful recording of non-police largely impossible. Oregon's exception allowing one to record a felony endangering human life favors recording one class of crimes, but prevents other important recording, like filming hate-motivated crimes

or elder abuse. Each of these subjects carry First Amendment consideration as they involve individual expressive deliberation. On any given day, a journalist must consider which subject to film—the police engaged in potential abuse or an environmental bureaucrat known to take bribes, for example. That same journalist may ponder over whether to pursue a hot tip about a deadly felony planned in that night's protest or to record a different tip suggesting hate crimes will be committed at another protest. In each example, Oregon law prefers one class of content may be recorded more easily—a preference that lies wholly outside the state's authority.

Oregon's content triggers appear to be more the result of rushed, mangled amendments over the decades and less of a plan to silence journalists. But the difference is constitutionally meaningless. So long as the result of the law is that Oregon makes some recording easier and other more difficult based on content, a First Amendment injury occurs. "Illicit legislative intent is not the *sine qua non* of a violation of the First Amendment." *Reed v. Town of Gilbert Ariz.*, 576 U.S. 155, 165 (2015) (quoting *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 117 (1991)). Because Oregon's recording law gives generous permission to record the police or acts involving felonies endangering human life, but not otherwise, its exemptions are content-based, making the law as a whole content-based.

### III. A Word About Severability and King Pyrrhus

A Pyrrhic victory will occur here if this Court severs the content triggers in the law—Or. Rev. Stat. § 165.540(5)(b)(a)-(b)—and then upholds its remainder. This would simply swap one constitutional problem for another, as Oregon's recording law would change from being content-based to one that is wildly overbroad.

The temptation to sever Oregon's recording exemptions should be resisted for three reasons. First, Appellees waived the arguments as they were never briefed below. *See Schmidt*, 72 F.4th at 1062. Per *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 951 n.10 (9th Cir. 2011) (en banc), such waiver makes it inappropriate for the Court to consider these arguments now. *See Legal Services Corp. v. Velazquez*, 531 U.S. 533, 549 (2001).

Second and third, the earlier panel majority correctly applied Oregon state severability rules to determine that the offensive exemptions were inseverable. *Schmidt*, 72 F.4th at 1063–66. Under Oregon precedent, after determining a part of a law is unconstitutional, courts must ask whether the rest of the law would be deemed constitutional if the offending provisions were stricken. *Id.* at 1063. This line of reasoning also requires an examination of whether the severed law would satisfy content-neutral constitutional scrutiny. *Id.* at 1064. This asks whether the law, as severed, would leave open ample alternatives for speech. *Id.*

The *Schmidt* majority correctly concluded that were the exemptions to Oregon's recording law to be severed, the law would function as "an absolute prohibition on a particular type of expression." *Id.* at 1065 (quoting *U.S. v. Grace*, 461 U.S. 171, 177 (1983)). That is, the law's notification requirement would "effectively destroy the intended content of the recording"—candid responses caught in real time. *Id.* As established earlier in *Wasden*, *Anderson*, and *Meyer*, Veritas's recording process is inextricably intertwined with its end production and it is permitted to decide the most effective means by which to record.

As the First, Third, and Seventh Circuit Courts of Appeals have recognized, audiovisual recording is self-authenticating and provides the most accurate depiction of an event happening in public. *See Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 840 (1st Cir. 2020) (recording law that left available open recording did not offer ample alternative modes of communication); *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017); *Alvarez*, 679 F.3d at 595, 607. Other options to directly interview news subjects are simply no substitute for undercover reporting. As was pled here, Oregon's announcement requirement would "effectively destroy" its ability to record candid content. *Schmidt*, 72 F.4th at 1065; *see* ER-99 (Ver. Compl. ¶38). Thus, severing the exemptions in Section § 165.540(5)(b)(a)-(b) would leave the law content-based and, even if content-neutral, unconstitutionally

overbroad. Because this would not restore the law to a constitutionally defensible position, the law should simply be facially stricken.

Removing the exemptions to Oregon's recording law would effectively implement one of the broadest recording laws nationwide. Severed of its specific content-based restrictions, the law would forbid: recording the police committing abuse, capturing a homicide at a political protest (like Project Veritas did in Virginia, *see* DktEntry 24 (USB drives containing video exhibits)), or any of the on-the-spot recordings—like those detailed by the various *amici*—that offer the American public insight into the real operations of business and government. The effect of the law would be to limit the "stock of information from which members of the public may draw"—a result which is wholly foreign to the First Amendment. *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 783 (1978). Because of these considerations, facial invalidation of Oregon's recording law is appropriate.

## Conclusion

For the foregoing reasons, the Court should rule that requiring all participants in a conversation to be specifically informed of a recording triggers First Amendment scrutiny and that the law's exceptions to this rule are content-based regulations of speech. The Court should find that Section 165.540 cannot withstand strict scrutiny and invalidate it due to it being facially unconstitutional.

Respectfully submitted on the 28th Day of May, 2024.

/s/ Benjamin Barr
Benjamin Barr
BARR & KLEIN PLLC
444 N. Michigan Avenue
Chicago, IL 60611
(202) 595-4671 Telephone
ben@barrklein.com

/s/ Stephen Klein
Stephen R. Klein
BARR & KLEIN PLLC
1629 K Street NW, Ste. 300
Washington, DC 20006
(202) 804-6676 Telephone
steve@barrklein.com

*Attorneys for Plaintiffs-Appellees*

**Certificate of Compliance**

I certify that:

This brief complies with this Court's order dated May 13, 2024 because this brief is less than 15 pages, excluding the items exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

/s/ Stephen Klein
Stephen R. Klein
BARR & KLEIN PLLC
1629 K Street NW, Ste. 300
Washington, DC 20006
(202) 804-6676 Telephone
steve@barrklein.com

**Certificate of Service**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system on May 28, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Stephen Klein
Stephen R. Klein
BARR & KLEIN PLLC
1629 K Street NW, Ste. 300
Washington, DC 20006
(202) 804-6676 Telephone
steve@barrklein.com