**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| PROJECT VERITAS; PROJECT VERITAS ACTION FUND, | No.22-35271 |
| *Plaintiffs-Appellants*, | D.C. No. 3:20-cv-01435-MO |
| v. | |
| MICHAEL SCHMIDT, in his official capacity as Multnomah County District Attorney; ELLEN ROSENBLUM, in her official capacity as Oregon Attorney General, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued and Submitted December 7, 2022
Pasadena, California

Filed July 3, 2023

Before: Carlos T. Bea, Sandra S. Ikuta, and Morgan
Christen, Circuit Judges.

Opinion by Judge Ikuta;
Dissent by Judge Christen

## SUMMARY[*]

### Civil Rights / First Amendment

The panel reversed the district court's dismissal of a complaint challenging, as an unconstitutional restriction of protected speech, Section 165.540(1)(c) of the Oregon Revised Code, which generally prohibits unannounced recordings of conversations, subject to several exceptions.

Section 165.540(1)(c) of the Oregon Revised Statutes provides that a person may not obtain or attempt to obtain the whole or any part of a conversation by means of any device if not all participants in the conversation are specifically informed that their conversation is being obtained. The law provides two exceptions relevant to this appeal: (1) section 165.540(1)(c) does not apply to a person who records a conversation during a felony that endangers human life, Or. Rev. Stat § 165.540(5)(a); and (2) section 165.540(1)(c) allows a person to record a conversation in which a law enforcement officer is a participant if the recording is made while the officer is performing official duties and meets other criteria. Plaintiff Project Veritas, a non-profit media organization that engages in undercover investigative journalism, states that it documents matters of

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

public concern by making unannounced audiovisual recordings of conversations, often in places open to the public.

Applying *Animal Legal Def. Fund. v. Wasden*, 878 F.3d 1184 (9th Cir. 2018), the panel held that section 165.540(1)(c) regulates protected speech (unannounced audiovisual recording) and is content based because it distinguishes between particular topics by restricting some subject matters (e.g., a state executive officer's official activities) and not others (e.g., a police officer's official activities). As a content-based restriction, the rule fails strict scrutiny review because the law is not narrowly tailored to achieving a compelling governmental interest in protecting conversational privacy with respect to each activity within the proscription's scope, which necessarily includes its regulation of protected speech in places open to the public. Thus, citing *Cohen v. California*, 403 U.S. 15, 21 (1971), and *Hill v. Colorado*, 530 U.S. 703, 717 (2000), the panel held that Oregon does not have a compelling interest in protecting individuals' conversational privacy from other individuals' protected speech in places open to the public, even if that protected speech consists of creating audio or visual recordings of other people. The panel further determined that section 165.540(1)(c) burdens more speech than is necessary to achieve its stated interest and there were other ways for Oregon to achieve its interests of protecting conversational privacy. Finally, addressing the dissent, the panel determined that severing the exceptions that made the general prohibition content based and extending the general prohibition to those protected First Amendment activities, would create significant constitutional issues rather than cure them. Because section 165.540(1)(c) is not a valid

time, place, or manner restriction, it cannot be saved by striking the two exceptions at issue here.

Dissenting, Judge Christen stated that because the majority does not dispute that the State has a significant interest in protecting the privacy of Oregonians who engage in conversations without notice that their comments are being recorded, the court's analysis should be straightforward. First, principles of federalism require that the panel begin from a premise of reluctance to strike down a state statute. Next, following Supreme Court precedent, the panel should sever the two statutory exceptions that Project Veritas challenges, apply intermediate scrutiny to the content-neutral remainder, recognize that the statute is well-tailored to meet Oregon's significant interest, and uphold section 165.540(1)(c) as a reasonable time, place, or manner restriction. Judge Christen stated that the purpose Oregon advances is its significant interest in protecting participants from having their oral conversations recorded without their knowledge. The majority recasts the State's interest as one in "protecting people's conversational privacy from the speech of other individuals." That reframing of the legislature's purpose serves as the springboard for the majority's reliance on an inapplicable line of Supreme Court authority that pertains to state action aimed at protecting people from unwanted commercial or political speech, not protection from speech-gathering activities like Project Veritas's, which are qualitatively different because they appropriate the speech of others.

**COUNSEL**

Benjamin Barr (argued), Barr & Klein PLLC, Bull Valley, Illinois; Stephen Klein, Barr & Klein PLLC, Washington, D.C.; for Plaintiffs-Appellants.

Philip M. Thoennes (argued), Assistant Attorney General; Michael A. Casper, Senior Assistant Attorney General; Benjamin Gutman, Solicitor General; Ellen F. Rosenblum, Attorney General of Oregon; Office of the Oregon Attorney General; Salem, Oregon; for Defendants-Appellees.

**OPINION**

IKUTA, Circuit Judge:

Oregon law generally prohibits unannounced recordings of conversations, subject to several exceptions. We conclude that Oregon's law is a content-based restriction that violates the First Amendment right to free speech and is therefore invalid on its face.

I

A

Section 165.540(1)(c) of the Oregon Revised Statutes provides: "[A] person may not . . . [o]btain or attempt to obtain the whole or any part of a conversation by means of any device . . . if not all participants in the conversation are specifically informed that their conversation is being

obtained."   Or. Rev. Stat. § 165.540(1)(c).[1]   The statute
defines "[c]onversation" as "the transmission between two
or more persons of an oral communication which is not a
telecommunication or a radio communication, and includes
a communication occurring through a video conferencing
program." Or. Rev. Stat. § 165.535(1). Because this section
explicitly applies to the recording of a video conference and
bars individuals from obtaining a conversation "by means of
any device," it applies to both audio and video recordings of
a conversation.   Indeed, the Oregon courts have interpreted
the statute as applicable to video recordings of conversations
and other conduct.[2]  *See State v. Copeland*, 522 P.3d 909,
911–12 (Or. Ct. App. 2022) (applying section 165.540(1)(c)
to "the video and audio recording of [a] shooting taken by
the victim on his body camera").[3]

---

[1] Oregon is one of a few outliers in enforcing such a broad prohibition
on unannounced recordings of conversations.  Only five states, including
Oregon, prohibit individuals from making recordings without providing
notice to or obtaining the consent of the recording's subjects in a place
open to the public where the subjects lack a reasonable expectation of
privacy. *See* Appendix A.

[2] Because both the statutory text and judicial opinions confirm that
section 165.540(1)(c) applies to video recordings of conversations, the
dissent's assertion that "the statute does not sweep in . . . video
recordings" is incorrect.  Dissent at 59.

[3] Contrary to the dissent's argument that section 165.540(1)(c) applies
only to oral communications, Dissent at 48 n.6, *Copeland* did not
differentiate between the video recording of a "heated discussion," 522
P.3d at 911, and the video recording of a shooting, *id.* at 912 (noting that
"[t]he state sought to introduce the video and audio recording of the
shooting taken by the victim on his body camera").

This general rule is subject to numerous exceptions. *See* Or. Rev. Stat. § 165.540(2)–(7), (9).**[4]** Two are relevant here. First, section 165.540(1)(c) does not apply to a "person who records a conversation during a felony that endangers human life." *Id.* § 165.540(5)(a). This exception applies even if the recording "was initiated before the felony began." *Copeland*, 522 P.3d at 912. Second, section 165.540(1)(c) allows "[a] person [to] record[] a conversation in which a law enforcement officer is a participant" if the recording is "made while the officer is performing official duties" and meets other criteria.**[5]** Or. Rev. Stat. § 165.540(5)(b). The Oregon courts have not yet interpreted this exception.

---

[4] The statute provides that section 165.540(1)(c) does not apply to: (1) "subscribers or members of their family who perform the acts prohibited in [§ 165.540(1)] in their homes," Or. Rev. Stat. § 165.540(3); (2) "[p]ublic officials in charge of and at jails, police premises," and "other penal or correctional institutions," *id.* § 165.540(2)(a)(B); or (3) persons who use unconcealed recording devices to "intercept oral communications that are part of" specified "[p]ublic or semipublic meetings," "[r]egularly scheduled classes or similar educational activities in public or private institutions," or "[p]rivate meetings or conferences if all [participants] knew or reasonably should have known that the recording was being made," *id.* § 165.540(6).

[5] The exception from section 165.540(1)(c) applies only if:

> (A) The recording is made while the officer is performing official duties;
> (B) The recording is made openly and in plain view of the participants in the conversation;
> (C) The conversation being recorded is audible to the person by normal unaided hearing; and

The general rule in section 165.540(1)(c) and the two relevant exceptions to the rule evolved over a lengthy period of time. According to the Oregon Supreme Court, the state legislature first enacted section 165.540(1)(a) in 1955 "to allow the police to record telephone conversations when one party consents to the recording." *State v. Lissy*, 747 P.2d 345, 347–49, 347 n.3 (Or. 1987). In 1959, the legislature amended section 165.540 to add section 165.540(1)(c), which prohibited tape recording of face-to-face conversations without all participants' consent. *Id.* at 350 & n.4. Twenty years later, in 1979, some legislators attempted to amend this provision because of concerns "that a person who tape records a public meeting, public speech or classroom lecture without 'specifically informing' all participants that the discussion is being taped is guilty of a Class C felony." *Id.* at 351 (citation omitted). This effort to amend the law failed. *See id.*

But in 1989, legislators succeeded in making an exception to section 165.540(1)(c) for felonies endangering human life, resulting in section 165.540(5)(a). Or. Rev. Stat. § 165.540(5)(a) (1989). According to the legislative history of this amendment, the change was made to enable police officers to use a body wire to record a "situation [that] involves [a] felony where drugs are involved or human life is endangered" without first obtaining a court order. A-Engrossed H.B. 2252, 65th Assemb., Reg. Sess. 1 (Or. 1989); *see also Or. H.R. Staff Measure Summary*, H.B. 2252,

---

(D) The person [recording] is in a place where the person lawfully may be.

Or. Rev. Stat. § 165.540(5)(b). "Law enforcement officer" is generally defined as a person authorized to enforce criminal laws. *Id.* §§ 133.726(11); 165.540(10)(b).

65th Assemb., Reg. Sess. (Or. 1989) ("This measure would eliminate the requirement that police officers obtain prior court approval before using a 'body wire' where felony drug offenses or life-endangering felonies are being committed."); *Hearing on H.B. 2250, 2251, 2252 Before the Subcomm. on Crime & Corrs. of the H. Comm. on the Judiciary*, 65th Assemb., Reg. Sess. 11–12 (Or. 1989) (statement of Cap. Will Hingston, Or. State Sheriffs' Ass'n) (stating that section 165.540 "causes a great deal of concern for officer safety and informant safety during a narcotics transaction" because "there is little consistency in obtaining a court order for a body wire before a transaction goes down," and the "amendment will afford officers in their performance a great deal more safety and rapid support when doing a narcotics transaction").

In 2015, the legislature added another exception to section 165.540(1)(c) to allow a person to record a conversation in which a law enforcement officer is a participant, resulting in section 165.540(5)(b). Or. Rev. Stat. § 165.540(5)(b) (2015). According to testimony by the ACLU submitted to the state judiciary committee in support of this amendment, this change was necessary because otherwise the statute was "inconsistent with the vast and developing consensus among courts and legal scholars confirming that the right to record on-duty police is constitutionally protected." *Hearing on H.B. 2704 Before the H. Comm. on the Judiciary*, 78th Assemb., Reg. Sess. 1 (Or. 2015) (testimony of Kimberly McCullough, ACLU Leg. Dir.). The ACLU further testified that "because it is common knowledge that the public has a right to record on-duty police, people all over Oregon are unintentionally violating Oregon's eavesdropping statute when they openly record without a warning." *Hearing on H.B. 2704 A Before*

*the S. Comm. on the Judiciary*, 78th Assemb., Reg. Sess. 1 (Or. 2015) (testimony of Kimberly McCullough, ACLU Leg. Dir.).

B

Project Veritas is a non-profit media organization that engages in undercover investigative journalism. Project Veritas stated that it documents matters of public concern by making unannounced audiovisual recordings of conversations, often in places open to the public. In the past, Project Veritas journalists have used undercover recordings to document the "Unite the Right" rally in Charlottesville, Virginia, to record campaign workers for presidential candidates, to capture the efforts of campaign staff to stir up violence at rallies of the opposing candidate, and to interview the staff for a gubernatorial candidate who confirmed the candidate's more controversial views and efforts to conceal them.

Project Veritas stated that it would conduct similar investigations in Oregon but for Oregon's prohibition on unannounced in-person audiovisual recordings. Among other things, Project Veritas alleged it would investigate corruption at the state agency responsible for enforcing Oregon's public records law by recording undercover interviews with officers and staff in locations open to the public, like restaurants, parks, and sidewalks. In addition, Project Veritas alleged it would investigate the "rise in violent protests in Portland between the police and members of Antifa and other" groups by secretly recording interactions between police officers and protesters. Project Veritas would also send undercover journalists into groups of police and protesters to engage them in conversation and record their candid remarks. Outside of organized rallies,

Project Veritas would "do most of its [undercover] recording on public sidewalks, public parks, or in other areas held open to the public." Project Veritas alleged that the safety and even lives of its journalists would be endangered if they were to record conversations openly and in plain view or to inform participants that they are being recorded.

Project Veritas sued the Oregon Attorney General, Ellen Rosenblum, and the District Attorney of Multnomah County, Oregon, Michael Schmidt (collectively, Oregon), challenging section 165.540 as an unconstitutional restriction of protected speech. Project Veritas's complaint alleged that because section 165.540 favored recording some subjects, but disfavored others, the differential treatment rendered section 165.540(1)(c) and its exceptions unconstitutional. For instance, the complaint alleged that under Oregon law, an individual could record the police in particular circumstances, *see* Or. Rev. Stat. § 165.540(5)(b), and make a "secret audio recording" during a felony that endangers human life, *see id.* § 165.540(5)(a), but "may not openly record the conversations of city council members, school board members, or any other government actors without specifically notifying them," *see id.* § 165.540(5)(b). Project Veritas sought to enjoin defendants from enforcing section 165.540(1)(c) and to obtain a declaratory judgment that the law is unconstitutional on its face and as applied to Project Veritas.

Oregon moved to dismiss the complaint. The district court partially granted the motion, and the parties agreed to

dismiss the remaining claims with prejudice.**[6]**    Project Veritas timely appealed.

II

We review de novo a district court's dismissal of a complaint for failure to state a claim. *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1107 (9th Cir. 2010). "[W]e have an independent obligation to ensure that we have subject matter jurisdiction," which includes a determination that Project Veritas has standing to bring its pre-enforcement claim. *Airline Serv. Providers Ass'n v. L.A. World Airports*, 873 F.3d 1074, 1078 (9th Cir. 2017).

Project Veritas's allegations are sufficient to establish standing for a First Amendment pre-enforcement claim. Under Article III of the Constitution, plaintiffs must establish "the irreducible constitutional minimum of standing," by showing that they suffered an injury in fact, that there is "a causal connection between the injury and the conduct complained of," and that it is likely that "the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations and quotation marks omitted). "Because constitutional challenges based on the First Amendment present unique standing considerations, plaintiffs may establish an injury in fact without first suffering a direct injury from the challenged restriction." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (cleaned up). In a pre-enforcement

---

[6] Project Veritas's complaint challenged sections 165.540(1)(c) (making unannounced recordings), 165.540(1)(d) (obtaining such recordings from others), and 165.540(1)(e) (distributing such recordings). The district court denied Oregon's motion to dismiss with respect to Project Veritas's section 165.540(1)(d) and (1)(e) claims, but the parties later agreed to dismiss those claims with prejudice.

challenge, plaintiffs can show injury in fact by establishing that (1) they intend to violate the law; and (2) have shown a reasonable likelihood that the government will enforce the statute against them. *Id.*

For purposes of this pre-enforcement challenge, Project Veritas makes a clear showing of injury in fact. First, Project Veritas alleged that but for section 165.540(1)(c), it would make unannounced recordings of conversations in a manner that would violate the general prohibition and not fall within an exception, and described in great detail the persons, conversations, and events it would like to record. *See supra* p. 10–11. For its part, Oregon has prosecuted individuals for violating section 165.540(1)(c) in the past[7] and does not state that it would refrain from prosecuting Project Veritas for creating such recordings, if the recordings were made in violation of the law. Finally, Project Veritas alleged a causal connection between the challenged statute and its inability to carry on its undercover journalistic endeavors and that it is likely that its injury will be redressed by a favorable decision.[8]

We reject Oregon's arguments that we lack jurisdiction because Project Veritas asserts an as-applied challenge which is not ripe. Project Veritas's claim is properly construed as a facial challenge to section 165.540. "A facial challenge is an attack on a statute itself as opposed to a

---

[7] *See, e.g.*, *State v. Neff*, 265 P.3d 62, 63 (Or. Ct. App. 2011); *State v. Depeche*, 255 P.3d 502, 503–04 (Or. Ct. App. 2011); *State v. Bichsel*, 790 P.2d 1142, 1143 (Or. Ct. App. 1990); *State v. Knobel*, 777 P.2d 985, 987 (1989).

[8] Because we conclude that section 165.540(1)(c) is facially unconstitutional, we do not evaluate Project Veritas's alternative challenge that the statute is overbroad.

particular application," *City of Los Angeles v. Patel,* 576 U.S. 409, 415 (2015), while "[a]n as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others," *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998). Here, Project Veritas attacks the statute itself as an unconstitutional regulation of unannounced recordings of nearly all conversations held in places open to the public— not only those conversations that Project Veritas seeks to record.[9]

## III

The First Amendment, applicable to the States through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend I. "While the First Amendment literally forbids the abridgment only of speech, the Supreme Court has long recognized that its protection does not end at the spoken or written word." *United States v. Swisher*, 811 F.3d 299, 310 (9th Cir. 2016) (cleaned up) (citation and quotation marks omitted). We have recognized there is no material "distinction between the process of creating a form of *pure* speech (such as writing or painting) and the product of these processes (the essay or artwork) in terms of the First Amendment protection afforded." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010). Indeed, "we have never seriously questioned that the processes of writing words down on paper, painting a

---

[9] Because we must analyze section 165.540(1)(c) with respect to the full scope of its prohibition, it is irrelevant that "Project Veritas seeks to record only in public places" or "avers only that *most* of its recording will occur in public places." Dissent at 49.

picture, and playing an instrument are purely expressive activities entitled to full First Amendment protection." *Id.* at 1062.

### A

Here, the state law at issue regulates individuals' conduct in making an audio or video recording. Under our case law, such conduct qualifies as speech entitled to the protection of the First Amendment. *See Animal Legal Def. Fund. v. Wasden*, 878 F.3d 1184, 1203–04 (9th Cir. 2018).

*Wasden* involved "a secretly-filmed exposé of the operation of an Idaho dairy farm," which showed dairy workers who "dragg[ed] a cow across the ground by a chain attached to her neck; twist[ed] cows' tails to inflict excruciating pain; and repeatedly beat[], kick[ed], and jump[ed] on cows to force them to move." *Id.* at 1189. This 2012 exposé distributed by an animal rights group, Mercy for Animals, resulted in the Idaho legislature enacting a statute targeting undercover investigation of agricultural operations, which criminalized, among other things, "a person from entering a private agricultural production facility and, without express consent from the facility owner, making audio or video recordings of the 'conduct of an agricultural production facility's operations.'" *Id.* at 1203 (citation omitted). The statute defined its scope broadly and did not exclude audio or video recordings of conversations. *See id.* In enacting the law, members of the Idaho legislature "discussed the bill as protecting against two types of perceived harm to agricultural producers," specifically: "concerns about farm security and privacy" and concerns about damage caused by investigative reporting itself. *Id.* at 1192. One legislator "described the[] videos as used . . .

'publicly [to] crucify a company' and 'as a blackmail tool.'"
*Id.*

After noting the "tension between journalists' claimed
First Amendment right to engage in undercover
investigations and the state's effort to protect privacy and
property rights," *id.* at 1190, we held that the animal rights
activist's conduct—creating an unannounced recording—
was constitutionally protected First Amendment speech, *id.*
at 1203–04. *Wasden* reached this conclusion in two steps.

First, *Wasden* extended our prior ruling that "there is 'a
First Amendment right to *film* matters of public interest,'"
*id.* at 1203 (emphasis added) (citing *Fordyce v. City of
Seattle*, 55 F.3d 436, 439 (9th Cir. 1995), to hold that "[t]he
act of recording is *itself* an inherently expressive activity"
protected by the First Amendment, *id.* (emphasis added).
We reasoned that audio and video recordings require
"decisions about content, composition," and the like, which
decisions are just as expressive as "the written word or a
musical score" ultimately disseminated to the public. *Id.*
"Because the recording process is itself expressive and is
'inextricably intertwined' with the resulting recording, the
creation of audiovisual recordings is speech entitled to First
Amendment protection as purely expressive activity." *Id.* at
1204 (citation omitted).

Second, given that the act of recording is protected
speech, *Wasden* held that the statute's prohibition of
recording "the conduct of an agricultural production
facility's operations" without "express consent from the
facility owner" constituted a regulation of a form of

protected speech, which triggered First Amendment scrutiny. *Id.* at 1203–04.**[10]**

Applying *Wasden*'s conclusion here, section 165.540(1)(c) prohibits making audio and visual recordings unless all participants in the conversation are informed of the recording. Under *Wasden*, the recording itself is protected speech, and therefore the Oregon statute constitutes a regulation of protected speech. We conclude that section 165.540(1)(c) triggers First Amendment scrutiny.

B

Because we must determine the constitutionality of section 165.540(1)(c) under the First Amendment, we next turn to the question whether it is content based or content neutral. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A law is content based if it "single[s] out any topic or subject matter for differential treatment." *City of Austin v. Reagan Nat'l Ad. of Austin, LLC*, 142 S. Ct. 1464, 1472 (2022).

---

[10] *Wasden*'s conclusion is consistent with our sister circuits, which have held that creation of audio and video recordings constitutes First Amendment-protected speech. *See, e.g.*, *People for the Ethical Treatment of Animals, Inc. v. North Carolina Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 821–23 (4th Cir. 2023) (rejecting argument that the creation of unauthorized recordings of "images or sound occurring within an employer's premises" as part of undercover investigations conducted by PETA to publicize animal cruelty was not speech protected by the First Amendment); *Am. C.L. Union of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) ("The act of *making* an audio or visual recording is necessarily included within the First Amendment's guarantee of speech and press rights."); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (holding that "[t]he First Amendment protects the . . . right to record matters of public interest").

1

*Wasden* again guides our analysis. After holding that the creation of audio and video recordings was speech entitled to full First Amendment protection, *Wasden* held that the Idaho statute at issue in that case, which required the facility owner's consent to make unannounced recordings of "the conduct of an agricultural production facility's operations," was "an 'obvious' example of a content-based regulation of speech because it 'defin[es] regulated speech by particular subject matter.'" 878 F.3d at 1204 (citing *Reed*, 576 U.S. at 163). We gave two reasons for this conclusion. First, the statute drew "a distinction 'on its face' regarding the message the speaker conveys." *Id.* (citing *Reed*, 576 U.S. at 165). Specifically, it "would permit filming a vineyard's art collection but not the winemaking operation." *Id.* "Likewise, a videographer could record an after-hours birthday party among co-workers, a farmer's antique car collection, or a historic maple tree but not the animal abuse, feedlot operation, or slaughterhouse conditions." *Id.* Second, we reasoned that "only by viewing the recording can the [state] authorities make a determination about criminal liability" because the application of the exception "explicitly pivots on the content of the recording." *Id.*

Our second rationale (that a law regulating the act of making specified recordings is content based if state authorities cannot apply the law without viewing or listening to the particular recording at issue) requires some further examination. After we decided *Wasden*, the Supreme Court rejected a per se rule "that a regulation cannot be content neutral if it requires reading the [speech] at issue." *City of Austin*, 142 S. Ct. at 1471. Instead, *City of Austin* held that location-based rules, such as a rule differentiating between signs on a premise that advertise an on-site business from

signs that advertise some off-site matter, are not content
based, even though city authorities had to review the sign's
message to apply the rule. *Id.* at 1472. When a rule is merely
a "location-based and content-agnostic on-/off-premises
distinction," it does not "singl[e] out specific subject matter
for differential treatment." *Id.* at 1475 (citation omitted).
Instead, the sign's message merely "informs the sign's
relative location." *Id.* at 1473. But as the Court clarified,
this exception for location-based rules does not affect the
Court's longstanding holding that "regulations that
discriminate based on the topic discussed or the idea or
message expressed . . . are content based." *Id.* at 1474
(citation and quotation marks omitted).

*Wasden* did not address a location-based rule akin to an
"on-/off-premises distinction," but considered a rule that
singled out "specific subject matter for differential
treatment" and discriminated based on "the topic discussed
or the idea or message expressed." *Id.* at 1474–75. As a
result, *City of Austin*'s analysis does not conflict with our
holding in *Wasden*, which remains binding. *See Miller v.
Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (holding that a
three-judge panel is bound by precedent unless it "is clearly
irreconcilable with the reasoning or theory of intervening
higher authority").    Therefore, we continue to consider
whether a law "pivots on the content of the recording,"
*Wasden*, 878 F.3d at 1204, in determining whether the law
discriminates on the basis of "the topic discussed or the idea
or message expressed" and is, therefore, content based, *City
of Austin*, 142 S. Ct. at 1474 (citing *Reed*, 576 U.S. at 171).

Applying *Wasden* here, section 165.540 is a content-
based restriction on speech.      On its face, section
165.540(1)(c) and its exceptions draw a distinction between
topics. The speech regulated by section 165.540(1)(c) is the

act of making a recording, which means that the activity captured by a recording constitutes the content or subject matter of that speech. Because the rules imposed by section 165.540 vary depending on the activity being recorded, the statute clearly draws content-based distinctions under *Wasden*. The law's applicability plainly "pivots on the content of the recording"—namely, what the recording captures. *Wasden*, 878 F.3d at 1204. For example, the law applies no restrictions to recording law enforcement officials engaged in their official duties, *see* Or. Rev. Stat. § 165.540(5)(b), but prohibits recording other government officials performing official duties unless they are informed that their conversation is being recorded. Similarly, the statute distinguishes between recording felonies endangering human lives, *id.* § 165.540(5)(a), and recording similar conduct during the commission of a misdemeanor. These distinctions are "obvious" examples of a content-based regulation of speech because they "define regulated speech by particular subject matter." *Wasden*, 878 F.3d at 1204 (cleaned up) (citation omitted). In addition, state "authorities [can] make a determination about criminal liability" under the law "only by viewing the recording." *Id.* This serves as further evidence that the applicability of section 165.540(1)(c) pivots on the content of the recording, thereby demonstrating that the law is content based.

2

Oregon argues that section 165.540(1)(c)'s general prohibition on the act of making unannounced recordings is a content-neutral speech regulation for two reasons. Neither is persuasive.

Oregon first argues that the statute is content neutral because the statute's exceptions are not based on the words

spoken and recorded, and therefore state authorities do not have to listen to and analyze the recording to determine whether an exception applies. We disagree. The statute at issue in *Wasden* did not distinguish based on the words spoken in a recording, but we nevertheless held that it was content based because it discriminated on the basis of subject matter to be recorded. 878 F.3d at 1204. For the same reason, it is the statute's differential treatment of recordings based on their subject matter (e.g., whether the speaker's recording obtains the conversation of Oregon police officers or Oregon executive officers) that makes the statute content based, not the words exchanged in the conversation.

Second, Oregon argues that we can consider section 165.540(1)(c) as a stand-alone provision, and ignore the exceptions to the general prohibition. But this approach is foreclosed by binding precedent. To start, it is well-established that when a court evaluates the constitutionality of a general prohibition, it must consider any exceptions to the general rule. "[A] rule [is] content-based when it establishes a general ban on speech, but maintains exceptions for speech on certain subjects." *Glendale Assocs., Ltd. v. NLRB*, 347 F.3d 1145, 1155 (9th Cir. 2003). Stated differently, where exceptions to a restriction of protected speech "are based on content, the restriction itself is based on content." *Nat'l Ad. Co. v. City of Orange*, 861 F.2d 246, 249 (9th Cir. 1988) (citation omitted); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2347 (2020) (plurality opinion) (holding that a prohibition of robocalls was content based due to its exception for robocalls collecting government held debts); *Foti*, 146 F.3d at 636 (holding that an ordinance's general ban of "*all* signs on *all* public property" was content based due to its

"exemptions for open house signs and safety, traffic, and public informational signs").[11]

Moreover, any exception to a general restriction on protected speech—even if the exception applies to speech that our case law has recognized as receiving First Amendment protection, like recording police officers performing official duties in public, *see Fordyce*, 55 F.3d at 439; *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018)—necessarily renders the restriction content based.  The Supreme Court analyzed a similar situation in *Reed*, where the challenged state law generally restricted the display of outdoor signs without a permit, but exempted signs that had ideological and political messages, which implicate speech that case law has recognized as receiving First Amendment protection.  576 U.S. at 164–65. Despite these exceptions, the Court held that the law as a whole was content based and subject to strict scrutiny, "regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas

---

[11] The district court concluded that the law enforcement exception did not render section 165.540(1)(c) content based because recordings of "conversations where a law enforcement officer is a speaker" is "government speech," which "is generally not subject to First Amendment challenges."  Oregon does not rely on this argument, and we conclude the government speech doctrine is not applicable here. Although the Supreme Court has held that a government entity's expression of its own views does not violate the speech rights of individuals who disagree, *see Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009), this case does not involve a suit against the government for expressing its views.  Rather, it involves a statute that impinges on a private individual's speech by restricting the ability to record public officials.  The individual engaging in the speech being regulated is the private party that makes the recording—not the government.  Therefore, the government speech doctrine is inapposite.

contained' in the regulated speech." *Id.* at 165 (citation omitted). Therefore, under this precedent, we must analyze both the general prohibition and the exceptions as one regulatory regime. Doing so makes clear that section 165.540 is a content-based regulation of speech.**[12]**

C

Because we conclude that section 165.540(1)(c) and its exceptions constitute a content-based speech restriction, we can uphold the statute only if it survives strict scrutiny. *See Wasden*, 878 F.3d at 1204. Strict scrutiny requires the government to show that the speech restriction is "narrowly tailored to address the State's compelling governmental interests." *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1229 (9th Cir. 2019). Under strict scrutiny, the challenged law must be constitutional with respect to "each activity within the proscription's scope." *Berger v. City of Seattle*, 569 F.3d 1029, 1053 (9th Cir. 2009) (citing *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)). It does not matter that a narrower restriction on speech activities could have been justified by the government's interest. *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 168 (2002). For instance, a law that generally prohibits canvassers from engaging in door-to-door advocacy without a permit is facially unconstitutional. *Id.* Although the government's "interest in preventing fraud could adequately support the ordinance insofar as it applies to commercial transactions and the solicitation of funds," the interest in fraud prevention does not justify the ordinance insofar as it

---

[12] The dissent concedes that the statutory exceptions to the general ban on unannounced recordings render section 165.540 content based. Dissent at 50.

applies "to [Jehovah Witnesses who offer religious literature], to political campaigns, or to enlisting support for unpopular causes." *Id.*

In *Wasden*, we applied strict scrutiny to the content-based Idaho statute. 878 F.3d at 1204. We assumed that Idaho's asserted interest in protecting both property and privacy interests in an agricultural production facility was a compelling government interest, *see id.*, but concluded that Idaho had not satisfied the narrow tailoring requirement because, among other reasons, there were "various other laws at Idaho's disposal that would allow it to achieve its stated interests while burdening little or no speech," *id.* at 1205 (cleaned up) (citation and quotation marks omitted). "For example, agricultural production facility owners can vindicate their rights through tort laws against theft of trade secrets and invasion of privacy." *Id.* And, as another example, "[t]o the extent the legislators expressed concern that fabricated recordings of animal abuse would invade privacy rights, the victims can turn to defamation actions for recourse." *Id.* Further, we explained, "'the remedy for speech that is false is speech that is true'—and not, as Idaho would like, the suppression of that speech." *Id.* (cleaned up) (citation omitted). Therefore, we struck down Idaho's ban on creating audio and visual recordings as failing to survive First Amendment scrutiny. *Id.*

Applying strict scrutiny to section 165.540(1)(c) in light of these precedents, we must consider whether that section is constitutional with respect to "each activity within the proscription's scope," *Berger*, 569 F.3d at 1053, which necessarily includes its regulation of protected speech in places open to the public, *see supra* pp. 14 n.9, 23–24.

1

We first consider the nature of Oregon's interest here. At the outset, Oregon does not assert it has a compelling interest, but argues only that it has a significant governmental interest in protecting individuals' conversational privacy. In analyzing this interest, we are bound by *Wasden*'s conclusion that "[t]he act of recording is itself an inherently expressive activity" that merits First Amendment protection. 878 F.3d at 1203. Therefore, prohibiting a speaker's creation of unannounced recordings in public places to protect the privacy of people engaged in conversation in those places is the equivalent of prohibiting protesters' or buskers' speech in public places for the same purpose. *See Berger*, 569 F.3d at 1054. Thus, we must analyze Oregon's interest in conversational privacy as protecting people's conversational privacy from the speech of other individuals, even in places open to the public.

In general, the government does not have a compelling interest in protecting individual privacy against unwanted communications (including the "speech" comprised of recording others) in areas open to the public unless the audience's "substantial privacy interests are being invaded in an essentially intolerable manner." *Cohen v. California*, 403 U.S. 15, 21 (1971); *see also Hill v. Colorado*, 530 U.S. 703, 717 (2000) (recognizing that the government's interest in protecting privacy "varies widely in different settings"). Courts have recognized such a compelling interest only when patients seeking medical care are bombarded by "the cacophony of political protests" and individuals at their homes are confronted with unwanted speech. *Hill*, 530 U.S. at 716. The government's interest in protecting the public's privacy from unwanted speech (including recordings of people's conversations) "is far less important" for

individuals engaging in recreational, social, or commercial activities in places open to the public, such as "strolling through Central Park," *id.*, or "waiting in line or having lunch outdoors in a public park," *Berger*, 569 F.3d at 1054. Indeed, we have held that the government does not even have a "significant interest in protecting [individuals] from unpopular speech" where those who constitute the intended audience are commercial patrons of "a place of public entertainment." *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 861 n.10 (9th Cir. 2004). Applying this framework here, Oregon does not have a compelling interest in protecting individuals' conversational privacy from other individuals' protected speech in places open to the public, even if that protected speech consists of creating audio or visual recordings of other people.

2

Nor is Oregon's rule narrowly tailored to be "the least restrictive or least intrusive means of" achieving the government's interest in conversational privacy, as required to pass strict scrutiny review. *Ward v. Rock Against Racism*, 491 U.S. 781, 798–99 & n.6 (1989). Under strict scrutiny, a speech restriction must "target[] and eliminate[] no more than the exact source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485 (citation omitted). A law is not narrowly tailored if it restricts "speech that do[es] not cause the types of problems that motivated the [law]." *Comite de Journaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 948 (9th Cir. 2011) (en banc). In addition, a law is not narrowly tailored if it is over-inclusive because it suppresses more speech than is necessary to further Oregon's goal of protecting people's conversational privacy. *See Wasden*, 878 F.3d at 1205.

Applying this test, we conclude that section 165.540 burdens more protected speech than is necessary to achieve its stated interest. *See id.* The law regulates protected speech to avoid impinging on people's conversational privacy. But in public places, speech does not intrude on privacy unless it intrudes in "an essentially intolerable manner." *See Berger*, 569 F.3d at 1056 (holding that a statute prohibiting "passive and unthreatening acts" such as offering a handbill or displaying a sign, even if the communications were unwanted, was not narrowly tailored under intermediate scrutiny). As the Supreme Court has explained, "it is difficult, indeed, to justify a prohibition on *all* uninvited approaches . . . regardless of how peaceful the contact may be, without burdening more speech than necessary to prevent intimidation." *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 774 (1994). Section 165.540(1)(c) does not distinguish between "passive and unthreatening" acts and intolerable intrusions. Under our case law, that does not constitute narrow tailoring.

Moreover, where speech occurs in places open to the public, the privacy interest of other individuals in those public areas is implicated only if and where the speech is unwanted. *See Hill*, 530 U.S. at 716; *Berger*, 569 F.3d at 1056. Yet section 165.540(1)(c) does not distinguish between wanted and unwanted speech (including wanted or unwanted recordings).**[13]** For example, protesters demonstrating in favor of their political views may have no objection to unannounced recordings of conversations, which would provide more publicity about their goals and

---

[13] For its part, the dissent apparently assumes without explanation that all unannounced recordings are unwanted speech and all announced recordings are welcomed speech. Dissent at 53–61.

beliefs. While some people may desire privacy for a conversation held in places open to the public, such instances cannot justify Oregon's wholesale restriction on protected speech (i.e., recordings) in public areas. *See Rock Against Racism*, 491 U.S. at 799 (stating that a speech restriction "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals").

The dissent argues that *Berger* and its progeny are inapplicable to section 165.540(1)(c) because "state action aimed at protecting people from unwanted commercial or political speech" is "qualitatively different" than state action protecting people "from speech-gathering activities like Project Veritas's . . . because they appropriate the speech of others." Dissent at 45. According to the dissent, the sort of speech that includes the "appropriation of another person's speech" (i.e., recordings) is qualitatively more burdensome than other types of speech that might intrude on a person's privacy. Dissent at 64.

This position is foreclosed by *Wasden*, which did not accord any special attention to the privacy interests of people whose speech might be recorded. Rather, *Wasden* held that a state law prohibiting audio or video recordings of the conduct of an agricultural production facility's operations, which necessarily would include conversations, directions, and other forms of oral communications, "suppresse[d] more speech than necessary to further Idaho's stated goals of protecting property and privacy." 878 F.3d at 1205. *Wasden*'s analysis of recordings under the same framework applicable to other sorts of protected speech is consistent with precedent: for example, under our case law, we analyze expressive conduct that merits First Amendment protection as symbolic speech in the same manner as we analyze oral

communications. *See Swisher*, 811 F.3d at 318 ("Content-based prohibitions of speech and symbolic speech are analyzed under the same framework.").**14**

Finally, as in *Wasden*, the rule is not narrowly tailored because "there are various other laws at [Oregon's] disposal that would allow it to achieve its stated interests while burdening little or no speech." 878 F.3d at 1205 (citation and quotation marks omitted). Individuals whose conversation is captured in public by unannounced recordings "can vindicate their rights" through an invasion of privacy tort. *See, e.g.*, *Humphers v. First Interstate Bank of Oregon*, 696 P.2d 527, 531–32 (Or. 1985) (en banc) (noting that Oregon has recognized the common law privacy torts of appropriation, offensive publication of private facts, and intrusion upon exclusion); *State v. Lien*, 441 P.3d 185, 193 (Or. 2019) ("Tortious invasion of privacy is one of the limited number of torts in Oregon in which a plaintiff may be awarded damages consisting solely of mental suffering caused by the violation."); *Anderson v. Fisher Broad. Cos.*, 712 P.2d 803, 814 (Or. 1986) (explaining instances where a television program airing photographs of an accident victim could give rise to a tortious invasion of privacy claim);

---

[14] The dissent's reliance on *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995), for the argument that speech involving the creation of a recording that captures people's speech "implicates the 'principle of autonomy to control one's own speech'" is misplaced. Dissent at 57–58. *Hurley* held that the First Amendment prohibits the state from forcing a speaker to incorporate a message that the speaker does not want to convey. *See id.* at 559, 581. To the extent *Hurley* has any bearing on this case, it supports our view that a law raises serious constitutional issues if it prohibits a speaker from conveying the message the speaker wants to convey—candid responses to issues of controversy—by making unannounced recordings.

*McLain v. Boise Cascade Corp.*, 533 P.2d 343, 345–46 (Or. 1975) (holding that unannounced recordings of the plaintiff "engaged in various activities on his property outside his home" were not actionable as invasion of privacy torts because the recordings "were done in such an unobtrusive manner that plaintiff was not aware that he was being watched and filmed" and the plaintiff "could have been observed by . . . [a] passerby"). Or if the recording is fabricated, "the victims can turn to defamation actions for recourse." *Wasden*, 878 F.3d at 1205; *see also Neumann v. Liles*, 369 P.3d 1117, 1120–21 (Or. 2016).[15]

3

We conclude that section 165.540(1)(c) regulates protected speech (unannounced audiovisual recording), and is content based because it distinguishes between particular topics by restricting some subject matters (e.g., a state executive officer's official activities) and not others (e.g., a police officer's official activities). As a content-based restriction, the rule fails strict scrutiny review because the law is not narrowly tailored to achieving a compelling governmental interest in protecting conversational privacy with respect to "each activity within the proscription's scope," *Berger*, 569 F.3d at 1053, and there are other ways

---

[15] The dissent's concern regarding "deepfakes" is overblown. Dissent at 56–57, 72 n.16. As we explained in *Wasden*, victims of such fabrications can vindicate their rights through tort actions. *See* 878 F.3d at 1205. Moreover, deepfakes are not a problem unique to unannounced recordings. Such "deepfakes" can be created just as easily with announced recordings. As the dissent states, all one needs is "audio and video of the person to be modeled" to create a "deepfake." Dissent at 56–57, 72 n.16.

for Oregon to achieve its interests, *see Wasden*, 878 F.3d at 1205.

## IV

The dissent agrees with our holding that section 165.540(1)(c) and its exceptions constitute a content-based speech restriction that fails strict scrutiny review. Dissent at 50, 63. This should end our analysis.

Instead, the dissent argues that section 165.540(1)(c)'s general prohibition should be analyzed as a stand-alone provision that, by itself, is a constitutional content-neutral speech restriction. Dissent at 53–54. To reach that conclusion, the dissent relies exclusively on its argument that the court should offer Oregon a remedy of severability. Dissent at 50–53. Oregon chose not to make this argument to the district court or to our court. But we briefly address it here. *Cf. Comite de Jornaleros de Redondo Beach*, 657 F.3d at 951 n.10 (declining to sever a subsection of a challenged statute "[b]ecause the City ha[d] [forfeited] any argument regarding severability by failing to raise it in its briefs or at oral argument").[16]

## A

"Severability is of course a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). To determine whether a state statute is severable, we are bound by state statutes and state court opinions. *See Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1325 (9th Cir. 2015) (en banc).

---

[16] The dissent cites several Supreme Court cases decided *before* we issued *Comite de Jornaleros*. Dissent at 51–52, 52 n.7. But we are bound by our precedent unless it is irreconcilable with a subsequent higher authority. *See Miller*, 335 F.3d at 893.

The Oregon Supreme Court addressed the "nature of severability" in *State v. Dilts*, 103 P.3d 95, 99 (Or. 2004) (en banc).**[17]** According to the Oregon Supreme Court, the relevant statute, "[section] 174.040[,] governs decisions regarding severability." *Id.* This statute provides that "it is the legislative intent, in the enactment of any statute, that if any part of the statute is held unconstitutional, the remaining parts shall remain in force" unless an exception applies.**[18]** The exceptions to this presumption (that the legislature would prefer an unconstitutional part of a statute to be severed and the rest to remain in force) include circumstances where "parts of the statute are so interconnected that it appears likely that the remaining parts would not have been enacted without the unconstitutional part, or . . . [if] the remaining parts are incomplete and cannot be executed in accordance with legislative intent." *Outdoor*

---

[17] *Dilts* provided a generally applicable analysis of Oregon severability law. Nothing in the opinion suggests that this analysis would be different if a party proposed severing the unconstitutional portion of a civil statute, rather than a criminal statute. *But see* Dissent at 65.

[18] Section 174.040 of the Oregon Revised Statutes provides in full:

It shall be considered that it is the legislative intent, in the enactment of any statute, that if any part of the statute is held unconstitutional, the remaining parts shall remain in force unless:

(1) The statute provides otherwise;

(2) The remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the remaining parts would not have been enacted without the unconstitutional part; or

(3) The remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the legislative intent.

*Media Dimensions, Inc. v. Dep't of Transp.*, 132 P.3d 5, 18 (Or. 2006).

Based on this statute, and Oregon Supreme Court cases, severability analysis applies "when part of a statute is held to be unconstitutional." *Dilts*, 103 P.3d at 99. Under such circumstances, a court must consider "whether *that* part of the statute can be severed and the remaining parts of the statute saved." *Id.* Namely, under this framework, a court must make two determinations. First, it must conclude that part of the statute is unconstitutional. Second, it must conclude that the rest of the statute can be "saved," meaning it would be deemed constitutional, if the unconstitutional part were severed. "When a party contends the entire act is unconstitutional," then "severability is not germane until the constitutional claim is . . . resolved." *Bernstein Bros. v. Dep't of Revenue*, 661 P.2d 537, 539 (Or. 1983).

As a general rule, under *Dilts* and section 174.040, a court's threshold determination is whether a part of the statute is unconstitutional. Indeed, *Dilts* rejected Oregon's severability argument in that case because no party alleged that the specific provision the state proposed to sever was unconstitutional. 103 P.3d at 99. Nevertheless, when a statute raises First Amendment concerns because it is content based, the Oregon Supreme Court has considered whether to sever a portion of the statute that singles out a topic or subject matter for differential treatment, even if that portion is not itself unconstitutional. *See Outdoor Media Dimensions, Inc.*, 132 P.3d at 19.

In this context, *Outdoor Media Dimensions* considered a state statute that "requir[ed] a permit for a sign whose message does not relate to the premises on which the sign is located while providing an exemption for a sign whose

message does relate to the premises on which the sign is located." *Id.* at 7. The court first held that by exempting on-premises signs from the permit requirement, the statute was, "on its face, an impermissible restriction on the content of speech" in violation of the Oregon constitution. *Id.* at 18. Turning to the issue of severability, the court explained that to remedy the constitutional violation it could either invalidate the permit requirement or sever the exception for on-premises signs. *Id.* at 19. The court determined that "faced with that choice, the legislature would not have been willing to extend the [statute's] permit and fee requirements to . . . on-premises signs," and, therefore, the court held that "the appropriate remedy" was to invalidate the permit requirement. *Id.*

## B

### 1

Under *Outdoor Media*, we may consider whether severing the exceptions to section 165.540(1)(c) would "save" that section's general prohibition, even though the exceptions are not themselves unconstitutional. Assuming that section 165.540(1)(c), considered by itself, is content neutral, it can be "saved" as constitutional if it qualifies as a valid time, place, or manner restriction. Such a restriction must (1) be content neutral, (2) survive intermediate scrutiny review, and (3) "leave open ample alternative channels for communication of the information." *Hoye v. City of Oakland*, 653 F.3d 835, 844 (9th Cir. 2011) (citing *Rock Against Racism*, 491 U.S. at 791); *see also Regan v. Time, Inc.*, 468 U.S. 641, 648 (1984). Assuming that section 165.540(1)(c) would be content neutral if it were a stand-alone provision and would survive intermediate scrutiny review, we conclude it does not satisfy the third requirement.

"[A] regulation that forecloses an entire medium of public expression across the landscape of a particular community or setting fails to leave open ample alternatives." *United Bhd. of Carpenters & Joiners of Am. Loc. 586 v. NLRB*, 540 F.3d 957, 969 (9th Cir. 2008). Regulations may not hamper a speaker's preferred mode of communication to such an extent that they compromise or stifle the speaker's message. *See McCullen v. Coakley*, 573 U.S. 464, 487–90 (2014). Alternatives that are "less effective media for communicating the [speaker's] message . . . . are far from satisfactory." *Linmark Assocs., Inc. v. Township of Willingboro*, 431 U.S. 85, 93 (1977). "[F]ree speech protections extend to the right to choose a particular means or avenue of speech in lieu of other avenues." *United Bhd.*, 540 F.3d at 969 (cleaned up) (citation and quotation marks omitted). Thus, while the "[g]overnment may regulate the *manner* of speech in a content-neutral way," the government "may not infringe on an individual's right to select the *means* of speech." *Foti*, 146 F.3d at 641–42.

For example, in *City of Ladue v. Gilleo*, the Supreme Court held that an ordinance that prohibited displaying signs in front of one's residence did not leave open ample alternative channels of communication. 512 U.S. 43, 56 (1994). In reaching that conclusion, the Supreme Court rejected the city's argument that the law left open ample alternative channels of communication because "residents remain free to convey their desired messages by other means, such as *hand-held* signs, letters, handbills, flyers, telephone calls, newspaper advertisements, bumper stickers, speeches, and neighborhood or community meetings." *Id.* (citation and quotation marks omitted). In doing so, the Supreme Court explained that "[d]isplaying a sign from one's own residence often carries a message quite distinct

form placing the same sign someplace else, or conveying the
same text or picture by other means." *Id.* Indeed, it is
"[p]recisely because of their location [that] such signs
provide information about the identity of the speaker." *Id.*
(quotation marks omitted). To illustrate, the Supreme Court
noted that "[a] sign advocating 'Peace in the Gulf' in the
front lawn of a retired general or decorated war veteran may
provoke a different reaction than the same sign in a 10-year-
old child's bedroom window or the same message on a
bumper sticker of a passing automobile." *Id.* Likewise,
"[a]n espousal of socialism may carry different implications
when displayed on the grounds of a stately mansion than
when pasted on a factory wall or an ambulatory sandwich
board." *Id.* at 56–57. Moreover, the intention behind
placing a sign at one's residence may be "to reach neighbors,
an audience that could not be reached nearly as well by other
means." *Id.* at 57 (emphasis omitted). In some instances,
barring a means of speech effectively eliminates a message.
For speakers "of modest means or limited mobility, a yard
or window sign may have no practical substitute." *Id.* And
for others, "the added costs in money or time of taking out a
newspaper advertisement, handing out leaflets on the street,
or standing in front of one's house with a handheld sign may
make the difference between participating and not
participating in some public debate." *Id.*

In light of this understanding of what case law requires
for a speech restriction to leave open ample alternative
channels for communication, it is clear that section
165.540(1)(c) does not meet the mark. It functions as "an
absolute prohibition on a particular type of expression"—the
creation of unannounced audiovisual recordings. *United
States v. Grace*, 461 U.S. 171, 177 (1983). Though section
165.540(1)(c) allows individuals to record conversations

where participants are "specifically informed that their conversation is being obtained," such notification would effectively destroy the intended content of the recording. The subject matter of unannounced recordings is the subjects' candid responses to issues of controversy. Because the protected speech is the recording of subjects' unfiltered responses, *see Wasden*, 878 F.3d at 1204, a rule that requires the person creating the recording to provide notice extinguishes that speech.      In other words, creating announced recordings is not an adequate alternative channel of speech for creating unannounced recordings.**[19]**

Nor does after-the-fact reporting of an undercover interview or encounter provide an adequate alternative method of communication.  Audiovisual recording is a unique medium of communication.  It captures in real time both the sounds and sights of an event, making it more trustworthy and persuasive—and thus having vastly greater impact—than post-hoc written or oral accounts.  *See Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017) (noting that audiovisual recordings "corroborate[] or lay[] aside subjective impressions for objective facts"); *Am. C.L. Union of Illinois v. Alvarez*, 679 F.3d 583, 595, 607 (7th Cir. 2012) (stating that the "self-authenticating character" of audiovisual recordings "makes it highly unlikely that other methods could be considered reasonably adequate substitutes").  Indeed, the Supreme Court recognized the importance of audiovisual recording as corroborating or disproving testimony in *Scott v. Harris*.  Even on summary

---

[19] In fact, the dissent expressly acknowledges these attributes, which are unique to unannounced recordings.  Dissent at 55.  But by recognizing that unannounced recordings are unique, the dissent has necessarily conceded that other forms of media are inadequate substitutes.

judgment when "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" the court must rely on "the record of a videotape capturing the events in question," when it "clearly contradicts the version of the story told by" the nonmoving party. 550 U.S. 372, 378 (2007) (citation omitted). Audiovisual recordings are also unique because they can readily be disseminated to a wider audience when incorporated into news programming. *See Fields*, 862 F.3d at 359 ("Recordings also facilitate discussion because of the ease in which they can be widely distributed via different forms of media."); *Am. C.L. Union of Illinois*, 679 F.3d at 607 (noting that audiovisual recordings are "powerful methods of . . . disseminating news and information"). Accordingly, section 165.540(1)(c) does not leave open alternative channels to real-time, unannounced audiovisual recordings. And we therefore conclude that section 165.540(1)(c) (if read as a stand-alone provision, without exceptions) is not a valid time, place, or manner restriction.

In opposing this analysis, and arguing that section 165.540(1)(c) leaves open ample alternative channels of communication, the dissent reframes the medium of public expression sought by Project Veritas at a high level of generality. According to the dissent, the relevant medium of communication is not the unannounced recordings that capture candid responses, but rather "investigative journalism" generally. Dissent at 61–63. At this high level of generality, the dissent insists section 165.540 does not prevent Project Veritas from engaging in investigative journalism of some sort. And it claims that we previously held that restricting unannounced recording does not foreclose the medium of investigative journalism. *See*

*Dietemann v. Time, Inc.*, 449 F.2d 245 (9th Cir. 1971). Dissent at 55–56, 62 & n.11, 65.

We disagree with this analysis. First, the dissent again fails to recognize the implications of *Wasden*. Under *Wasden*, the creation of an unannounced recording of a subject's unguarded conduct (which would include any statements made in the course of such conduct) is itself a form of protected speech and constitutes "a significant medium" of public expression. 878 F.3d at 1203 (citation and quotation marks omitted). As explained above, section 165.540(1)(c) does not leave ample alternative channels for Project Veritas's mode of speech. Thus, the dissent's argument that section 165.540(1)(c) does not foreclose investigative journalism as a journalistic approach misses the mark. At some level of generality, "art" can be made without a paint brush—but neither sculpture nor architecture is a substitute for painting.

Moreover, the dissent's reliance on *Dietemann* is misplaced. Dissent at 55–56, 62 & n.11, 65. In *Dietemann*, two journalists used a ruse to gain entry to the plaintiff's home and then surreptitiously photographed and recorded him without consent. 449 F.2d at 245–46. We held that the plaintiff could state a claim for invasion of privacy under California law because the conduct occurred inside the plaintiff's home, *id.* at 248, and because the First Amendment did not "accord newsmen immunity from torts or crimes committed during the course of newsgathering," *id.* at 249. But *Dietemann* has no bearing on the question whether a rule prohibiting unannounced recordings in public places fails to leave open ample alternative channels of communication.

For this reason, the dissent's argument that a parade of horribles will result from our analysis—such as the invalidation of "eavesdropping statutes"—is not well-taken. Dissent at 73. As explained, *see supra* Section III.A., the threshold question is whether the challenged law restricts First Amendment protected speech. Under *Wasden*, the creation of an unannounced recording is speech protected by the First Amendment. But we are not aware of any cases holding that eavesdropping (without more) is protected speech. Therefore, the First Amendment would not constitute grounds to invalidate a statute prohibiting that conduct. Moreover, we analyzed section 165.540(1)(c) as a prohibition of First Amendment protected speech in *public places*. *See supra* Section III.C. Our analysis of the state's asserted governmental interest and whether its restriction on speech is narrowly tailored would necessarily be different in the context of eavesdropping, where an individual's heightened privacy interests in his own home are at stake. Nothing we have said today impugns the well-established rule that the First Amendment does not "accord [a speaker] immunity from torts or crimes committed" in service of his speech. *Dietemann*, 449 F.2d at 249.[20]

2

Because we conclude that section 165.540(1)(c) is not a valid time, place, or manner restriction, it cannot be "saved" by striking the two exceptions at issue here. Therefore,

---

[20] The dissent argues that our conclusion that section 165.540(1)(c) is not a valid time, place, or manner restriction, means that the Oregon legislature is "in a catch-22." Dissent at 69. But a judicial determination that a statute is unconstitutional does not put the legislature in a catch-22 situation; rather, it merely tells the legislature that its enactment has impermissibly infringed on the First Amendment rights of its citizens.

"severability is not germane." *Bernstein Bros.*, 661 P.2d at
539. Further, under *Outdoor Media Dimensions*, we also
conclude that the Oregon legislature would not intend the
exceptions to be severed, because when Oregon courts
analyze severability, they "assum[e] that the legislature
prefers to avoid enacting a bill that raises serious questions
of constitutionality." *State v. Borowski*, 220 P.3d 100, 109
(Or. Ct. App. 2009).

If the exceptions were removed, section 165.540(1)(c)
would raise serious constitutional issues. This section would
prohibit the unannounced recording of police officers
performing their official duties or a felony endangering
human life. But we have consistently and repeatedly held
that "[t]he First Amendment protects the right to photograph
and [to] record matters of public interest," *Askins*, 899 F.3d
at 1044, which includes the right to "observ[e]
government[al] operation[s]," *Reed v. Lieurance*, 863 F.3d
1196, 1211 (9th Cir. 2017), and the commission of a crime,
*see Obsidian Fin. Grp., LLC v. Cox*, 740 F.3d 1284, 1291–
92 (9th Cir. 2014). Requiring a citizen to inform all parties
involved to capture governmental officials' performance of
official duties in public places, for example, would
substantially impede this speech right by foreclosing a major
avenue for citizens to "[g]ather[] information about
government officials in a[n unaltered] form that can readily
be disseminated to others," despite the fact that this type of
speech "serves a cardinal First Amendment interest in
protecting and promoting 'the free discussion of
governmental affairs.'" *Glik v. Cunniffe*, 655 F.3d 78, 82
(1st Cir. 2011) (citing *Mills v. Alabama*, 384 U.S. 214, 218
(1966)). Further, an announced recording of a felony in
progress would not only tend to reduce the opportunity to
capture such evidence, but also tend to imperil the person

recording. Given the impetus for this exception was to enable police officers to make unannounced recordings of felony drug transactions and felonies endangering human life without first obtaining a court order, *see supra* pp. 8–9, the legislature would not choose to endanger police by eliminating this exception to the general rule.

The dissent suggests that removing the exceptions from the general prohibition in section 165.540(1)(c) would not raise constitutional issues because a court would likely deem section 165.540(1)(c) unconstitutional as applied to an individual who filmed police or other matters of public interest in public places. Dissent at 68–69. But such a conclusion merely acknowledges that the general prohibition itself raises serious constitutional issues. Therefore, severing the exceptions that make the general prohibition content based, and extending the general prohibition to these protected First Amendment activities, would create significant constitutional issues rather than cure them. Under *Outdoor Media*, we must presume that the Oregon legislature would not retain such a law.[21]

---

[21] The dissent argues that the legislature would want to retain section 165.540(1)(c) as a stand-alone provision, even if the exception in section 165.540(5)(b) for recording police officers were severed, because the general prohibition in section 165.540(1)(c) "was freestanding for fifty-six years before the legislature adopted the exception that allows the recording of law enforcement officers performing official duties in public." Dissent at 51; *see also* Dissent at 67–68. This evinces a misunderstanding of the relevant legislative history. The legislature adopted section 165.540(1)(c) long before *Fordyce* made clear that such a general prohibition on filming matters of public concern raises serious constitutional questions. *See* 55 F.3d at 439. Following *Fordyce* and subsequent opinions reiterating this rule, the legislature added the exception in section 165.540(5)(b)—likely to eliminate this constitutional concern. (Unfortunately, the addition of this exception

\* \* \*

Reading section 165.540(1)(c) as a whole, we conclude that it is a content-based speech restriction that cannot survive strict scrutiny because Oregon has not asserted a compelling government interest and because the statute is not narrowly tailored. The statute is also not a valid time, place, or manner restriction because it does not leave open ample alternative channels for communication. Applying Oregon law, we may not sever the exceptions because severing them would not render section 165.540(1)(c) constitutional. Accordingly, we conclude that the statute is facially unconstitutional.

**REVERSED and REMANDED.**

---

CHRISTEN, Circuit Judge, dissenting:

"The right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965).

When it adopted Oregon Revised Statutes section 165.540(1)(c), the Oregon legislature required that notice must be given before in-person oral conversations may be recorded. With this statute, the legislature ensured

---

rendered section 165.540 a content-based speech restriction, which created a different First Amendment issue.) Given that the Oregon legislature already evinced its intent to avoid the constitutional questions raised when section 165.540(1)(c) was a standalone provision, we must conclude that the legislature would not sever the exception in section 165.540(5)(b), which would merely bring back to life the same constitutional issue that the Oregon legislature faced prior to enacting this exception.

that Oregonians would be free to engage in the "uninhibited exchange of ideas and information,"[1] without fear that their words could be broadcast beyond their intended audience, appear on the evening news, or worse, be manipulated and shared across the internet devoid of relevant context.

Project Veritas engages in undercover investigative journalism, and it finds Oregon's protection against the secret recording of oral conversations a hindrance to its operations.  Project Veritas seeks a ruling declaring section 165.540(1)(c) unconstitutional, arguing there is no distinction between hearing a conversation and secretly recording it.  Because the majority does not dispute that the State has a significant interest in protecting the privacy of Oregonians who engage in conversations without notice that their comments are being recorded, our court's analysis should be straightforward.  First, principles of federalism require that we begin from a premise of reluctance to strike down a state statute.  Next, following Supreme Court precedent, we should sever the two statutory exceptions that Project Veritas challenges, apply intermediate scrutiny to the content-neutral remainder, recognize that the statute is well-tailored to meet Oregon's significant interest, and uphold section 165.540(1)(c) as a reasonable time, place, or manner restriction.

The majority takes a very different path.  It begins by straining to avoid the conclusion that the two exceptions to section 540(1)(c)'s notice requirement that Project Veritas challenges are severable.  From there, the majority concludes that severance is inappropriate by implausibly speculating that the Oregon legislature—which the majority faults for

---

[1] *Bartnicki v. Vopper*, 532 U.S. 514, 532 (2001) (citation omitted).

overzealously protecting privacy—would have preferred to
jettison all of section 540(1)(c) rather than striking the two
exceptions.

My colleagues do not contest that Oregon has a
significant interest in protecting people from unannounced
recordings of in-person conversations, but they rewrite the
State's articulated purpose. The purpose Oregon advances
is its significant interest in protecting participants from
having their oral conversations recorded without their
knowledge. The majority recasts the State's interest as one
in "protecting people's conversational privacy *from the
speech of other individuals*." Slip Op. at 25. (emphasis
added). That reframing of the legislature's purpose serves
as the springboard for the majority's reliance on an
inapplicable line of Supreme Court authority that pertains to
state action aimed at protecting people from unwanted
commercial or political speech; not protection from speech-
gathering activities like Project Veritas's, which are
qualitatively different because they appropriate the speech
of others.

The majority glosses over this important distinction, and
in the end, it declares that all of section 165.540(1)(c) is
unconstitutional by concluding that the State's ban on
unannounced recordings leaves no adequate alternative
channel of communication. This final rationale is contrary
to the reasoning of our own court, which has explained that
"hidden mechanical contrivances are [not] 'indispensable
tools' of newsgathering. Investigative reporting is an
ancient art; its successful practice long antecedes the
invention of miniature cameras and electronic devices."
*Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir. 1971).
Because modern technology now allows voice recordings to
be manipulated and disseminated worldwide with a few

keystrokes and clicks, the protection afforded by section 165.540(1)(c) is more important than ever.

For all these reasons, I respectfully dissent.

I.

In 1955, the Oregon legislature enacted what is now section 165.540 of the Oregon Revised Statutes, a wiretapping law that requires the consent of one party before a telecommunication or a radio communication may be recorded in Oregon. *See State v. Lissy*, 747 P.2d 345, 350 (1987); Or. Rev. Stat. § 165.540(1)(a) (1955).[2] The legislature amended section 165.540 in 1959 to require that anyone wishing to record an in-person conversation must first specifically inform all participants.[3] *Lissy*, 747 P.2d at 350 & n.4. "[T]he primary concern underlying [§] 165.540(1)(c) was the protection of participants in conversations from being recorded without their knowledge." *State v. Neff*, 265 P.3d 62, 66 (Or. Ct. App. 2011). The 1959 amendment was codified as

---

[2] The original wiretapping statute provided, in relevant part, that a person may not "[o]btain or attempt to obtain the whole or any part of a telecommunication or a radio communication to which such person is not a participant, by means of any device, contrivance, machine or apparatus, whether electrical, mechanical, manual or otherwise, unless consent is given by at least one participant." Or. Rev. Stat. § 165.540(1)(a) (1955).

[3] The section was later amended to include face-to-face conversations conducted via video conference. *Compare* Or. Rev. Stat. § 165.540(6)(a) (2022), *with* Or. Rev. Stat. § 165.540(6)(a) (2019). My use of the term "in-person conversation" encompasses the audio portion of conversations conducted by video conference.

section 165.540(1)(c) of the Oregon Revised Statutes, and it is the focus of Project Veritas's appeal.**[4]**

Two exceptions to Oregon's ban on recording in-person oral conversations are at issue. The first, adopted by the legislature in 1989, allows the unannounced recording of "a conversation during a felony that endangers human life." Or. Rev. Stat. § 165.540(5)(a) (1989). The second exception, adopted in 2015, permits the unannounced recording of "a conversation in which a law enforcement officer is a participant," provided that certain conditions are met. Or. Rev. Stat. § 165.540(5)(b) (2015).**[5]** As to this exception, the majority recognizes that our own court has squarely held that the right to record law enforcement officers performing official duties in public is protected by the First Amendment. *See Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018). The majority takes the position that federal law also protects recording during a felony that endangers human life. Assuming the exceptions to section 540(1)(c) are indeed co-extensive with

---

[4] Section 165.540(1)(c) provides that no person may "[o]btain or attempt to obtain the whole or any part of a conversation by means of any device, contrivance, machine or apparatus, whether electrical, mechanical, manual or otherwise, if all participants in the conversation are not specifically informed that their conversation is being obtained." Or. Rev. Stat. § 165.540(1)(c) (1961). The term "conversation," is defined to include only "oral communications." Or. Rev. Stat. § 165.535(1).

[5] Specifically, the officer must be "performing official duties," the recording must be made "openly and in plain view," the conversation must be "audible to the person by normal unaided hearing," and the person recording must be "in a place where the person lawfully may be." Or. Rev. Stat. § 165.540(5)(b).

conduct protected by the federal constitution, the exceptions
do not change the speech that is permitted in Oregon.

II.

Project Veritas challenges section 165.540(1)(c)'s
requirement that a participant must give notice before
recording an in-person conversation in Oregon. This
provision applies to unannounced recordings of
"conversations," which, as explained, are defined to include
only "*oral* communications." **6** Or. Rev. Stat. §§ 165.535(1),
165.540(1)(c) (emphasis added). Project Veritas proposes to
investigate the Oregon Public Records Advocate and Public
Records Advisory Council by conducting surreptitious or
unannounced recordings of conversations in areas open to
the public, including cafes, parks, and sidewalks. Project
Veritas also proposes to investigate violent protests in
Portland by: (1) secretly recording conversations between
police and protestors; (2) secretly recording conversations

---

6 The majority asserts that section 165.540(1)(c) applies to both audio
and video recordings. It supports this statement with the observation that
the statute "bars individuals from obtaining a conversation 'by means of
any device,'" Slip Op. at 6 & n.3 (quoting *State v. Copeland*, 522 P.3d
909, 911–12 (Or. Ct. App. 2022)), and the observation that the term
"conversation" is defined to include both in-person oral communications
and those conducted via video conference. Neither observation changes
that the statute expressly requires notification only before recording an
oral communication. A video recording that does not include an
accompanying audio recording of an oral communication is not subject
to the statute. The majority resists the result of the clear statutory
language by arguing *Copeland* did not differentiate between a video of a
"heated discussion" and a video of a shooting. Slip Op. at 6 n.3. But
that case concerned a video that captured both a conversation and a
shooting, and nothing in that opinion implies that section 165.540(1)(c)
would apply to a video that did not capture an oral communication. *See
Copeland*, 522 P.3d at 912–13.

between its journalists and police; (3) secretly recording conversations between its journalists and protestors; and (4) openly recording conversations with protestors without providing notice of the recording. The majority repeatedly suggests that Project Veritas seeks to record only in public places, but Project Veritas avers only that *most* of its recording will occur in public places. It does not identify the other venues that it has in mind.

Project Veritas acknowledges the validity of Oregon's prohibition on "eavesdropping," and explicitly disavows any intention of eavesdropping. As Oregon defines that term, this means Project Veritas will not intercept wire or oral communications to which Project Veritas is not a party, without the consent of the participants. Or. Rev. Stat. § 165.543(1). Instead, Project Veritas plans to record conversations in which its reporters participate by using concealed recording devices and not giving notice that the conversations are being recorded. Project Veritas argues that such recording is protected speech under the First Amendment and that the other participants in these conversations have only a "limited," "tenuous," and "minimal" privacy interest in not having their speech recorded.

A.

In defining the scope of First Amendment protection, our precedent draws no distinction between the process of creating speech and speech itself. *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061–62 (9th Cir. 2010). We have explained that "[b]ecause the recording process is itself expressive and is 'inextricably intertwined' with the resulting recording, the creation of audiovisual recordings is speech entitled to First Amendment protection as purely

expressive activity." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1204 (9th Cir. 2018) (quoting *Anderson*, 621 F.3d at 1062) (reasoning that the act of creating a recording is itself expressive, much like writing a book or painting a picture). But unlike writing a book or painting a picture, recording a conversation involves the appropriation of others' speech. To be clear, I agree that Project Veritas's act of creating a recording is protected speech, but it is important to recognize that the type of speech Project Veritas plans to engage in—unannounced in-person recordings of oral conversations—infringes upon other speakers' competing interest in conversational privacy. That competing interest plays a critical role when we assess whether the State's time, place, or manner restriction is reasonable and sufficiently tailored to the State's significant interest.

Project Veritas argues that the dangerous-felony exception and the law-enforcement exception are both content based, rendering all of section 165.540(1)(c) content based. For purposes of this analysis, I assume this is correct. Content-based restrictions on speech are subject to strict scrutiny, *Wasden*, 878 F.3d at 1204, and Oregon does not argue that section 165.540(1)(c) can satisfy that heightened standard. But even assuming that section 165.540(1)(c) fails strict scrutiny if the two challenged exceptions are considered, the question we should ask next is whether the two statutory exceptions are severable.

B.

The Supreme Court recently reiterated in *Barr v. American Ass'n of Political Consultants, Inc.* [*AAPC*], 140 S. Ct. 2335 (2020), that when confronted with an exception that renders a restriction on speech impermissibly content based, we apply ordinary severability principles, starting

with a "strong presumption of severability" that dates back
to the Marshall Court. *Id.* at 2350; *see Free Enter. Fund v.
Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010).
"The Court's presumption of severability . . . allows courts
to avoid judicial policymaking or *de facto* judicial legislation
in determining just how much of the remainder of a statute
should be invalidated." *AAPC*, 140 S. Ct. at 2351. The
presumption of severability applies with particular force
where, as here, the legislature "added an unconstitutional
amendment to a prior law. In those cases, the Court has
treated the original, pre-amendment statute as the 'valid
expression of the legislative intent.'" *Id.* at 2353 (quoting
*Frost v. Corp. Comm'n of Okla.*, 278 U.S. 515, 526–27
(1929)).    We need not guess at whether the Oregon
legislature intended its previously enacted protection for in-
person conversations to exist independently, because
section 165.540(1)(c) was a freestanding provision for thirty
years before the legislature adopted the dangerous-felony
exception, and it was freestanding for fifty-six years before
the legislature adopted the exception that allows the
recording of law enforcement officers performing official
duties in public. As the majority points out, the Oregon
legislature's statutory scheme is among the nation's
strongest protections for conversational privacy. Slip Op. at
6 n.1. What the majority overlooks is that this makes it
particularly implausible that the legislature intended
Oregon's entire conversational privacy statute to be struck
down rather than have the two challenged exceptions
severed. The majority suggests that it addresses severability
only because I rely on it, Slip Op. at 31, but the Supreme
Court has made clear that striking down a statute before
considering severability is not an option.

We have an obligation to consider severability regardless of whether litigants raise it.[7] Principles of federalism make it particularly important that we apply a surgical approach in this case and sever any constitutionally suspect provisions, because we are a federal court treading on a state statute. The majority acknowledges that the "[s]everability [of a state statutory provision] is of course a matter of state law," *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam), and both Oregon statutory law and Oregon Supreme Court precedent require us to apply a presumption in favor of severability, *see* Or. Rev. Stat. § 174.040; *Outdoor Media Dimensions, Inc. v. Dep't of Transp.*, 132 P.3d 5, 18 (Or. 2006). Specifically, Oregon Revised Statutes section 174.040 provides:

> It shall be considered that it is the legislative intent, in the enactment of any statute, that if any part of the statute is held unconstitutional, the remaining parts shall remain in force unless:
>
> > (1) The statute provides otherwise;

---

[7] *New York v. United States*, 505 U.S. 144, 186 (1992) ("Having determined that the take title provision exceeds the powers of Congress, we *must consider* whether it is severable from the rest of the Act." (emphasis added)); *accord Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 507 (1985) (rejecting appellees' argument that appellants had forfeited the severability issue before our circuit and concluding that our circuit should have considered severability before striking down a state statute); *see* Brief for All Appellees at 44, *Brockett*, 472 U.S. 491 (Nos. 84-28, 84-143), 1984 WL 565782, at *44; *see also Nat'l Ass'n for Gun Rights, Inc. v. Mangan*, 933 F.3d 1102, 1122 (9th Cir. 2019) (addressing severability sua sponte even though neither litigant addressed it on appeal or in the district court).

(2) The remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the remaining parts would not have been enacted without the unconstitutional part; or

(3) The remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the legislative intent.

In *Outdoor Media Dimensions*, the Oregon Supreme Court explained that "[o]rdinarily, when one part of a statute is found unconstitutional, this court's practice (and the legislature's stated preference) is to sever the offending part and save the remainder of the statute, unless the legislature has directed otherwise, unless the parts of the statute are so interconnected that it appears likely that the remaining parts would not have been enacted without the unconstitutional part, or unless the remaining parts are incomplete and cannot be executed in accordance with legislative intent." 132 P.3d at 18. None of Oregon's exceptions to the presumption of severability apply here, so we should sever the two exceptions Project Veritas challenges and evaluate the constitutionality of the remaining notice requirement.

C.

No one disputes that section 165.540(1)(c) is content neutral if the two challenged exceptions are severed, so intermediate scrutiny applies. *See Turner Broad. Sys., Inc.*

*v. FCC*, 512 U.S. 622, 642 (1994).  To survive intermediate scrutiny, a time, place, or manner restriction on speech must be "narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).  The narrow-tailoring requirement does not mean that the government's restriction on speech must be the "least restrictive or least intrusive means" of serving the state's interest, but the government cannot "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals."  *Id.* at 798–99.

1.

Oregon's attorney general argues that section 165.540(1)(c)'s restriction on recording in-person conversations is justified by Oregon's significant interest in ensuring that Oregonians know whether their conversations are being recorded.  This is unquestionably a significant state interest.  The Supreme Court has recognized that "[p]rivacy of communication is an important interest" and that restrictions protecting this interest can "encourag[e] the uninhibited exchange of ideas and information among private parties."  *Bartnicki v. Vopper*, 532 U.S. 514, 532 (2001) (citation omitted).  The Court has also recognized that "the fear of public disclosure of private conversations might well have a chilling effect on private speech."  *Id.* at 533; *accord Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 605 (7th Cir. 2012) ("[Conversational privacy] is easily an important governmental interest.").

Project Veritas does not dispute this point.  Indeed, it acknowledges that "[p]rivacy is an important governmental

interest that eavesdropping and wiretapping prohibitions are narrowly tailored to protect." Nevertheless, Project Veritas argues that if one of its undercover reporters consents to having an in-person conversation recorded, the other party to the conversation has only a "limited," "tenuous," and "minimal" privacy interest in not being recorded. To reach this implausible conclusion, Project Veritas begins from the assertion that "[a]n audio recording by a party is little more than a more accurate record of what one party is already, in the overwhelming majority of circumstances, entitled to share in a free society." In other words, in Project Veritas's view, having one's oral communication secretly recorded imposes no greater burden on privacy than merely having the same comments heard—never mind that recorded comments can be forwarded to vast audiences, posted on the internet in perpetuity, selectively edited, presented devoid of context, or manipulated using modern technology.

Project Veritas's premise is emphatically wrong. In *Dietemann*, we reasoned:

> One who invites another to his home or office takes a risk that the visitor may not be what he seems, and that the visitor may repeat all he hears and observes when he leaves. But he does not and should not be required to take the risk that what is heard and seen will be transmitted by photograph or recording, or in our modern world, in full living color and hi-fi to the public at large or to any segment of it that the visitor may select. A different rule could have a most pernicious effect upon the dignity of man and it would surely lead to

> guarded conversations and conduct where
> candor is most valued . . . .

449 F.2d at 249.   This rationale is not limited to
conversations within private residences, nor does Project
Veritas represent that it intends to limit its unannounced
recordings to public places, despite the majority's
suggestions to the contrary.   Ironically, Project Veritas
argues that "audiovisual recordings are uniquely reliable and
powerful methods of preserving and disseminating news and
information," (internal quotation marks and citation
omitted), but sees no contradiction in its assertion that
turning these "uniquely reliable and powerful methods" on
private conversations poses no threat to privacy.

The secret recording of speech is far more destructive to
one's privacy than merely having oral communications
heard and repeated.   Recorded speech can be stored
indefinitely,   disseminated   widely,   and   viewed
repeatedly.   In the age of the internet and generative artificial
intelligence (AI), surreptitious recording of in-person
conversations risks massive and ongoing invasions of
privacy.   Today, anyone can access and learn how to use AI-
powered generative adversarial networks to create
convincing audio or video "deepfakes" that make people
appear to say or do things they never actually did.[8]   With
these tools, "the only practical constraint on one's ability to
produce a deepfake [is] access to training materials—that is,

---

[8] Robert Chesney & Danielle Citron, *Deepfakes and the New
Disinformation   War*,   Foreign   Affairs   (Dec.   11,   2018),
https://www.foreignaffairs.com/articles/world/2018-12-11/deepfakes-
and-new-disinformation-war [https://perma.cc/TW6Z-Q97D].

audio and video of the person to be modeled."**[9]** *Id.* The importance of the right to have notice before one's oral communications are recorded cannot be overstated because technology now allows recordings to be selectively edited, manipulated, and shared across the internet in a matter of seconds.

Project Veritas acknowledges the privacy interest at stake in Oregon's ban on eavesdropping, yet it denies that the same privacy interests are at stake in Oregon's ban on secret recording of in-person conversations. This position is unsupportable. The privacy interest implicated by secret recordings of in-person conversations is grounded in the same concerns as the privacy interest implicated by eavesdropping; in both circumstances, a person's oral communications are shared with an unintended audience and the speaker loses the ability to knowingly choose to speak, or not speak, based upon that audience.

There is no question that journalists perform a vital role in our society and their ability to engage in speech is entitled to constitutional protection, but Project Veritas's speech is not the only speech implicated by the issues in this appeal. By striking down Oregon's carefully crafted statute, the court denies Project Veritas's interviewees the opportunity to knowingly choose not to participate in the recordings Project Veritas plans to create. Respectfully, the majority overlooks that secret recordings can incorporate and disseminate oral comments in ways the original speaker did

---

[9] The majority argues this concern about deepfakes is overblown because a person's voice can also be captured through announced recording. This misses the critical point: once a person has notice that her conversation will be recorded, she can choose not only what to say, but also whether to speak at all.

not intend, and that this implicates the "principle of autonomy to control one's own speech." *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995). As the Supreme Court has explained, "The First Amendment securely protects the freedom to make—*or decline to make*—one's own speech; *it bears less heavily when speakers assert the right to make other people's speeches*." *Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003) (emphasis added) (rejecting a First Amendment challenge to a copyright extension); *see also Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 559 (1985) (recognizing, along with the freedom to express one's views publicly, the "concomitant freedom *not* to speak publicly" (quoting *Est. of Hemingway v. Random House*, *Inc.*, 244 N.E.2d 250, 255 (N.Y. 1968))).

Project Veritas stresses that its clandestinely recorded conversations will be held mostly in public places like cafes or parks. But the State has a significant interest in preventing the secret recording of private conversations even when those conversations occur in public or semi-public locations. Everyday experiences tell us that "private talk in public places is common." *Alvarez*, 679 F.3d at 606 (citation omitted). In many circumstances, even if a conversation may be heard or overheard by multiple people, the State maintains a significant interest in preventing its recording. For example, the State of Oregon points out that this interest is most obvious in multiparty gatherings that welcome members of the public yet expect that attendees will not make secret recordings of each other, such as twelve-step groups, bible study, and religious services. Our society respects those boundaries. Oregon has a significant interest in preventing unannounced recordings of oral in-person conversations.

2.

The next question is whether section 165.540(1)(c) is narrowly tailored to that interest. I conclude it is. By requiring that participants in a conversation be informed before it is recorded—but *not* requiring that they consent to the recording—the statute infringes as little as possible on the process Project Veritas intends to use to create its speech, while still protecting the interviewees' right to knowingly participate in Project Veritas's speech—or not. Once a person is on notice that she will be recorded, recording does not violate any privacy interest. Keeping the Oregon legislature's actual purpose in mind, the statute is exceptionally well tailored to ensuring that Oregonians' conversations will not be recorded without their knowledge. Consistent with that interest, the statute does not sweep in photography or video recordings—but rather applies only to recordings of oral communications.[10]

There are some settings in which people cannot reasonably expect *not* to have their oral statements recorded, and the Oregon legislature crafted its statute to account for those situations:

> The prohibitions in subsection (1)(c) of this section do not apply to persons who intercept or attempt to intercept oral communications that are part of any of the following

---

[10] Although "private talk in public places is common," *Alvarez*, 679 F.3d at 606 (citation omitted), and people may reasonably expect, even in public places, that their private conversations will not be recorded, a person cannot reasonably expect that his visual image will not be captured in public.

> proceedings, if the person uses an unconcealed recording device . . . :
>
> (A) Public or semipublic meetings such as hearings before governmental or quasi-governmental bodies, trials, press conferences, public speeches, rallies and sporting or other events;
>
> (B) Regularly scheduled classes or similar educational activities in public or private institutions; or
>
> (C) Private meetings or conferences if all others involved knew or reasonably should have known that the recording was being made.

Or. Rev. Stat. §165.540(6)(a). The exceptions in section 165.540(6)(a) permit Project Veritas to openly record at public protests as it proposes to do. Project Veritas points out that this exception does not render section 540(1)(c) *perfectly* tailored to Oregon's stated purpose. For example, the law prohibits recording "a loud argument on the street, a political provocateur on a crowded subway, [or] a drunk, hate-filled conversation in a parking lot," even though the participants in such conversations lack any expectation that their words will not be recorded. Section 165.540(1)(c)'s notice requirement may be overbroad as applied to these fringe cases, but far from demonstrating that a "substantial portion of the burden on speech does not serve to advance [Oregon's] goals," *Ward*, 491 U.S. at 799, Project Veritas's resort to these niche examples illustrates that the bulk of Oregon's protection against secret audio recording is targeted at achieving the State's significant interest. Nothing

more is required to meet intermediate scrutiny's tailoring requirement.

3.

Section 165.540(1)(c) also leaves open ample alternative channels of communication for Project Veritas to engage in investigative journalism and to communicate its message. It is well-settled that an alternative channel need not be ideal, but merely adequate. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981); *Reynolds v. Middleton*, 779 F.3d 222, 232 n.5 (4th Cir. 2015) ("The available alternatives need not be the speaker's first or best choice or provide the same audience or impact for the speech." (citation and internal quotation marks omitted)); *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002) ("An adequate alternative does not have to be the speaker's first choice."). A restriction runs afoul of the "alternative channels" requirement if it eliminates the only method of communication by which speakers can convey their message to a particular audience. *See, e.g.*, *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229–30 (9th Cir. 1990). But a regulation does not fail intermediate scrutiny merely because the other available channels of communication would convey the same message somewhat less conveniently or effectively. *See, e.g.*, *Santa Monica Nativity Scenes Comm. v. City of Santa Monica*, 784 F.3d 1286, 1298–99 (9th Cir. 2015); *One World One Fam. Now v. City & County of Honolulu*, 76 F.3d 1009, 1014 (9th Cir. 1996).

"We have observed that the Supreme Court generally will not strike down a governmental action for failure to leave open ample alternative channels of communication unless the government enactment will foreclose an entire

medium of public expression across the landscape of a particular community or setting." *Menotti v. City of Seattle*, 409 F.3d 1113, 1138 (9th Cir. 2005) (alteration accepted) (internal quotation marks and citation omitted). Project Veritas has no colorable argument that it would be unable to gather information to engage in investigative journalism, to communicate its message "across the landscape of a particular community or setting," or to reach a particular audience if it cannot secretly record in-person oral interviews. Indeed, we made clear in *Dietemann* that restricting surreptitious recording does not foreclose an entire medium.[11]  449 F.2d at 249.

Project Veritas retains ample alternative means of engaging in investigative journalism and expressing its message. It can employ all the tools of traditional investigative reporting, including but not limited to talking with whistleblowers and other inside sources, crowd-sourcing information, researching public records, taking photographs and recording videos that do not capture oral conversations, and using Oregon's freedom-of-information laws. *See, e.g.*, Or. Rev. Stat. §§ 192.311–.431, 192.610– .695. It can also openly record during public and semi-public meetings and events, Or. Rev. Stat. § 165.540(6)(a)(A), and, in other settings, provide notice that it is recording without announcing that it is engaging in investigative journalism. These many approaches to

---

[11] The majority protests that *Dietemann* addressed whether the First Amendment barred state tort liability for invasion of privacy, but my colleagues do not try to explain why *Dietemann*'s observations about the nature and history of investigative reporting are not applicable here.

traditional investigative reporting satisfy the alternative-channels requirement.

### III.

Rather than taking the straightforward path that this case calls for, the majority strikes down all of section 165.540(1)(c) by making several unjustified leaps. First, the majority decides that the two content-based exceptions Project Veritas challenges cannot be severed because, it reasons, the exceptions themselves are not unconstitutional and severing them would raise *other* constitutional questions. Despite strong indications to the contrary, the majority next decides that the Oregon legislature would rather strike down the state's entire statutory protection for conversational privacy rather than sever the two exceptions. The majority also errs by invoking case law that addresses statutes and ordinances adopted to protect others from unwanted commercial or political speech. Finally, my colleagues conclude that even if the two exceptions were severed, section 165.540(1)(c) would still be unconstitutional because it fails to leave open ample alternative channels of communication. The majority makes several missteps in its analysis.

### A.

I agree that section 165.540(1)(c) would not survive strict scrutiny viewed as a whole—indeed, Oregon never argues otherwise. But the State of Oregon specifically describes Oregon's interest in in this statute as "protecting Oregonians from having their private conversations unwittingly made the subject of audio recordings without their knowledge." *See Neff*, 265 P.3d at 66 ("[T]he primary concern underlying [section] 165.540(1)(c) was the protection of participants in conversations from being

recorded without their knowledge."). The majority redefines Oregon's interest, reasoning, because the act of recording a conversation is protected speech, Oregon's interest is more accurately stated "as protecting individuals' conversational privacy from the speech of other individuals, even in places open to the public." Slip Op. at 25.

The analogy the majority draws, to case law addressing statutes protecting individuals from the unwanted speech of others, is flawed. *See Cohen v. California*, 403 U.S. 15, 21 (1971); *Hill v. Colorado*, 530 U.S. 703, 717 (2000); *Berger v. City of Seattle*, 569 F.3d 1029, 1054 (9th Cir. 2009) (en banc); *Kuba v. 1-A Agric. Association*, 387 F.3d 850, 861 n.10 (9th Cir. 2004)). The cases the majority cites involve restrictions on speech intended to further different interests, such as preventing the display of profane slogans in a courtroom (*Cohen*); limiting abortion protestors' unwanted approaches toward clinic patients (*Hill*); shielding park-goers from obnoxious behavior by street performers (*Berger*); and protecting commercial patrons from the speech of protesters (*Kuba*). None of the cases cited by the majority address one speaker's appropriation of another person's speech, as Project Veritas proposes to do. Our court gravely missteps by ignoring that this appeal implicates not only the First Amendment rights of the person creating a recording, but also the First Amendment rights of those who do not wish to have their speech recorded.

The majority incorrectly asserts that *Wasden* forecloses my analysis. Slip Op. at 28. *Wasden* concerned a video of cows being abused at an agricultural facility, not a secretly recorded audio conversation between people. *See* 878 F.3d at 1189–90. *Wasden* cannot bear the weight the majority places on it because the video in that case did not require the court to confront a secret audio recording that invaded

conversational privacy and captured the oral communications of other people. The majority is also incorrect to suggest that *Wasden* foreclosed any argument that unannounced recordings that appropriate others' speech place a greater burden on privacy than other types of unwanted expressive conduct. *Wasden* held that the creation of a recording is speech protected by the First Amendment, *see id.* at 1203; it did not purport to address whether the invasion of privacy caused by secret recording of private conversations is equivalent to the invasion of privacy caused by being bombarded with unwanted speech in public places.

B.

The majority agrees that Oregon law governs severability, but it concludes that the dangerous-felony and law-enforcement exceptions cannot be severed from section 165.540(1)(c) for three wobbly reasons. First, the majority decides that even without these exceptions, the statute would be unconstitutional because it fails to leave open ample alternative channels. I disagree with this conclusion for reasons previously explained, and because my colleagues' rationale contravenes our own court's recognition that investigative journalism does not require secret recording devices or hidden cameras. *See Dietemann*, 449 F.2d at 249.

The majority also argues that Oregon law does not permit the two challenged exceptions to be severed because the exceptions themselves are not unconstitutional. The majority misreads Oregon law. In particular, its reliance on *State v. Dilts*, 103 P.3d 95 (Or. 2004) is sorely misplaced. There, a defendant's Sixth Amendment rights were violated when a judge imposed a sentence above the state-law guidelines without providing the defendant an opportunity to argue the facts justifying an increased sentence to the jury.

*Id.* at 99. On appeal, the prosecution asked the court to sever the state-law requirement that the defendant's sentence be within the guidelines even though neither party had challenged the constitutionality of the mandatory guidelines. *Id.* In other words, the prosecution asked the court to sever the requirement not because it rendered the statute unconstitutional, but because it rendered the defendant's sentence unconstitutional. It was only in response to the prosecution's unusual argument that the Oregon Supreme Court explained it would not sever a statute that neither party claimed was unconstitutional. *Id.*

The Oregon Supreme Court makes no bright-line distinction between exceptions that are themselves unconstitutional and exceptions that render the remainder of a statute unconstitutional. For instance, in *Outdoor Media Dimensions*, the Oregon Supreme Court evaluated a multifaceted state statute that regulated highway signs. 132 P.3d at 7. The plaintiffs challenged several of the statute's provisions, including one that required permits for highway signs unrelated to the premises but exempted on-premises signs. *Id.* at 9. The permit requirement and exemption were adopted at the same time. *See* Or. Rev. Stat. §§ 377.725, 377.735 (1971). The court concluded that the on-premises exemption was content based and that it rendered the permitting requirement unconstitutional, but it upheld the rest of the statute. *Outdoor Media Dimensions*, 132 P.3d at 19. Notably, the court did not consider the constitutionality of the exemption—which allowed on-premises signs without a permit—in isolation. Rather, the court concluded that the "on-premises/off-premises distinction" was unconstitutional and that severance of that provision was appropriate. *Id.*; *see also City Univ. v. State, Off. of Educ. Pol'y & Plan.*, 885 P.2d 701, 703, 706–07 (Or. 1994)

(severing an exception that caused an Oregon statute to discriminate against out-of-state schools in violation of the Commerce Clause).

Turning to the remedy, the *Outdoor Media Dimensions* court considered "the same two unpalatable choices that the legislature would face," namely, whether to strike only the exemption from the permitting requirement, and require permits for "thousands of individuals and businesses"; or to instead strike the permitting requirement entirely. 132 P.3d at 19. The court decided the outcome should turn on legislative intent alone, and ultimately invalidated the entire permitting requirement because it concluded that the legislature would not have enacted it without the simultaneously enacted exemption. *Id.* Here, by contrast, I see no viable argument that the Oregon legislature did not intend the dangerous-felony exception and law-enforcement exception to be severable, because section 165.540(1)(c) was operative for decades before these exceptions were added. *See AAPC*, 140 S. Ct. at 2353. The legislature did not direct that the exceptions may not be severed, they are not interconnected, nor is the remaining part of the statute incomplete or inoperable without them. Or. Rev. Stat. § 165.540.

Finally, the majority argues that Oregon courts would invalidate all of section 165.540(1)(c), not just the content-based exceptions, because severing those exceptions would raise other constitutional concerns.[12]   To support this contention, the majority cites *State v. Borowski*, 220 P.3d

---

[12] The majority also relies on the legislative history of the challenged exceptions, taking the unusual step of calling out statements made by the Oregon State Sheriffs' Association and the ACLU to divine legislative intent. Slip Op. at 9–10.

100, 109 (Or. Ct. App. 2009), which considered, among other factors, the legislature's preference to avoid enacting bills that raise serious questions of constitutionality. But *Borowski*, much like *Outdoor Media Dimensions*, concerned an exception enacted simultaneously with the challenged provision. *See id.* at 109; Or. Rev. Stat. § 164.887 (1999). Because the Oregon legislature enacted section 165.540(1)(c) as a stand-alone provision that operated for decades before it adopted either of the challenged exceptions, we are not left to wonder whether the legislature would enact section 165.540 on its own—it did exactly that in 1959. *See State ex rel. Musa v. Minear,* 401 P.2d 36, 39 (Or. 1965) (declaring an amended state statute invalid and reverting to the pre-amendment statute).

Failing to sever the two exceptions makes even less sense when one considers that the majority concedes the First Amendment protects the right to record law-enforcement officers in public and the right to make unannounced recordings during felonies that endanger human life. *See Askins*, 899 F.3d at 1044; *Obsidian Fin. Grp., LLC v. Cox*, 740 F.3d 1284, 1291–92 (9th Cir. 2014); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995).**[13]**

---

[13] Other circuits agree. On recording law-enforcement officers, see, for example, *Glik v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011); *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017); *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017); *Alvarez*, 679 F.3d 583; *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000). Indeed, the First Circuit has held that the First Amendment right to record law enforcement is "clearly established" even for the purposes of qualified immunity. *See Glik*, 655 F.3d at 85 ("[A] citizen's right to film government officials, including law enforcement officers, in the discharge of their duties in a public space is a basic, vital, and well-established liberty safeguarded by the First Amendment."). On recording crimes, see, for instance, *Adventure Outdoors, Inc. v.*

Because the exceptions to section 540(1)(c) permit conduct
protected by the federal constitution, both exceptions could
be struck without changing the speech that is permitted in
Oregon. *Cf. Alvarez*, 679 F.3d at 608 (enjoining Illinois
from enforcing its recording prohibition as applied to open
audio recording of law-enforcement officers engaged in their
official duties in public places). Nevertheless, the majority
concludes that because the Oregon legislature included these
carveouts, Oregon's entire notice requirement must receive
strict scrutiny. The majority's reasoning places the
legislature in a catch-22: the First Amendment requires it to
carve out the two challenged exceptions, but because the
legislature included the carveouts, the majority decides the
entire statute becomes subject to strict scrutiny. We need not
adopt this topsy-turvy approach; we should simply sever the
two challenged exceptions.

C.

Perhaps the weakest link in the majority's opinion is its
conclusion that section 165.540(1)(c) does not leave open
ample alternative channels of communication because it
constitutes an "absolute prohibition on a particular type of
expression," namely "unannounced audiovisual recordings."
Setting aside that the statute does not address video
recording,**14** I disagree that Oregon's ban on unannounced
audio recording eliminates an entire medium of public
expression. The majority cites *Linmark Assocs., Inc. v.*

---

*Bloomberg*, 552 F.3d 1290, 1298 (11th Cir. 2008) (observing that speech
that "alleged violations of federal gun laws" involved a matter of public
concern); *Boule v. Hutton*, 328 F.3d 84, 91 (2d Cir. 2003) (holding that
an article addressing art-market fraud "is certainly protected" under the
First Amendment).

14 *See* Or. Rev. Stat. § 165.535(1).

*Township of Willingboro*, 431 U.S. 85, 93 (1977); *City of Ladue v. Gilleo*, 512 U.S. 43, 56–57 (1994); *McCullen v. Coakley*, 573 U.S. 464, 487–90 (2014); *United Bhd. of Carpenters & Joiners of Am. Loc. 586 v. NLRB*, 540 F.3d 957, 969 (9th Cir. 2008); and *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) in support of its alternative-channels holding, but these cases all miss the mark.

In *Linmark*, the Supreme Court invalidated as content based a township's ban on "For Sale" signs, which it had enacted "to stem what it perceive[d] as the flight of white homeowners from a racially integrated community." 431 U.S. at 86. The Court stressed that the township council was concerned "with the substance of the information communicated" by the signs and that the ban was not "unrelated to the suppression of free expression." *Id.* at 93, 96 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)). *Linmark*'s language cannot be stretched to imply that any alternative that is "less effective" than a speaker's chosen medium is "far from satisfactory." Slip Op. at 35 (quoting *Linmark*, 431 U.S. at 93). Rather, *Linmark* explained that the Court doubted whether the ordinance left open "ample alternative channels for communication" because the alternatives were "less effective," and also because those alternatives "involve[d] more cost and less autonomy than 'For Sale' signs [and] [we]re less likely to reach persons not deliberately seeking sales information." *Linmark*, 431 U.S. at 93 (internal citations omitted). After *Linmark*, the Supreme Court clarified that an alternative need not be a speaker's first or best choice, but is adequate if it "permits the more general dissemination of a message." *Frisby v. Schultz*, 487 U.S. 474, 483 (1988); *see Heffron*, 452 U.S. at 647 ("[T]he First Amendment does not guarantee the right to communicate one's views at all times

and places or in any manner that may be desired."). Project Veritas does not argue that alternatives to surreptitious recording involve more cost, or less autonomy, or otherwise make their message less likely to reach its intended audience. Project Veritas's complaint is that Oregon's statute will impede its ability to gather information.

*City of Ladue* also fails to support Project Veritas's cause. There, the Supreme Court held that a restriction on residential signs did not leave open adequate alternative channels of communication because "[d]isplaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means." 512 U.S. at 56. *City of Ladue* emphasized the long-held tradition of respect for individual liberty in the home and for a person's ability to speak there. *Id.* at 58. Here, by contrast, Project Veritas does not argue that reporting on in-person oral conversations without surreptitiously obtained audio recordings would convey a different message, only that its information gathering would be somewhat less effective, and there is no comparable tradition of respect for surreptitious recording. Indeed, surreptitious recording is generally considered a breach of journalistic ethics except when certain narrow criteria are met.[15]

*McCullen* is even less applicable. There, the Court struck down a statute establishing buffer zones around abortion clinics because the statute was insufficiently tailored. The Court did not even reach "whether the Act

---

[15] *See, e.g.*, Radio Television Digital News Ass'n (RTDNA), *Guidelines for Hidden Cameras*, https://www.rtdna.org/hidden-cameras [https://perma.cc/8MQ3-P8A9].

leaves open ample alternative channels of communication." *McCullen*, 573 U.S. at 496 n.9.

The majority correctly observes that the First Amendment's protections "extend to the 'right to choose a particular means or avenue of speech . . . in lieu of other avenues,'" *United Bhd.*, 540 F.3d at 969 (quoting *Foti*, 146 F.3d at 641), but section 165.540(1)(c) governs how, not whether, Project Veritas can use recording devices. The statute thus permissibly "regulate[s] the *manner* of speech in a content-neutral way," without "infring[ing] on an individual's right to select the *means* of speech." *Foti*, 146 F.3d at 641–42.

The majority and Project Veritas both argue that recordings are unique in their trustworthiness, "self-authenticating character," and ease of distribution, ignoring that surreptitious audio recording is a uniquely effective means for reporters to gather information *precisely* because it is uniquely effective at invading privacy. The very aspects of surreptitious audio recording that render it distinct from other modes of communication, such as its discreetness and its ability to widely disseminate the contents of a conversation, are the same aspects that render it particularly damaging to privacy.[16]

The majority's alternative-channels analysis is particularly concerning because it has no obvious limits. My colleagues suggest that their opinion will be cabined because

---

[16] It is also worth noting that the self-authenticating character of audio recordings is rapidly eroding as modern technology renders "deepfakes" ever more accessible and difficult to distinguish from actual recordings. *See generally* Bobby Chesney & Danielle Citron, *Deep Fakes: A Looming Challenge for Privacy, Democracy, and National Security*, 107 CAL. L. REV. 1753, 1755–68 (2019).

they view section 165.540(1)(c) as an outlier among other states' limitations on recording conversations. But if it is enough to show that newsworthy information could be obtained by a particular method, the majority's rationale might well apply to Oregon's eavesdropping statute, or to narrower conversational privacy statutes adopted in other states. After all, eavesdropping and unannounced recording in non-public locations are also effective methods to gather information of public concern that cannot be otherwise obtained. Though the majority disavows the suggestion that its reasoning could be applied to strike down eavesdropping statutes, it is hard to see why the forty other states that have adopted more limited conversational privacy statutes are not vulnerable in light of today's opinion.

IV.

"[G]enerally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991). In this case, we should simply sever the constitutionally suspect exceptions that Project Veritas challenges, and uphold the remainder of section 165.540(1)(c).

## Appendix A

**States allowing recording without providing notice to or obtaining consent from the recording's subjects when created in a place where the subjects lack a reasonable expectation of privacy:**

Alabama: Ala. Code §§ 13A-11-30, 13A-11-31; *Chandler v. Alabama*, 680 So. 2d 1018, 1026 (Ala. Crim. App. 1996)

Arizona: Ariz. Rev. Stat. Ann. §§ 13-3001(8), 13-3005(A)(2), 13-3012(9); *Arizona v. Hauss*, 688 P.2d 1051, 1056 (Ariz. Ct. App. 1984)

Arkansas: Ark. Code Ann. §§ 5-16-101(a), (b), 5-60-120(a)

California: Cal. Penal Code § 632; *Flanagan v. Flanagan*, 27 Cal. 4th 766, 768 (2002); *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 117–18 (2006)

Colorado: Colo Rev. Stat. Ann. §§ 18-9-301(8), 18-9-304(1)(a)

Connecticut: Conn. Gen. Stat. Ann. § 53a-189a(a)(1); *Connecticut v. Panek*, 177 A.3d 1113, 1126 (Conn. 2018)

Delaware: Del Code Ann. tit. 11, §§ 2401(13), 2402(a)(1), (c)(4)

District of Columbia: D.C. Code §§ 23-541(2), 23-542(a)(1), (b)(3)

Florida: Fla. Stat. §§ 934.02(2), 934.03(1)(a), (2)(d); *McDonough v. Fernandez-Rundle*, 862 F.3d 1314, 1319 (11th Cir. 2017); *Florida v. Inciarrano*, 473 So. 2d 1272, 1275 (Fla. 1985); *Dept. of Ag. & Con. Servs. v. Edwards*, 654 So. 2d 628, 632–33 (Fla. Dist. Ct. App. 1995)

Georgia: Ga. Code Ann. §§ 16-11-60(3), 16-11-62(1), 16-11-66(a); *Suggs v. Georgia*, 854 S.E.2d 674, 680 (Ga. 2021)

Hawaii: Haw. Rev. Stat. §§ 803-41, 803-42(a)(1), (b)(3)(A); *Hawaii v. Graham*, 780 P.2d 1103, 1110 (Haw. 1989)

Idaho: Idaho Code Ann. §§ 18-6701(2), 18-6702(1)(a), (2)(d)

Illinois: 720 Ill. Comp. Stat. Ann. §§ 5/14-2(a)(1), (2), 5/14-1(a), (d), (g)

Iowa: Iowa Code Ann. §§ 727.8(2), (3)(a), 808B.1(8), 808B.2(1)(a), (2)(c)

Kansas: Kan. Stat. Ann. § 21-6101(a)(4), (f)

Louisiana: La. Stat. Ann. §§ 15:1302(15), 15:1303(A)(1), (C)(4); *Marceaux v. Lafayette City-Par. Consol. Gov't*, 731 F.3d 488, 495 & n.5 (5th Cir. 2013)

Maine: 15 Me. Rev. Stat. §§ 709(4), (5), 710(1)

Maryland: Md. Code Ann., Cts. & Jud. Proc. §§ 10-401(13), 10-402(a)(1), (c)(3); *Agnew v. Maryland*, 197 A.3d 27, 34–35 (Md. 2018)

Michigan: Mich. Comp. Laws §§ 750.539a, 750.539c, 750.539d(1), *Bowens v. Ary, Inc.*, 794 N.W.2d 842, 843–44 (Mich. 2011); *Kasper v. Rupprecht*, No. 312919, 2014 WL 265542, at *2 (Mich. Ct. App. Jan. 23, 2014) (per curiam); *Lewis v. LeGrow*, 670 N.W.2d 675, 684 (Mich. Ct. App. 2003); *Sullivan v. Gray*, 324 N.W.2d 58, 60–61 (Mich. Ct. App. 1982) (per curiam)

Minnesota: Minn. Stat. §§ 626A.01, 626A.02; *Minnesota v. Vaughn*, 361 N.W. 2d 54, 57–58 (Minn. 1985)

Mississippi: Miss. Code Ann. §§ 41-29-501(j), 41-29-531(e), 41-29-533(1); *Jackson v. Mississippi*, 263 So. 3d 1003, 1011 (Miss. Ct. App. 2018); *Ott v. Mississippi*, 722 So. 2d 576, 582 (Miss. 1998)

Nebraska: Neb. Rev. Stat. Ann. §§ 86-283, 86-290(1)(a), (2)(c); *Nebraska v. Biernacki*, 465 N.W.2d 732, 735 (Neb. 1991)

Nevada: Nev. Rev. Stat. Ann. § 200.650; *Lane v. Allstate Ins. Co.*, 969 P.2d 938, 940 (Nev. 1998)

New Hampshire: N.H. Rev. Stat. Ann. §§ 570-A:1(II), 570-A:2(I)(a); *Fischer v. Hooper*, 732 A.2d 396, 401 (N.H. 1999); *New Hampshire v. Lamontagne*, 618 A.2d 849, 851 (N.H. 1992)

New Jersey: N.J. Stat. Ann. §§ 2A:156A-2(b), 2A:156A-3(a), 2A:156A-4(d)

North Carolina: N.C. Gen. Stat. Ann. §§ 15A-286(17), 15A-287(a)(1)

North Dakota: N.D. Cent. Code Ann. §§ 12.1-15-02(1)(a), (3)(c), 12.1-15-04(5)

Ohio: Ohio Rev. Code Ann. §§ 2933.51(B), 2933.52(A)(1), (B)(4); *Ohio v. Childs*, 728 N.E.2d 379, 388 (Ohio 2000)

Oklahoma: Okla. Stat. Ann. tit. 13, §§ 176.2(12), 176.3(1), (2), 176.4(5); *K.F. v. Oklahoma*, 797 P.2d 1006, 1007 (Okla. Crim. App. 1990)

Pennsylvania: 18 Pa. Cons. Stat. Ann. §§ 5702, 5703(1), 5704(4); *Pennsylvania v. Mason*, 247 A.3d 1070, 1081 (Pa. 2021)

Rhode Island: R.I. Gen. Laws Ann. §§ 11-35-21(a)(1), (c)(3), 12-5.1-1(10)

South Carolina: S.C. Code Ann. §§ 17-30-10, 17-30-15(2), 17-30-20(1), 17-30-30(C)

South Dakota: S.D. Codified Laws §§ 23A-35A-1(6), (10), 23A-35A-20(1), (2); *South Dakota v. Owens*, 643 N.W.2d

735, 753 (S.D. 2002); *South Dakota v. Braddock*, 452 N.W.2d 785, 788 (S.D. 1990)

Tennessee: Tenn. Code Ann. §§ 39-13-601(a)(1)(A), (b)(5), 40-6-303(14)

Texas: Tex. Penal Code Ann. § 16.02(b)(1), (c)(4); Tex. Code Crim. Proc. Ann. art. 18A.001(19)

Utah: Utah Code Ann. §§ 77-23a-3(13), 77-23a-4(1)(b)(i), (7)(b)

Virginia: Va. Code Ann. §§ 19.2-61, 19.2-62(A)(1), (B)(2)

Washington: Wash. Rev. Code Ann. § 9.73.030(1)(b); *Washington v. Roden*, 321 P.3d 1183, 1188 (Wash. 2014) (en banc); *Washington v. Kipp*, 317 P.3d 1029, 1034 (Wash. 2014) (en banc)

West Virginia: W. Va. Code §§ 62-1D-2(i), 62-1D-3(a)(1), (e); *West Virginia v. Mullens*, 650 S.E.2d 169, 187 (W. Va. 2007)

Wisconsin: Wis. Stat. Ann. §§ 968.27(12), 968.31(1)(a), (2)(c)

Wyoming: Wyo. Stat. Ann. §§ 7-3-701(xi), 7-3-702(a)(i), (b)(iv)

**States prohibiting recording without providing notice to or obtaining consent from the recording's subjects when created in a place where the subjects lack a reasonable expectation of privacy:**

Alaska: Alaska Stat. Ann. §§ 42.20.390(9), 42.20.310(a)(1)

Kentucky: Ky. Rev. Stat. Ann. §§ 526.010, 526.020

Massachusetts: Mass. Gen. Laws Ann. ch. 272, § 99(B)(2), (4), (C)(1); C*urtatone v. Barstool Sports, Inc.*, 169 N.E.3d 480, 483 (Mass. 2021)

Montana: Mont. Code Ann. § 45-8-213(1)(c); *Montana v. DuBray*, 77 P.3d 247, 263 (Mont. 2003); *Montana v. Lynch*, 969 P.2d 920, 922 (Mont. 1998)

Oregon: Or. Rev. Stat. § 165.540(1)(c)

**States without laws regarding the recording of in-person conversations:**

Indiana, Missouri, New Mexico, New York, Vermont